## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

**DOCKETED**

JAN 1 5 2003

FILED-ED4

03 JAN 14  PM 4: 34

CLERK
U.S. DISTRICT COURT

DIANE L. KLIPFEL and
MICHAEL V. CASALI,

        Plaintiffs,

        v

ROBERT RUBIN, Secretary, United
States Department of the Treasury;
JOSEPH MIEDZIANOWSKI; and,
THE CITY OF CHICAGO, a municipal
corporation,

        Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

No. 94 C 6415
Honorable Blanche M. Manning

### NOTICE OF FILING

**PLEASE TAKE NOTICE** that on January 14, 2003, I caused to be filed with the United

States District Court, Northern District of Illinois, 219 South Dearborn, Chicago, Illinois,

the attached **Fourth Amended Complaint.**

Dated: January 14, 2003

Respectfully Submitted,

**DIANE L. KLIPFEL AND MICHAEL
CASALI**

By: _Sally S._____
    One of Plaintiffs' Attorneys

Sally H. Saltzberg
P. Michael Loftus
Loftus & Saltzberg, P.C.
53 West Jackson Boulevard
Suite 1420
Chicago, IL 60604
(312) 913-2000

168

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

FILED·ED4
03 JAN 14 PM 4:34
DOCKETED U.S. DISTRICT
JAN 1 5 2003 CLERK
COURT

|  |  |  |
|---|---|---|
| DIANE L. KLIPFEL and<br>MICHAEL V. CASALI, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v | ) | No. 94 C 6415 |
| | ) | Honorable Blanche M. Manning |
| ROBERT RUBIN, Secretary, United<br>States Department of the Treasury;<br>JOSEPH MIEDZIANOWSKI; and,<br>THE CITY OF CHICAGO, a municipal<br>corporation, | )<br>)<br>)<br>)<br>) | |
| | ) | |
| Defendants. | ) | |

## FOURTH AMENDED COMPLAINT

NOW COME the plaintiffs, DIANE L. KLIPFEL and MICHAEL V. CASALI, by and

through their attorneys, GENSON & GILLESPIE and LOFTUS & SALTZBERG, P.C., and for

their Fourth Amended Complaint against the defendants ROBERT RUBIN, Secretary, United

States Department of the Treasury (or the current Secretary); JOSEPH MIEDZIANOWSKI; and

the CITY OF CHICAGO, a municipal corporation, state as follows:

## JURISDICTION AND VENUE

1.      Jurisdiction is invoked pursuant to the First and Fourteenth Amendment to the

Constitution of the United States, Title 42, U.S.C. Sections 1983 and 2000e. Supplemental

jurisdiction arises pursuant to 28 U.S.C. Sections 1331 and 1343(a).

2.      Venue is proper in as much as certain of the defendants reside or are located in the

Northern District of Illinois and the plaintiffs reside in the Northern District of Illinois, and

168

virtually all of the acts and damages complained of herein occurred in the Northern District of Illinois.

## PARTIES

3.      Plaintiff DIANE L. KLIPFEL (hereinafter referred to as "Klipfel" or "plaintiff Klipfel") is a citizen of the United States and a resident of the State of Illinois.  She was, at all relevant times, a Group Supervisor employed by the Bureau of Alcohol, Tobacco and Firearms, a branch of the United States Department of the Treasury.

4.      Plaintiff MICHAEL V. CASALI (hereinafter referred to as "Casali" or "plaintiff Casali") is a citizen of the United States and a resident of the State of Illinois.  He was, at all relevant times, a Group Supervisor employed by the Bureau of Alcohol, Tobacco and Firearms, a branch of the United States Department of the Treasury.  Plaintiff Casali is currently a Special Agent employed by the Bureau of Alcohol, Tobacco and Firearms.  Plaintiff Casali and plaintiff Klipfel are husband and wife.

5.      BUREAU OF ALCOHOL, TOBACCO AND FIREARMS is a branch of the United States Department of Treasury (hereinafter referred to as "ATF"), which is an Agency of the United States, which Agency's primary office is in Washington, D.C.; the United States Department of Treasury is an Agency within the meaning of Title VII of the Civil Rights Act of 1964, as amended (42 USC Section 2000e, *et. seq.*), and more particularly within the meaning of Section 2000e–16(a) of said Act. The ATF is not a defendant in this action and is included herein for identification purposes.

6.      Defendant ROBERT RUBIN (or current replacement) is the Secretary of the

United States Department of Treasury.

7. Defendant JOSEPH MIEDZIANOWSKI (hereinafter referred to as "Miedzianowski" or "CPD Officer Miedzianowski"), was, at all relevant times, employed by the City of Chicago as a sworn police officer. On April 23, 2001, Officer Miedzianowski was found guilty of federal violations of RICO (wherein the Chicago Police Department was the enterprise), narcotics conspiracy, narcotics delivery and firearms violations dating back at least until 1985, U.S. v. Miedzianowski, *et al.*, 98 CR 923.

8. Defendant CITY OF CHICAGO is a municipal corporation of the State of Illinois and is and was, at all relevant times, the employer of Officer Miedzianowski (hereinafter "CPD").

## CASALI AND KLIPFEL'S HISTORY WITH ATF

9. Plaintiff Casali is a current employee of the ATF employed as a special agent assigned to the Chicago, Illinois Field Division Office. As a federal criminal ATF investigator, his duties included detection, investigation and arrest of suspects who committed firearms, explosives, narcotics and other related criminal violations.

10. Plaintiff Klipfel is a former employee of the ATF now on retirement disability. Formerly, plaintiff Klipfel was a supervisory special agent assigned to the Chicago Field Division. As a federal criminal ATF investigator, her duties included detection, investigation and arrest of suspects who committed firearms, explosives, narcotics and other related criminal violations.

11. On or about October 23, 1976, Klipfel was hired as a Special Agent, Criminal

3

Investigator, by the ATF. On or about February 28, 1990, she became Group Supervisor of ATF Chicago Group III, and held that position until July 1, 1992, when she became Group Supervisor of ATF Oak Brook Group I. Since joining ATF, Klipfel was rated "fully successful" or higher in each of her performance evaluations. At all relevant times, Agent Klipfel reported to Assistant Special Agent in Charge ("ASAC") Jimmie Adamcik or ASAC Tom Lambert and Special Agent in Charge ("SAC") Joe Vince.

12.     On or about May 24, 1976, Casali was hired as a Special Agent, Criminal Investigator, by the ATF. On or about May 5, 1991, he became Group Supervisor of ATF Chicago Metro Group II and Group VI, where he remained until 1997. In 1997, Casali became ATF Firearms Instructor Coordinator for the Chicago Field Division and has held that position ever since. Since joining ATF, Casali has been rated "fully successful" or higher in each of his performance evaluations. At all relevant times, Agent Casali reported to Assistant Special Agent in Charge ("ASAC") Jimmie Adamcik and Special Agent in Charge ("SAC") Joe Vince.

13.     At all times prior to February 1, 1992, Klipfel enjoyed a reputation as a competent, professional, honest, truthful and capable agent and supervisor of ATF.

14.     At all times prior to February 1, 1992, Casali enjoyed a reputation as a competent, professional, honest, truthful and capable agent and supervisor of ATF.

15.     At no time prior to February 1, 1992, had any complaints been made to ATF Internal Affairs ("IA") regarding plaintiff Klipfel. At no time prior to February 1, 1992 had plaintiff Casali had any complaints sustained against him by ATF–IA. To the best of plaintiffs' knowledge, at no time prior to February 1, 1992, had ASAC Adamcik, SAC Vince nor any other

4

supervisor of Klipfel or Casali ever questioned either Klipfel's or Casali's ability or integrity as ATF agents and supervisors.

16.     Prior to February 1, 1992, neither Klipfel nor Casali had ever had any disciplinary action imposed upon either of them by ATF. At all times relevant hereto, SAC Vince was Special Agent In Charge of the Chicago Division Office and was the highest ranking supervisor of Klipfel and Casali in the Chicago Division Office.

## FACTUAL BACKGROUND PERTINENT TO ALL COUNTS

17.     On or about February 28, 1990, Klipfel reported to Chicago Metro III group of the ATF as the Group Supervisor. As such, Group Supervisor Klipfel proposed the formation of a task force specifically targeting Latin street gangs in Chicago, Illinois (the "Task Force"). In March, 1990, SA John Gamboa was assigned as the Latin Gang coordinator to oversee the investigation and to supervise the officers. CPD Officer Miedzianowski and CPD Officer Galligan ("Galligan" or "CPD Officer Galligan") were also assigned to the Task Force.

18.     In December, 1991, Gamboa was promoted to supervisor of the Chicago VII Group of ATF.

19.     On several occasions after formation of the Task Force, Gamboa stated that he had a special relationship with SAC Hoggatt, Hoggatt's successor SAC Vince and ASAC Adamcik and, that as a result of that relationship, he could cause harm to anyone's career.

## THE KLIPFEL DISCLOSURES

20.     During February, 1992, plaintiff Klipfel was the Group Supervisor of the ATF Chicago III group.

5

21.     On or about February 20, 1992, Klipfel, together with one ATF special agent (SA), one Chicago Police Department officer assigned to the ATF Chicago III group, and officers from the CPD Organized Crime Narcotics Unit, executed a search warrant on the home of Darrin Pippin in the Northern District of Illinois.

22.     On or about February 21, 1992, Klipfel reported to ASAC Jimmie Adamcik (Klipfel's immediate supervisor), in a telephone conversation, the following information regarding police corruption that Klipfel observed on the previous date in connection with the execution of several search warrants:

a)     On or about February 19, 1992, SA Laurie Jolley informed Klipfel that she was obtaining two search warrants; one for Darrin Pippin's (hereinafter referred to as "Pippin") residence located at 4533 North Drake, Chicago, Illinois, and the other for the residence of Pippin's mother, Frances Sanchez, located at 5028 North Kimball, Chicago, Illinois. Pippin was wanted for having failed to appear on the date that he was to begin serving a six-year narcotics related sentence. The warrants were to be served the next day on February 20, 1992. The group serving the warrants consisted of Klipfel, SA Jolley, Miedzianowski, Byrne and CPD officers Smith and Lasch. During the execution of the search warrant at Pippin's residence, Miedzianowski found a key on Pippin for a safety deposit box at Albany Park Bank located at 3400 W. Lawrence Ave., Chicago, Illinois. While Klipfel and Pippin were at the ATF office, Byrne and Miedzianowski apparently obtained a search warrant for the safe deposit box and searched it. Later that day, while still in ATF custody, Pippin stated to Klipfel that CPD Officer Byrne and CPD Officer Miedzianowski had stolen thousands of dollars and other property while serving these warrants.

b)     When confronted about this by Klipfel, who demanded that all the money and other property be inventoried as assets, CPD Officer Miedzianowski screamed at her, threatening Klipfel, her husband and their children, and Miedzianowski refused to inventory the money. Miedzianowski, in the company of CPD Officer Byrne and SA Laurie Jolley, kicked the door of Klipfel's automobile and screamed:

"Bitch, you're stupid. There are four of us here who will say you stole the money and stole off every search warrant you've ever been on. Four against one. Your husband and you both work in

6

> the City. Remember that, always remember that. And you better watch your darling kids. Your house could get lit up. That bastard (pointing to Pippin) will never back you up after he gets his ass poked in jail, and 'she' (SA Jolley) will back us on everything. She'll be our witness. Nothing happened, but the only thing that will happen is you'll get fired. Gamboa's going to hear about this. Adamcik will back us all the way and your ass will be out in the street. We own fucking Adamcik."

Klipfel immediately requested of ASAC Adamcik that CPD Officers Miedzianowski and Galligan, who were detailed to ATF, be sent back to their parent unit in the CPD.

23.     Beginning on or about February 21, 1992, Klipfel reported to ASAC Adamcik information regarding subsequent acts of corruption committed by certain CPD officers including, but not limited to CPD Officer Miedzianowski.

24.     Contrary to established ATF policy, ASAC Adamcik did not immediately report this matter to ATF Internal Affairs, CPD Internal Affairs ("CPD IA"), or the Federal Bureau of Investigations ("FBI"). ASAC Adamcik also did not cause his superior, SAC Vince, to report these matters. Instead, ASAC Adamcik secretly called the commanding officer of the CPD officers in question and leaked Klipfel's accusations.

25.     On or about March 18, 1992, Klipfel again reported to SAC Vince and ASAC Adamcik the same information she had reported on February 21, 1992, regarding the allegations of police corruption. Klipfel also reported to SAC Vince and ASAC Adamcik that CPD Officer Miedzianowski had threatened to kill Klipfel, Casali and their children.

26.     On or about April 29, 1992, Klipfel reported to ASAC Thomas Lambert that an associate of SAC Vince and ASAC Adamcik was under federal indictment for theft from an armored car. She reported that this person was alleged to have a connection to the organized

crime syndicate through his father and that his reputation as a disreputable person was known to other agents in the Chicago Field Division. ATF regulations required Klipfel to make these disclosures.

27.     As more fully set out below, as required by ATF regulations, on or about October 20, 1992, Klipfel reported to ATF Internal Affairs, her knowledge of sexual harassment in ATF management. Specifically, Klipfel reported sexual harassment allegations by Sandra Hernandez against her supervisor, John Gamboa, and the corruption prevalent in the Chicago ATF management that delayed Hernandez from reporting the harassment. ASAC Adamcik and SAC Vince discovered the details of this disclosure through an internal affairs report forwarded to Vince and Adamcik.

28.     On or about October 29, 1992, Klipfel reported to the United States Department of Treasury Office of Inspector General (the "OIG") her knowledge of the involvement of SAC Vince, ASAC Adamcik and others in diverting ATF car repair business to specific contract vendors who subsequently gave Vince and Adamcik gratuities in return. Klipfel also reported, as required by ATF regulations, that SAC Vince and ASAC Adamcik were consorting with a known criminal and were accepting gifts and favors from the CPD officers assigned to ATF who were alleged to be involved in illegal dealings with Chicago street gangs.

29.     On or about January 16, 1993, Klipfel reported to ATF-IA SA Hemsath, the allegations of police corruption regarding CPD Officers Joe Miedzianowski and John Galligan who were assigned to ATF.

30.     As required by ATF regulations, on or about January 21 and 22, 1993, Klipfel

provided ATF IA with extensive information regarding the corruption of Meidzianowski and other CPD police officers assigned to ATF and reported SAC Vince and ASAC Adamcik's failure to report it or to take any appropriate action.

31.    On or about February 23, 1993, Klipfel reported corruption and misconduct in ATF to a General Accounting Office Investigator.

32.  In or about July, 1993, Klipfel testified as an agency witness against GS Gamboa at his Merit Systems Protection Board hearing

33.    On or about September 22, 1993, Klipfel reported to a representative of the United States Attorneys Office, information she had received that CPD Officer Miedzianowski had coerced an ATF confidential informant into making false allegations to ATF IA and CPD IAD about Agent Klipfel in order to deflect a CPD IAD investigation of Miedzianowski.  According to the informant, Miedzianowski fabricated false allegations against Klipfel that the informant then reported to CPD IAD and ATF IA.  Officer Miedzianowski told the informant that Agent Klipfel was "messing everything up" and that if Agent Klipfel was not silenced, Officer Miedzianowski's criminal conduct would become public.  The informant believed that Officer Miedzianowski would kill the informant if the informant refused to file a false report against Agent Klipfel.  Subsequent to Agent Klipfel's disclosures, plaintiffs learned that Officer Miedzianowski drove the informant to CPD IAD, sat next to the informant during his IAD interview and actually participated in the IAD interview.  The informant gave the same false statement regarding Agent Klipfel to ATF IA.

9

## THE CASALI DISCLOSURES

34.     During April, 1992, plaintiff Casali was the group supervisor of the ATF Chicago II group.  During that time, Group II was involved in an undercover investigation into firearms and narcotics trafficking offenses being committed by the Latin Lovers Street Gang in Chicago, IL.  During the investigation, Casali learned from an informant that Miedzianowski was involved in supplying the gang with firearms and narcotics stolen from search warrants and in covering up a murder.

35.     As required, on or about June 1, 1992, Casali reported to SAC Vince the information Casali learned regarding the illegal acts committed by Miedzianowski who was still assigned to ATF.

36.     On or about June 1, 1992, SAC Vince ordered Casali not to contact any outside agencies regarding his disclosure of police corruption and SAC Vince took no further action on this information during the following three weeks.

37.     On or about June 22, 1992, Casali again reported to SAC Vince and ASAC Adamcik the criminal allegations of narcotics and firearms violations being committed by Miedzianowski and other CPD officers assigned to ATF, including the cover-up of a narcotics related murder.

38.     On or about June 22, 1992, SAC Vince and ASAC Adamcik asked Casali to identify any others who knew of these allegations and ordered Casali not to contact ATF IA nor the FBI, the authorities that had primary jurisdiction to investigate his allegations of police corruption.

39.     On June 24, 1992 a meeting was held at Chicago Police Department Gang Crimes North Unit between SAC Vince, ASAC Adamcik, Sergeant Donald Korte (Miedzianowski's and Galligan's immediate supervisor), CPD Officer Miedzianowski and CPD Officer Galligan to discuss the continuing problems resulting from the Klipfel and Casali disclosures.

40.     On or about June 26, 1992, Casali reported to a representative of the United States Attorney's Office, Chicago, Illinois, the information regarding the conduct of CPD Officer Miedzianowski.

41.     On or about July 6, 1992, Casali provided SAC Vince, ASAC Adamcik and a representative of the United States Attorney's Office with a taped, undercover telephone conversation with a suspect who identified a CPD officer as a source of supply for guns and silencers. The suspect's tapes and earlier admissions implicated Officer Miedzianowski. As a result, the representative of the United States Attorney's Office immediately ordered ASAC Adamcik to end Officer Miedzianowski's involvement with ATF.

42.     SAC Vince and ASAC Adamcik allowed the CPD officers to remain in their assignment to ATF for another six months. Finally, on or about January 8, 1993, a directive from ATF Headquarters, Washington, D.C., mandated the termination of the detail of CPD Officer Miedzianowski and CPD Officer Galligan to the ATF Chicago III group as a direct result of the Casali and Klipfel disclosures.

43.     SAC Vince and ASAC Adamcik did not refer this matter to ATF IA or their immediate supervisors in a timely manner, as required by ATF regulations. ATF IA was not notified by SAC Vince or ASAC Adamcik until November 12, 1992; almost 9 months from the

date of the first disclosure by Klipfel.

44.     On or about January 22, 1993, Casali reported to ATF IA his knowledge of police corruption and the corruption of ATF managers.

45.     On or about November 29, 1993, Casali met with an agent from the Department of the Treasury's Office of Inspector General, ("OIG"), an oversight agency, and reported all of the aforesaid violations and misconduct on the part of SAC Vince, ASAC Adamcik and the CPD officers.

46.     On or about December 19, 1994, Casali provided OIG with a note containing ASAC Adamcik's handwriting that reflected ASAC Adamcik's involvement with an indicted felon.

### PLAINTIFFS' ASSISTANCE TO SANDRA HERNANDEZ

47.     Sandra I. Hernandez, at all relevant times, was a Special Agent with ATF and was assigned to the Chicago Division Office.

48.     Beginning in or about June,1990, and continuing until in or about November, 1992, Sandra Hernandez was subjected to continuous sexual harassment perpetrated by GS Gamboa.

49.     On or about October 20, 1992, Klipfel gave a statement and sworn affidavit to ATF IA corroborating Sandra Hernandez' allegations and detailing her knowledge of the sexual harassment of Sandra Hernandez by GS Gamboa.

50.     On November 6, 1992, defendant Miedzianowski and his supervisor, Sgt. Korte, complained to SAC Vince that the sexual harassment allegations against GS Gamboa were a

vicious attack orchestrated by plaintiff Klipfel.

51. On November 10, 1992, SA Hernandez passed an ATF administered polygraph exam concerning her allegations of sexual harassment against GS Gamboa. On November 12, 1992, GS Gamboa was relieved of his gun and badge, pending completion of the sexual harassment investigation.

52. The following day, on November 13, 1992, SAC Vince knowingly made a false allegation against plaintiff Klipfel.

53. Throughout the EEO process, Sandra Hernandez feared physical retaliation from GS Gamboa's friend Joe Miedzianowski. As a result, Hernandez did not disclose her true home address to ATF, instead using the building address of her babysitter. On December 18, 1992, there was a break-in at the false address Sandra Hernandez had given to ATF as her home address. At his deposition in a related matter, James Kalkman, from ATF Internal Affairs, testified that in January 1993 he interviewed an eye-witness to the break-in. The witness identified one of the perpetrators as Miedzianowski. Kalkman testified, under oath, that the same witness was approached by Chicago Police Department Internal Affairs officers who used intimidation to try to get the witness to recant her identification.

54. From October, 1992 and continuing through January, 1993, plaintiffs gave counsel and advice to Sandra Hernandez and voiced to management and others their opposition to the sexual harassment by GS Gamboa and to the manner in which ATF management was handling Sandra Hernandez's complaint of sexual harassment.

55. As a result of plaintiffs' assistance to SA Hernandez, SAC Vince, ASAC Adamcik

13

and other agents acting for and on behalf of SAC Vince and ASAC Adamcik, spread rumors that Klipfel and SA Hernandez were homosexual lovers and that they had manufactured the sexual harassment claim in order to punish GS Gamboa for bringing charges against plaintiffs. At the time those rumors were spread, all of the perpetrators knew that they were totally false.

56.     As a result of the Hernandez allegations, OIG conducted a special inquiry into systemic problems of sexual harassment at ATF including SA Hernandez' allegations against GS Gamboa and allegations of ATF retaliation against witnesses of the harassment against Hernandez. On or about October 29, 1992, Klipfel gave a statement to an OIG special agent concerning the sexual harassment of Sandra Hernandez occurring in the Chicago office of ATF.

57.     On or about November 25, 1992, ATF Internal Affairs issued a final report regarding Sandra Hernandez' charges of discrimination against SA Gamboa. That report contained Klipfel's sworn affidavit and was seen by ASAC Adamcik and SAC Vince.

58.     As a direct result of Casali and Klipfel's assistance to SA Sandra Hernandez, and plaintiffs' participation in the protected activity as aforesaid, defendants embarked upon an intentional and malicious campaign of rumors, retaliation and harassment against both plaintiffs.

59.     On or about January 5, 1993, SAC Vince personally sought to have ATF IA investigate the same allegation that he had already made to the OIG and that had been found to be without merit. SAC Vince made his allegation to ATF IA just days after SA Gamboa was served with a Notice of Proposed Removal for sexual harassment violations.

60.     On January 8, 1993, ASAC Adamcik gave false and uncorroborated information to ATF in order to denigrate plaintiffs' competency and integrity and to institute additional

14

investigations with plaintiffs as the target.

61.     SAC Vince and ASAC Adamcik refused to take any action to stop the spread of vicious and untrue rumors about the plaintiffs and SA Hernandez despite several requests to do so beginning on or about September 22, 1992.

62.     On or about July 1993, both plaintiffs received their annual performance evaluations which covered the time period from July 1992 to July 1993 and both evaluations were downgraded without cause, adversely effecting their financial bonuses, future promotions and grade advancement opportunities.

63.     On or about March, 1994, ATF Group Supervisor John Ruggero physically threatened a prospective witness, prior to his testimony in Klipfel's EEOC hearing. This witness had previously furnished a statement that supported Agent Klipfel. In or about March, 1994, Klipfel reported Ruggero's threats to a representative of ATF. On information and belief, ATF took no action to curtail Ruggero's witness intimidation.

64.     On or about May 3, 1994, OIG issued a final report regarding Hernandez' charges of discrimination against SA Gamboa and ATF retaliation against those who supported Hernandez. OIG independently investigated each personnel charge ATF employees brought against plaintiffs Casali and Klipfel after their assistance to Hernandez and found, in part:

   a)     The apparent reason for these retaliatory actions against Sandra Hernandez's supporters is to harm their credibility, thereby diminishing the validity of their statements made in support of the allegation of sexual harassment of Sandra Hernandez by John Gamboa, which in turn would increase his chances of keeping his job. (pp. 00303)

15

b)      There is a pattern of possible retaliation against Diane Klipfel for her support of Sandra Hernandez.  Since John Gamboa was investigated for alleged sexual harassment of Sandra Hernandez, three IA Reports of Incident have been filed on Sandra's primary witness, Diane Klipfel... In two of the three incident reports to IA, the information was furnished by people [ASAC Adamcik and Miedzianowski] that had supported Gamboa in the investigation.  (OIG pp. 00307 and 00308)

c)      The timing of anonymous Report of Incident [against plaintiff Casali], after GS Casali's support of Sandra Hernandez can be seen as an attempt to discredit or intimidate SA Casali for his support of Sandra Hernandez. (pp. 00331)

d)      In our opinion there are indications of retaliation against GS Casali resulting from his and his wife's support of Sandra Hernandez.  (pp. 00332)

e)      Diane Klipfel is the apparent primary target in the retaliation against those supporting Sandra Hernandez. (pp.  00424).

f)      There is no documentation in the investigation file to support the preliminary contacts made in this case. (pp. 00465)

65.    On April 25, 1994, ATF responded to the OIG findings regarding plaintiffs' assistance to Hernandez and did not dispute OIG's factual findings.  OIG's findings remain unrefuted today.

66.    In fact, Curtis Cooper, the former Regional Inspector for ATF Internal Affairs, testified, under oath, that he specifically agreed with OIG's findings regarding retaliation against Casali and Klipfel for their assistance to Hernandez in the EEO process. He stated: "Question: have you found that in fact the office of Internal Affairs is used to harass and intimidate or has been in the past, those who get involved in the EEO process?  Answer:  In my opinion, yes."

16

(Testimony of Curtis Cooper, p. 134, *Comer v. Rubin,* Civ. Action No. 1:92 CV 2746, No. Dist of Ohio, ED).

67.     In OIG's Report regarding plaintiffs' assistance to Sandra Hernandez and the rash of personnel complaints filed against plaintiffs immediately after their assistance to Hernandez, OIG concluded:

> The most apparent reason for reporting these incidents is to harm the credibility of the witnesses [plaintiffs], thereby diminishing the validity of the statements they made in support of the allegations of sexual harassment. It could also be concluded that the atmosphere in this BATF field division was conducive to a get-even type of behavior. People would not engage in this type of behavior unless they believed that it would be tolerated and could possibly work.

OIG Report, p. 26.

68.     As a result of Casali and Klipfel's assitance to SA Sandra Hernandez, plaintiffs suffered damages including physical threats, intimidation, harassment, ridicule, spurious disciplinary investigations, lowered performance evaluations, irreparable damage to their professional and personal reputations and extreme mental anguish.

## CONSTITUTIONAL VIOLATIONS BY THE CITY OF CHICAGO THROUGH MIEDZIANOWSKI AND HIS SUPPORTERS AT ATF

69.     Miedzianowski had the ability to influence, direct and control the actions of ASAC Adamcik, SAC Vince and other ATF agents. Some acts of reprisal by ATF were conducted in support of Joe Miedzianowski and the City of Chicago.

70.     CPD Officer Miedzianowski repeatedly falsely told agents that it was Klipfel who stole the property from Pippin while executing a search warrant and that she had stolen before while executing search warrants. In addition, CPD Officers Miedzianowski and Galligan

frequently falsely told ATF Agents Marianos, Littman, Jolley and other agents that Klipfel turned them into ATF internal affairs.

71.    Between March 23, 1992 and May 1, 1992, Klipfel received numerous harassing telephone calls on her ATF pager.

72.    On March 24, 1992, Klipfel was berated by SAC Vince and ASAC Adamcik regarding her complaint against the CPD officers and was told by Vince that Lieutenant Eugene Karczewski of the CPD, who was CPD Officer Byrne's supervisor in the CPD Organized Crime Unit, was coming out to lodge a complaint against Klipfel about the way that she had treated CPD Officers Byrne and Miedzianowski. SAC Vince was highly agitated as a result and stated that Klipfel was "ruining his political agenda with the Chicago Police Department."

73.    On three different occasions in November and December, 1992 SA James Grady (a cousin of Galligan) told Klipfel that he would not enter her office since he was afraid of being accidentally shot by CPD Officer Miedzianowski when he fired through the window to kill her.

74.    On November 6, 1992, CPD Officer Miedzianowski, CPD Sgt. Korte and SAC Vince met at the ATF Oak Brook office to discuss Klipfel. After that meeting, ATF Operations Officer Christopher Pelletiere stated that "some group supervisor was going to get theirs today."

75.    On November 9, 1992, a black plastic rat was left on Klipfel's desk . The rat was on top of a white piece of paper with the typewritten name "Klipfel".

76.    On November 9, 1992, CPD Officer Byrne visited Darrin Pippen's attorney Daniel Coyne and told Coyne that it was Klipfel that had stolen Pippin's money and vehicle on the search warrant executed on February 20, 1992.

77.     On November 15, 1992, plaintiffs learned that Miedzianowski and Galligan had been making derogatory statements about them since March, 1992 and attempting to persuade agents to give false statements about them. Miedzianowski and Galligan told the agents that Klipfel was turning in ATF agents to Internal Affairs and that they should help Miedzianowski and Galligan to destroy her. They repeatedly stated that Klipfel, not they, was the one that had stolen on the warrants and that she had stolen before.

78.     On November 16, 1992, SA Mark Bartholomew stated that Klipfel was the "Anti-Christ" of the Chicago ATF because of the information that Miedzianowski and Galligan were disseminating about her and expressed concern that she would no longer be able to function as an ATF agent because of her destroyed reputation.

79.     On January 11, 1993, ASAC Adamcik told Acting Supervisor Ralph Rider that two agents were coming forward to give "highly damaging statements" concerning Klipfel and requested whether he knew of anyone else that would give a statement against her.

80.     On January 15, 1993 CPD Officer Byrne visited Darrin Pippin at the Robinson Correctional Facility and Byrne stated that Klipfel is a "crazy bitch" and that they had talked to her boss on numerous occasions and had gotten her transferred, suspended, demoted and that although she did not know it yet, that she was going to be transferred soon to ATF headquarters as punishment.

81.     On February 5, 1993, plaintiffs learned that Miedzianowski repeatedly told other CPD gang crimes officers not to work with ATF, and especially not to work with Diane Klipfel because she was a rat and may be wearing a wire.

19

82.     On February 11, 1993, Carol Marin, a Chicago television reporter, contacted Klipfel and told Klipfel that she had received information that Klipfel was a "crazy neurotic bitch, a racist" and that Marin had received an anonymous ATF report on the Darrin Pippin warrant.

83.     On February 18, 1993, SA John Rotunno and SA Richard Marianos were interviewed at the Chicago Police Department Office of Internal Affairs and asked whether Klipfel had made any racial statements and also asked about Klipfel's relationship with minority ATF agents.

84.     On February 19, 1993, Klipfel learned that, in violation of CPD IAD rules, CPD Officer Miedzianowski had learned the contents of the ATF agents' written statements made to Chicago Police Department Office of Internal Affairs almost immediately after such statements had been provided.

85.     On March 2, 1993, Klipfel was notified that an ATF Internal Affairs investigation had begun against her based on allegations of CPD Officers Miedzianowski and Galligan that she had made racial remarks and held a racist meeting over one and one-half years before.

86.     On numerous occasions between March 1,1993 until the present date, the Chicago Police Department caused false statements and innuendoes to circulate throughout the City of Chicago Police Department and the Chicago office of ATF concerning both Casali and Klipfel.

87.     Miedzianowski and the City of Chicago manufactured, spread and caused to be spread statements concerning plaintiffs which they knew or should have known were totally false; including, but not limited to, that one or more of the plaintiffs was to be indicted, arrested,

20

fired, demoted or transferred. The purpose of these statements was to destroy the credibility of the plaintiffs so that their allegations against Miedzianowski would not be believed or investigated. SAC Vince, ASAC Adamcik, Miedzianowki and the City of Chicago ostracized both plaintiffs, and told other agents and employees of ATF that they too would be ostracized if they associated with either plaintiff.

88.     On August 2, 1994 both Casali and Klipfel receive Notices of Proposed Removal from ATF which were based on information primarily fabricated by the Chicago Police Department and forwarded to ATF. After issuing the Notices of Proposed Removals, for the next 25 months, ATF stripped plaintiffs of their supervisory positions and did not allow them to engage in law enforcement activity. On February 28, 1997, the Merit Systems Protection Board found the Chicago Police Department's allegations to be without merit and certified plaintiff Casali as a whisteblower pursuant to the Whisteblower Protection Act, 5 USC §2302 (b)(8).

89.     On or about June 6, 1995 CPD Officer Miedzianowski contacted Carol Marin concerning Casali and Klipfel and falsely stated to Ms. Marin that Casali and Klipfel had been fired from the ATF. On the same day, Miedzianowski sent a letter to Carol Marin and U.S. Congressman Harris Fawell's local office, via facsimile transmission, containing several false statements concerning Klipfel. A copy of the letter is attached hereto and made a part hereof as Exhibit A.

90.     As a direct result of plaintiffs' Constitutionally protected disclosures, Miedzianowski and the City of Chicago caused the plaintiffs to be threatened, intimidated, harassed, ridiculed, wrongfully disciplined, wrongfully suspended, stripped of their supervisory

positions, transferred to another office, not allowed to engage in law enforcement activity and threatened with termination from ATF.

## THE CITY OF CHICAGO'S KNOWLEGE
## AND SUPPORT OF MIEDZIANOWSKI'S CONDUCT

91.     The Chicago Police Department's practice of allowing certain police misconduct to go unchecked was widespread.  The Chicago Police Department failed to investigate prior allegations of criminal conduct by Miedzianowski and other officers and has a history of allowing police corruption to go unchecked.  The City of Chicago had received at least twenty or more internal affairs complaints and more than twenty excessive force complaints regarding Miedzianowski dating back to at least 1983.  Most of the excessive force complaints involved brutal beatings and threats to kill.  The City of Chicago also defended Miedzianowski against numerous civil lawsuits alleging Miedzianowski's criminal conduct including excessive force and threats to kill.  The City of Chicago settled the corresponding civil suits.

92.     On April 23, 2001, Miedzianowski was convicted of engaging in racketeering and narcotics conspiracy, dating back continuously at least 13 years and including the three years that he was assigned to ATF.  Throughout the 13 years, the City of Chicago failed to take any action to curb Miedzianowski's illegal activities, many of which Miedzianowski accomplished with the aid of other City of Chicago police officers, including high ranking officials, and which occurred during Miedzianowski's official work-shifts and involved the use of City of Chicago police property.

93.     Media surrounding criminal allegations against Miedzianowski and other police officers surfaced by February, 1993, but the City of Chicago and its highest level, policy-making

officials, ignored the news reports, acquiesced in the conduct and failed to act.

94.     Miedzianowski's supervisors knew about his conduct and failed to supervise him. Commander Phil Cline was the Detective Commander of Area 5 when Miedzianowski was assigned to Area 5. Commander Cline also previously worked as a Lieutenant in the gang crimes unit and supervised Miedzianowski. Commander Cline suspected that Miedzianowski was leaking information to gangbangers on more than one homicide investigation.

95.     Police Superintendent Terry Hillard, Superintendent of the Chicago Police Department, stated to the Chicago Tribune that he had to disband the gang crimes unit, of which Miedzianowski was a member, because of the Chicago Police Department's failure to supervise the unit.

96.     Other supervisors with actual knowledge of Miedzianowski's violations of plaintiffs' rights include: Sgt. Korte, Miedzianowski's supervisor at CPD Gangs Crimes North Unit. Sgt. Korte sat with Miedzianoski and SAC Joe Vince of ATF, on November 6, 1992 and complained about plaintiff Klipfel's allegations against Miedzianowki in an attempt to silence Klipfel. Chicago Police Department Lt. Karczewski, as far back as March, 1992, was so incensed by plaintiff Klipfel's allegations against Miedzianowski, that he called SAC Joe Vince at ATF and demanded an apology from Klipfel.

97.     The City of Chicago had express knowledge of Miedzianowski's unconstitutional conduct when it deliberately compromised its internal affairs investigation of plaintiffs' allegations against Miedzianowski. CPD's IAD investigation was conducted by a close personal friend of Miedzianowski, Assistant Deputy Superintendent Raymond Risley. As part of the

23

alleged investigation, CPD IAD interviewed Hector Hernandez but allowed Miedzianowski to be present for the interview and, in fact, Miedzianowski was sitting right next to Hernandez, in violation of CPD IAD rules. While testifying at Miedzianowski's criminal trial, Assistant Deputy Superintendent Risley admitted that CPD IAD's investigation of plaintiffs' allegations against Miedzianowski violated Departmental procedure, but Risley took no corrective action.

98.     Another witness who testified before CPD IAD and ATF IAD, on behalf of Meidzianowski, now also admits that he had been coerced by Miedianowski into making false statements against Klipfel. Witness A (who has requested that his name not be made public), gave his statement to CPD IAD in the presence of Miedzianowski who sat next to Witness A while he gave his statement. After Witness A gave his statement, CPD IAD allowed Miedzianowski to give an official statement that Miedzianowski signed in the presence of Witness A. Only after Miedzianowski signed his statement, did CPD IAD ask Witness A to sign a similar statement, still in the presence of Miedzianowski. Witness A's statement falsely alleged that Klipfel stole jewelry and cocaine. CPD IAD violated many of its internal procedures in their interview of Witness A and knowingly supported and encouraged Miedzianowski in his campaign of false accusations against plaintiffs.

99.     On March 11, 1993, Deputy Superintendant Risley of CPD Internal Affairs met with Treasury Inspector General Timothy Clifford, Department of Justice Attorney Green and ATF Internal Affairs Agents Hemseth and Kalkman and, in support of Miedzianowski's attempt to silence plaintiffs, stated that plaintiff Klipfel was a racist and made other derogatory comments about Klipfel, in an attempt to discredit her.

100.    To further discredit plaintiffs and in support of Miedzianowski's retaliation and attempts to silence plaintiffs, and in violation of plaintiffs' Constitutional rights, on June 9, 1993, one year before CPD IAD officially closed its investigation of plaintiffs' allegations against Miedzianowski, Ray Risley sent a memo to Police Superintendent Matt Rodriguez containing many false statements, including those of Witness A.  In the memo, Risley, after conducting virtually no investigation of plaintiffs' allegations against Miedzianowski, recommended that plaintiff Klipfel be prosecuted for "specious allegations."  Risley conducted no investigation or inquiry regarding the lack of any evidence supporting the witnesses' allegations, but falsely stated to Superintendent Rodriquez that Diane Klipfel, on more than one occasion, gave jewelry and cocaine to a gang member. Risley also recommended that the CPD reexamine its relationship with ATF.

101.    Other evidence of the true nature of the CPD IAD investigation of plaintiffs' allegations can be found in a government pleading filed in Miedzianowski's criminal case.  The government found: "The search of Miedzianowski's residence revealed evidence that before the prior investigation [the CPD IAD investigation of plaintiffs' allegations] was completed, Miedzianowski received copies of witness statements and other reports generated in the course of that investigation.  ...he was not authorized to have these documents." "This and other evidence obtained during the instant investigation indicates that, at best, the prior investigation was compromised in that Miedzianowski was kept informed of the progress of the prior investigation as it occurred."

102.    At his deposition in another matter, ATF IAD Special Agent James Kalkman

25

stated, regarding the CPD allegations against plaintiff Klipfel: "He had never had that many allegations in a short time period against one person come up unsubstantiated" and "the allegations were coming either directly or indirectly from the Chicago Police Department."

103. In October, 1993, ATF Special Agent Jaquez, while conducting surveillance in a narcotics case, was physically threatened by Miedzianowski and told to leave the area. CPD IAD Assistant Deputy Superintendent Ray Risley demanded that ATF send Special Agent Jaquez to the Chicago Police Department to give a statement. Upon meeting, Ray Risley confronted SA Jaquez and told him that this was all a scheme "cooked up by Diane" [plaintiff Klipfel] to get back at Miedzianowski. The Chicago Police Department and the City of Chicago failed to investigate Jaquez' allegations against Miedzianowski and failed to even take a statement from Jaquez.

104. CPD IAD also actively assisted Miedzianowski in filing numerous false complaints against plaintiffs by using official departmental correspondence to make referrals to ATF of false accusations of plaintiffs' alleged criminal conduct. The City of Chicago did not even conduct a cursory investigation of Miedzianowski's allegations against plaintiffs before making an official misconduct referral.

105. Even ATF acknowledged the City of Chicago's animus against plaintiffs in a brief filed on September 30, 1996 entitled: "Agency's Response to Appellant's Motion to Dismiss the Agency's Motion to Certify an Interlocutory Appeal."

> [Casali] has made serious allegations of corruption against certain police officers in the Chicago Police Department. As a result of these allegations, ATF's Chicago Field Division believes that the Chicago Police Department harbors intense hostility toward [Casali]. (Agency Brief, page 5).

26

## COUNT I

### VIOLATIONS OF TITLE VII OF THE CIVIL RIGHTS
### ACT OF 1964, AS AMENDED BY THE CIVIL RIGHTS ACT OF 1991
(ROBERT RUBIN, Secretary, United States Dept. of the Treasury)

106.    Plaintiffs reallege and adopt paragraphs 1 through 68, above, as though set forth in full herein.

107.    Plaintiff Klipfel filed with the Equal Employment Opportunity Commission (the "EEOC") three timely Complaints, Nos. 210–94–4592X, 210–94–4596X and 210–94–4597X entitled *Diane L. Klipfel v. Lloyd M. Bentsen, Secretary, United States Department of the Treasury*; all three Complaints were accepted for processing.  More than one hundred and eighty (180) days have passed since her Complaints were filed.  On July 29, 1994, the EEOC rendered a final decision on the Complaints denying Klipfel's claim of retaliation.

108.    Plaintiff Casali filed with the EEOC two timely Complaints, Nos. 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X and 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X, entitled *Michael V. Casali v. Lloyd M. Bentsen, Secretary, United States Department of the Treasury*; both Complaints were accepted for processing.  More than one hundred and eighty (180) days have passed since his Complaints were filed.  On August 26, 1994 the EEOC rendered a final decision on the Complaints denying Casali's claim of retaliation.

109.    During Agent Klipfel's March, 1994 EEO hearing, Joe Vince and Jimmie Adamcik expressly lied during their testimony and seriously compromised Klipfel's hearing.  At Klipfel's EEO hearing, both ATF supervisors expressly denied retaliating against plaintiffs, under oath.  Both supervisors also falsely denied even having knowledge of plaintiffs' 1992 and 1993 whistleblowing disclosures regarding the criminal conduct of Miedzianowski and Galligan.  But,

27

years later, during Agent Casali's 1997 MSPB hearing, ATF actually entered into stipulations admitting that in 1992 and 1993 plaintiffs had, indeed, informed SAC Vince and ASAC Adamcik of the Chicago police officers' illegal activities. In 1997, AUSA Steven Sinnott also stipulated that Vince and Adamcik did have knowledge, prior to the Klipfel 1994 EEO hearing, of plaintiffs' allegations against Officers Miedzianowski and Galligan. ATF never disciplined SAC Vince or ASAC Adamcik for their perjury at Agent Klipfel's EEO hearing. Based on ATF's subsequent stipulations, ATF's witnesses at Klipfel's EEO hearing committed perjury.

110.    During Agent Klipfel's EEO hearing, SA Tim Clifford of the Department of Treasury's Office of the Inspector General also testified that prior to the Klipfel EEO hearing, SAC Vince had filed false allegations with the OIG that Agent Klipfel was racist and had damaged an ongoing ATF investigation.

111.    At the time that the acts of retaliation and harassment were committed, defendant Rubin knew that Casali and Klipfel had lawfully protested discrimination and had lawfully assisted a victim of sexual discrimination in a manner recognized by Title VII of the Civil Rights Act of 1964, as amended; had participated in the investigation and the proceedings brought to assert the rights of Sandra Hernandez under Title VII and had assisted Sandra Hernandez in successfully vindicating her rights in a proceeding under Title VII.

112.    Prior to assisting Hernandez, plaintiffs had consistently exceeded their employers' legitimate expectations and had a right to expect, and did expect, that they would not suffer any retaliation as a consequence of their exercising their rights of free speech and association as guaranteed by the Constitution of the United States. Plaintiffs' speech involved matters of urgent

public concern.

113.    ATF has a pattern and practice of failing to take appropriate action to prevent acts of retaliation against those who report sexual harassment and against those who support victims of sexual harassment within ATF.    The OIG has conducted at least two investigations of systemic problems within ATF regarding sexual harassment violations including plaintiffs' allegations.  In their investigation of plaintiffs' allegations, OIG found that ATF supervisors had, in fact, retaliated against plaintiffs for their assistance to Sandra Hernandez.

114. The acts of retaliation committed by the Department of the Treasury against plaintiffs, as alleged herein and in the OIG Reports, were committed intentionally and knowingly in order to discriminate against plaintiffs, harass and humiliate them, and were in reprisal for plaintiffs' participation in proceedings charging sexual discrimination brought under the provisions of Title VII of the Civil Rights Act of 1964, as amended; and their lawful opposition to actions by ATF management, which they believed in good faith to be illegal under Title VII of the Civil Rights Act of 1964, as amended.

115.    As is partially set out in the May 3, 1994 OIG Report, the United States Department of the Treasury, through ATF, knowingly and intentionally committed such acts and reprisals because plaintiffs had engaged in activities protected under Title VII and for the purpose of punishing plaintiffs for engaging in such activities, with full knowledge and intent that such acts would have the effect of interfering with, intimidating, or otherwise discouraging the plaintiffs from exercising their rights in violation of Title VII of the Civil Rights Act of 1964, as amended.

116.    The United States Department of the Treasury, through ATF, knowingly and recklessly permitted or failed to correct the numerous, continuous and ongoing incidents of workplace harassment suffered by plaintiffs as a result of their assistance to Hernandez, thus significantly changing their working conditions.    The acts committed by the United States Department of the Treasury, as alleged herein, affected the terms, conditions, and privileges of plaintiffs' employment and, therefore, constitute violations of Section 2000e *et seq.* of Title VII of the Civil Rights Act of 1964, as amended.  (42 U.S.C. 2000e *et seq.*).

117.    As a direct and proximate result of the defendant's intentional, knowing, unlawful and unconscionable acts, plaintiffs have and will suffer lost wages, benefits and entitlements, damage to their career and reputation, pain, suffering, humiliation, and severe emotional distress.

**WHEREFORE**, plaintiffs Michael V. Casali and Diane L. Klipfel respectfully request that this Honorable Court:

A.    Declare the conduct of the defendant Rubin (or current Secretary) to be in violation of Title VII of the Civil Rights Act of 1964, as amended, and in contravention of law and public policy;

B.    Enter an injunction against the defendant Rubin (or current Secretary) ordering that such defendant cease and desist from any and all violations of Title VII of the Civil Rights Act of 1964, as amended, in the form of reprisals against plaintiffs; and, further, cease and desist from discriminating against plaintiffs in violation of their rights under Title VII of the Civil Rights Act of 1964, as amended;

C.    Enter an injunction against the defendant Rubin (or current Secretary) ordering that such defendant cease and desist from retaliating against plaintiffs in any manner whatsoever including any reprisals or retaliation which may be contained in the plaintiffs' personnel files which has been collected in reprisal for plaintiffs having participated in protected activity; and which information is found to be inaccurate, irrelevant, untimely and/or incomplete;

D.    Award plaintiffs compensatory damages to which they are entitled and which are just and reasonable including, but not limited to, all plaintiffs' medical, counseling,

hospital and other expenses related to these allegations;

E.     Award to plaintiffs their reasonable attorneys' fees, costs, and expenses incurred in vindicating their rights, and such pre–judgment and post–judgment interest as is allowable under law;

F.     Award to plaintiffs punitive damages in an amount in excess of $500,000.00;

G.     Allow a jury for all claims triable by a jury;

H.     Grant such other relief as this Honorable Court deems reasonable, just and proper.

## COUNT II
## VIOLATIONS OF 42 USC §1983
### (CITY OF CHICAGO AND MIEDZIANOWSKI)

118.    Plaintiffs reallege and adopt paragraphs 1 through 105, above, as though set forth in full herein.

119.    Count II is brought pursuant to the Civil Rights Act of 1964, Title 42 United States Code, §1983.

120.    The City of Chicago is a local governmental entity duly authorized and operating under the laws of the United States, the State of Illinois and the City of Chicago.

121.    The City of Chicago, CPD Superintendent of Police Hillard, CPD Deputy Superintendent Risley, CPD Commander Cline, CPD Lieutenant Eugene Karczewski, and other responsible policy making officials of the City of Chicago knew, acquiesced, or in the exercise of reasonable care, should have known, that the defendant Miedzianowski had engaged in a pattern and practice of misconduct, for at least 13 years, including, but not limited to: conspiring with other officers and lay persons to distribute controlled substances, robbery, extortion, money laundering, bribery, obtaining false legal documents, providing security for drug dealers,

31

disregarding violations of law, failing to enforce the law, leaking confidential information about law enforcement activities to coconspirators and associates, interfering with the investigation and prosecution of coconspirators and associates, unlawfully obtaining money and property from drug dealers, engaging in excessive force and violence, illegally searching and seizing persons and property, conducting illegal arrests and false imprisonments, retaliating against those who questioned his conduct, making false statements and committing perjury, interfering with Internal Affairs investigations, bringing false charges against other law enforcement officers and depriving persons in the City of Chicago, including plaintiffs, of their Constitutional rights.

122.  Despite a longstanding knowledge of the aforesaid pattern and practice of illegality, the City of Chicago failed to properly investigate these instances of illegality, and to supervise, train, discipline and terminate the employment of CPD Officer Miedzianowski and other responsible officers of the Chicago Police Department.

123.  The defendant City of Chicago developed and maintained this widespread *de facto* policy and custom with regard to acts of illegality committed by officers against civilians which encouraged Miedzianowski to believe that he could deprive plaintiffs of their Constitutional rights with impunity and with the explicit or tacit approval of the City of Chicago.

124.  Defendant City of Chicago's conduct, as alleged above, chilled plaintiffs' Constitutional rights to free speech and helped to cover-up its officers' RICO conspiracy and other unlawful acts.

125.  The City of Chicago has a duty to operate the affairs and business of the City in accordance with federal, state and local laws.

32

126. In violation of such duty, the City of Chicago and Miedzianowski, with the explicit or tacit approval of the City of Chicago, acting under color and pretense of law, engaged in acts to deny and deprive the plaintiffs of their rights guaranteed under the Constitution and laws of the United States, specifically including but not limited to, their right to free speech as guaranteed in the First Amendment to the Constitution of the United States and their right to life and liberty as guaranteed in the Fifth Amendment, through the 14th Amendment, to the Constitution.

127. The aforesaid conduct of the City of Chicago and CPD Officer Miedzianowski related to their governmental authority and the performance of their duties as police officers.

128. As a direct and proximate result of defendants City of Chicago and Miedzianowski, intentionally, knowingly, unlawfully and unconscionably acting in the manner aforesaid, plaintiffs have and will suffer lost wages, benefits and entitlements, damage to their career and reputation, pain, suffering, and humiliation and severe emotional distress and have been deprived of certain rights and privileges as citizens of the United States all in violation of 42 U.S.C. §1983.

**WHEREFORE**, plaintiffs Michael V. Casali and Diane L. Klipfel, request that this Honorable Court:

A. Enter a judgment in favor of the plaintiffs and against the defendants City of Chicago and Miedzianowski in an amount to be proven at trial;

B. Award to plaintiffs, and each of them, their reasonable attorneys' fees, costs, and expenses incurred in vindicating their rights, and such pre–judgment and post–judgment interest as is allowable under law;

C. Award to plaintiffs punitive damages from Miedzianowski in an amount in excess of $500,000.00;

33

D.    Allow a jury for all claims triable by a jury;

E.    Grant such other relief as this Honorable Court deems reasonable, just and proper.

COUNT III

**DEFAMATION**
(MIEDZIANOWSKI)

129.    Plaintiff Klipfel reallege and adopt paragraphs 1 through 105 above, as though set forth in full herein.

130.    Beginning on or about March, 1992 and continuing thereafter to at least June 6, 1995 and beyond, CPD Officer Miedzianowski, knowingly, and with intent to injure and destroy plaintiff Klipfel's good name and reputation in her employment and to cause the loss of her employment, falsely and maliciously stated on a continuing and regular basis to third parties, without privilege, that plaintiff Klipfel had: 1) stolen money while executing search warrants; 2) had wrongfully seized a vehicle from a suspect; 3) caused dissension among individual members of the ATF Chicago office for her own personal gain; 4) filed intentionally false and erroneous reports about CPD officers; 5) been a racist; 6) provided illegal narcotics to informants; 7) had emotional and mental problems and 8) was going to be fired from ATF and indicted.

131.    As a result of such false statements by the defendant CPD Officer Miedzianowski, plaintiff Klipfel has and will continue to suffer damage to her career and reputation, pain, suffering, humiliation and distress.

**WHEREFORE,** plaintiff Diane L. Klipfel requests that this Honorable Court:

A.    Enter a judgment in favor of plaintiff Klipfel and against the defendant, CPD Officer Miedzianowski, in an amount to be proven at trial;

34

B.     Enter an injunction against the defendant Miedzianowski, ordering that he cease and desist from any and all defamatory actions;

C.     Award to plaintiff Klipfel her reasonable attorneys' fees, costs, and expenses incurred in vindicating her rights, and such pre–judgment and post–judgment interest as is allowable under law;

D.     Award to plaintiff Klipfel punitive damages in an amount in excess of $500,000.00;

E.     Allow a jury for all claims triable by a jury;

F.     Grant such other relief as this Honorable Court deems reasonable, just and proper.

Dated: January 10, 2003

Respectfully submitted,

**DIANE L. KLIPFEL and**
**MICHAEL V. CASALI**

By: _____
One of Plaintiffs' Attorneys

Sally H. Saltzberg, Esq.
P. Michael Loftus, Esq.
Loftus & Saltzberg, P.C.
53 West Jackson Boulevard
Suite 1420
Chicago, IL 60604
(312) 913-2000

Edward M. Genson, Esq.
Genson and Gillespie
53 West Jackson Boulevard
Suite 1420
Chicago, IL 60604
(312) 726-9015

35

## CERTIFICATE OF SERVICE

The undersigned, an attorney, hereby certifies that she caused a copy of the foregoing **Fourth Amended Complaint** to be served upon all counsel, via regular mail, by depositing said notice and certificate in U.S. mail receptacle located at 53 West Jackson, Chicago, Illinois on this 14th day of January 2003 before 5:00 p.m.

Sally H. Saltzberg