COUNTY OF COOK )
) SS.
STATE OF ILLINOIS )

I, DARRIN PIPPIN. having been duly sworn, state, under penalty Of perjury:

1. That I am over the age of 21 and if called to testify, would testify to the information contained in this affidavit, based on my personal knowledge. This affidavit is being made of my own free will.
2. I am currently and have always been a resident of Chicago, Illinois.
3. I have been arrested 9 times for dealing narcotics. Of the 9 arrests, I have actually gone to court to face charges on 4 matters and was found not guilty on three. I pled guilty to the fourth case. In regard to the other 5 arrests, I was able to “walk away” from the charges by making an agreement with certain Chicago Police officers to set up other narcotics dealers to be "robbed" by members of the Chicago Police Department.
4. I have not been involved in any illegal activities since my arrest by ATF agents in February 1992.
5. Prior to my 1992 arrest by ATF, I had never met nor heard of ATF Agent Diane Klipfel.
6. At the age of 15, I began selling marijuana and then, later, cocaine with my mother, Francis Sanchez. As an associate of the Imperial Gangsters Street Gang, I sold cocaine, managed drug distribution sites, and managed financial matters for the David Ramirez narcotics enterprise. In about 1985 until 1991, I performed similar duties for the Juan Martir narcotics enterprise, yet another Imperial Gangster organization. As a gang associate for almost 20 years, I learned a great deal about conducting a criminal enterprise in the City of Chicago. In particular, I personally met a number of Chicago Police officers and quickly learned about the Chicago Police Department’s attitude toward gang members and narcotics organizations.
7. As set out in more detail, below, those of us who worked with the gangs in the narcotics trade knew that many members of the Chicago Police Department actually assisted gang members with their narcotics business in exchange for cash and drugs. My friends and I regularly observed sworn Chicago Police Officers commit crimes without repercussions. It was generally understood, on the street, that the Chicago Police Department did not prosecute its own officers, regardless of the strength of any evidence. The officers I worked with often represented that they had no fear of getting “caught” for committing crimes and they certainly did not fear repercussions from Chicago Police Internal Affairs. The attitude of the officers I observed was that the Chicago Police Department looked the other way when it came to officers committing crimes.
8. For example, the 14th District of the Chicago Police Department was known throughout my gang and others as a district where many of the officers were corrupt. 14th District Chicago Police Officer Rodriguez, also known as Chano, was a uniformed Chicago Police officer, an active member of the Spanish Lord Street Gang, and a cousin of narcotics distributor David Ramirez. Officer Rodriguez worked in the narcotics enterprise for about 10 years from the early 1980’s until the early 1990’s. David Ramirez paid Officer Rodriguez for his services in cash and cocaine. I personally worked with Officer Rodriguez on a daily basis. On about 15 occasions, Rodriguez drove me from one site to the other while I carried large amounts of drug-related cash. Officer Rodriguez made the decision to personally transport me because he felt that I would be safer having an armed police escort in a squad car, while carrying large amounts of drug money. Officer Rodriguez expressed his concern that I would be robbed by other Chicago police officers. To assist the narcotics trafficking, Officer Rodriguez picked up cocaine from where it was stored, at Fullerton and Laramie, and delivered it to where it was sold at Cortland and Kimball in Chicago.

EXHIBIT 10

When we ran low on cocaine, David Ramirez or I would call Officer Rodriguez who would make up to 5 or 6 deliveries a day, in uniform, driving a marked Chicago Police squad car, to the drug site. Officer Rodriguez never had a partner with him and never expressed concern about a Chicago Police Department supervisor checking up on him. In fact, although the drug site had been raided by Chicago Police on a regular basis, Officer Rodriguez told me that he was not concerned about being seen making deliveries because he was a Chicago Police officer.

9. In addition to facilitating drug trafficking, Officer Rodriguez also stole drugs and money from narcotics dealers. In 1986 or 1987, I personally assisted Officer Rodriguez, David Ramirez, Angel Collazo, and Archie (Last Name Unknown) in "ripping off' David Ramirez' cocaine connection for 9 kilos of cocaine. Officer Rodriguez' share was one kilo of cocaine.

10. Other examples of corrupt Chicago Police Officers include: Lt. Kijowski of the Chicago Police Department's 14th District, and his "crew" which included Officer Dennis Palaz, Officer McDonald (now in Area 5 Homicide) and another unknown officer. In the mid 1980's, they regularly demanded that they be paid $2,000 per week for protection against the Chicago Police raiding the Cortland and Kimball site. When the officers came to collect their weekly payment, Lt. Kijowski, Officer Palaz or Officer McDonald would arrive at my residence, occasionally sitting on the porch while I and other drug sellers made enough sales to meet the $2,000 quota. After each sale, we would hand the cash to the officers, until we had reached the weekly agreed upon $2,000. At times while Lt. Kijowski's crew was there, Officer Rodriguez, who was not involved with Lt. Kijowski's crew, would make deliveries of cocaine to us when we ran low.

11. I was present in the early to mid 1980's when Lt Kijowski, investigating a contract murder and aware that the Imperial Gangsters knew of it, told William Martinez, and David Ramirez that "they could continue to sell drugs at our spot only if we told him who did the murder and where the gun used was." David Ramirez gave Lt. Kijowski the name of the murderers, both Spanish Lord gang members, and the location of the gun used. The gang members were arrested and we were allowed to continue our narcotics business.

12. I was present in the mid 80's when Officer McDonald pulled over a man to whom we had just sold 8 ounces of cocaine. Officer McDonald offered to let the man go if he arranged to immediately pay Officer McDonald $5,000 and gave him the 8 ounces of cocaine. Raul Cruz, the arrestee's cousin, brought the $5,000 to the scene and paid Officer McDonald. Officer McDonald took the cocaine and allowed Cruz' cousin and the arrestee to leave without charges.

13. In 1995, after Officer McDonald transferred to Area 5 Homicide, I teased him, saying, "Now you are in Homicide, you aren't getting all that good dope money coming in anymore." Officer McDonald told me that in reality, the money was better in fixing homicide cases.

14. In 1987, one of Lt. Kijowski's crewmembers, a Chicago Police Officer we called "Commando," pulled me over and poured bleach and fabric softener throughout the interior of my vehicle. I reported this to Chicago Police Department's Internal Affairs Division, and then had to go into hiding because I quickly learned from friends that Lt. Kijowski's officers began looking for me, threatening to hurt me. I had to stay out of the area until Lt. Kijowski arranged for a sit down with David Ramirez, where it was agreed that I would withdraw the IAD complaint against his officer, Lt. Kijowski's men would stop harassing my family and friends, and Lt. Kijowski would not physically harm me.

15. In 1985, I learned that Chicago Police Officer Arciola a/k/a Arcio, again of the Chicago Police Department's 14th District, went to the home where gang member Raul Cruz was known to store large amounts of drugs and cash and was selling narcotics. Officer Arciola handcuffed Cruz to a

water pipe in the ceiling of the basement, kicked out his support chair and left him swinging in the air, with the pressure of the handcuffs cutting into his hands until he told Officer Arciola where he had hidden his cash and drugs. Arciola then located the cash and drugs and set Cruz free with out charges.

16. On two occasions, in about 1988 and 1989, another gang member, Juan Martir, and his brother Orlando Martir, were raided by Chicago Police Officers Heideman and Christine Spiros. The officers stole about $60,000 from the Martirs. To avoid prosecution, Juan and Orlando Martir also began to work as informants for the officers, setting up a number of Spanish Cobra gang members who were narcotics dealers. However, later I learned that the Martirs also set up the gang members to have money and narcotics stolen by the same Chicago Police officers.

17. In about 1988, Chicago Police Sgt. Michael Byrne raided my home at 3404 W. Cortland, Chicago. Sgt. Byrne also raided a separate upstairs apartment, where he found a gun that belonged to Fernando Vargas. Sgt. Byrne found narcotics in my apartment and he brought the gun to me and offered to forego drug and gun charges if I would set up David Ramirez for Sgt. Byrne to rob. Byrne told me that he knew that David Ramirez had gold and cash around, and he wanted me to help him get it. We discussed the fact that David Ramirez was making up to $120,000 per week, just from the Cortland and Kimball drug site. I agreed to help Sgt. Byrne, and all charges against me were later dropped.

18. I managed David Ramirez' drug sales funds and I knew about a number of safety deposit boxes where David Ramirez stored his cash. Sgt. Byrne knew that I had the information and I provided Sgt. Byrne and his crew of Chicago Police officers (which included Officer Walter Smith and two unknown officers), with information about at least 4 safety deposit boxes containing drug money. One box, at the Cole Taylor Bank located on Milwaukee Avenue, contained about $200,000. Sgt. Byrne raided the box and gave me $2,000 from the take. David Ramirez' stepfather, Jose Milette, who rented the box, told me that the officers had stolen all of the money. Sgt. Byrne and his crew stole about $240,000 from the other safety deposit boxes that I told them about. Sgt. Byrne gave me cash payments for providing information about the boxes.

19. From about 1985, until 1991, I provided information to Sgt. Byrne and his crew, which resulted in approximately 20 search warrants on locations where gang members were selling narcotics. Sgt. Byrne and his crew robbed these dealers and after each warrant, Sgt Byrne gave me an ounce or two of cocaine, which I then sold, keeping the profits.

20. In about 1989, I accompanied Sgt. Michael Byrne and Officer Walter Smith on a search warrant in the 2000 block of North Avers. I had provided the officers with information that there were at least 9 kilos of cocaine and a large amount of cash on the premises. Officer Smith and Sgt. Byrne had me dress in a Chicago Police Department raid jacket, clearly marked POLICE, as well as a Chicago Police raid hat, and accompany them inside the house during the raid to help them search for drugs and cash to rob. I located the items for them, and the officers took them without inventorying them, or arresting the dealers. The same day, Officers Byrne and Smith executed two other warrants based on information I provided, one in the 3900 block of Diversey, and one on Montrose and Austin. At both locations, the officers found cash and narcotics, which they informed me they stole.

21. In 1991, Sgt. Byrne, Officer Smith, Officer Joseph Miedzianowski and another officer assigned to Sgt. Byrne (not otherwise mentioned in this affidavit), raided my home at 1749 Lawndale, where they stole $7,000 and jewelry. They came to my house just as I was leaving with the $7,000 to buy cocaine as I was completely out. The officers brought an ounce of cocaine to my house that they claimed was mine and told me that they would charge me with it and send me to prison. They told me that they would let me go without charges if I agreed to set up more drug dealers to be

robbed by their crews. I agreed and asked for my $7,000 back. Sgt. Byrne laughed and said to: "consider it a tax write off."

22. In 1987 and 1988, I was the manager of The Squeaky Clean Car Wash, located at 2847 Pulaski. The car wash was both a working business and a large narcotics operation. I handled both businesses. In about 1989, the car wash was robbed by two uniformed Chicago Police Officers in a squad car. Their names are possibly Kurtz and Reynolds and they were from the Chicago Police Department Public Housing Unit. They stole about $25,000 from the operation, a kilo of cocaine and a cell phone. I know that the officers did not report the matter, nor did they complete an inventory of the narcotics. Juan Martir, who owned the car wash, reported the robbery to the Chicago Police Department. I do not believe that the officers were ever disciplined.

23. In about 1988, Officer Martinez of Area 6, Belmont and Western (who had a partner named Officer Fallon), had amassed a large cache of stolen jewelry at his house. His daughter, Lisette Martinez, began giving it to friends of mine who detailed the source to me.

24. In 1991, I was contacted by Sgt Michael Byrne's Lieutenant, in the Narcotics Section. The Lieutenant (whose name in unknown and not otherwise mentioned in the affidavit), told me that if I did not start setting up drug dealers to get robbed again, the officers in Narcotics would raid my house again.

25. In 1991, Sgt. Stack, his female partner, and four other unknown officers, possibly of the Town Hall District (these are not the same unknown officers mentioned elsewhere in this affidavit), raided my home at 3900 Addison. They stole $26,000 in cash, jewelry, and 1 gram of cocaine. These items did not appear on an inventory and I was not arrested.

26. On February 20, 1992, Chicago Police Sgt Byrne, Officer Walter Smith, Officer Lasch and ATF Agents Diane Klipfel and Laurie Jolley raided my house at 4533 N. Drake. At that time, Chicago Police Officers stole about $8,000 in cash, about $20,000 in jewelry, a leather coat, cameras, tools and miscellaneous items from the house. They then went to my safety deposit box and stole $14,000. The officers tried to intimidate me to keep the theft from the ATF Agents. The police officers told me that if I stayed quiet about the thefts, they would let me have half of the $14,000 in the box, so that my family would have money while I was in prison. I agreed. When I inadvertently began to mention the safety deposit box to Agent Klipfel, Officer Miedzianowski punched me to silence me. I recall starting to talk about the safe deposit box because I was so used to dealing with corrupt Chicago Police Officers who knew about the thefts from safe deposit boxes and from dealers. I actually forgot that the ATF agents were federal agents who were not supposed to know about the corruption within the Chicago Police Department.

27. Later on February 20, 1992, I accompanied the same ATF agents to serve a warrant they had at my mother's house at 5023 Kimball. The Chicago Police Officers warned my mother and me to be quiet in front of the federal agents. This time, the Chicago Police Officers stole about $2,000 in cash, expensive jewelry and food stamps. My mother became angry that the officers were stealing from her again, and started screaming in front of both federal agents, protesting that the officers had stolen her food stamps and jewelry.

28. Later on February 20, 1992, I provided Sgt. Byrne with information about Gary Sanchez, a drug dealer who kept large amounts of cash at his residence. That same day, Sgt. Byrne, Officer Miedzianowski, Officer Smith, Officer Lasch and ATF agent Laurie Jolley served a search warrant on the Sanchez residence. Sanchez told me that the officers stole about $10,000 in cash, cell phones, and guns from the residence, and that the officers never recorded the items on the police inventory. Later, I read the affidavit that Sgt. Byrne used to obtain the Sanchez search warrant

and saw that Sgt. Byrne indicated that he had sent me to the door of the house and watched me purchase an ounce of cocaine. This never happened and was simply fabricated by Sgt. Byrne.

29. Later, on February 20, 1992, I was alone with ATF Agent Klipfel, and I told her about the thefts. That same day, I observed a series of violent confrontations between Agent Klipfel and Officer Miedzianowski. I heard the officers threaten to harm Agent Klipfel's children, set her husband up with cocaine, firebomb her house and kill me. They threatened her that if she reported the thefts as she told them she would, they would say that it was she who stole all the money and that no one would believe me, as I was just a drug dealer. They also threatened her with making certain that she lost her job. The Chicago Police officers were violent and confrontational and screamed at Agent Klipfel. Klipfel remained calm and talked in a normal voice; although I could see that she felt that we were in danger. I saw Officer Miedzianowski kick in the side of Agent Klipfel's squad car. We were both so certain that Officer Miedzianowski would do us serious harm, that at one point, Agent Klipfel unhandcuffed me and told me that if anything started to happen, that I should start running to save myself.

30. One of the confrontations occurred in the parking lot of the Chicago Police Department's 17th District Police station, located at Pulaski and Sunnyside. The lot was very dark and empty. Klipfel confided in me as I watched that she had a gun in her pocket and she kept her hand on it. At one point, I observed Sgt. Byrne talking to Agent Klipfel, advancing at her, while she stepped backwards away from him, and the screaming Miedzainowski. At the same time an unmarked squad car, without lights, quietly rolled up behind Agent Klipfel. It appeared to me that the officers were trying to get Agent Klipfel near the unmarked squad, to push her in it. I felt that she and I were both about to be killed. When Agent Klipfel realized that the vehicle was there, she moved immediately into a lit area where officers in the station could see her.

31. That night, after Agent Klipfel took me to Cook County Jail, Officer Waiter Smith had me removed from my cell and brought to him. He told me that he and the other officers had delivered $7,000 to my wife Jeanette. Officer Smith advised me to keep my mouth shut, and, in return, he and the other officers would work on getting me out of jail. He told me to have my wife go to Puerto Rico and keep her mouth shut. He asked me if Agent Klipfel was planning on going to the FBI. Officer Smith let me call my wife to verify that Officers Byrne and Miedzianowski had delivered the money.

32. During the meeting with Officer Smith, he signed me up as an informant for the Chicago Police Department. He had me complete and sign the necessary Chicago Police Department forms. Officer Smith told me that they had to do this to cover their tracks, in light of Agent Klipfel's behavior. Up until February 1992, I had never been signed up as an informant, even though I had provided information for years to the Chicago Police Department.

33. Some time later I had an opportunity to review the affidavit to the search warrant that was used to gain access to my house on February 20, 1992. It indicated that an informant had been at my home the night before. That simply was untrue and the affiant was fabricating the story.

34. Strangely, Officers Byrne and Smith appeared at a number of court appearances I had regarding the arrest of February 20, 1992. They told me that they knew I was in contact with Agent Klipfel. They told me that I could get killed in prison if I didn't keep my mouth shut, but if I cooperated with them, they would help me get out of prison. They told me to make sure that my wife also kept quiet and that both of my sons, ages 1 and 2, could be killed if I talked about the robberies.

35. Several days later, Officer Walter Smith and Officer Miedzianowski delivered the jewelry they stole from the safety deposit box to my wife, valued at approximately $33,000.

36. After my arrest and imprisonment, I stayed in contact with Agent Klipfel. She told me that the ATF was being pressured by the Chicago Police Department to quiet her. I told her that I was afraid I would be killed in prison and/or my wife would be killed by the officers. My wife was terrified of the officers. Sgt. Byrne, Officer Miedzianowski and Officer Walter Smith repeatedly came to my wife's home. They told her that if she didn't forget all about what happened, they would shoot me right in front of her. Another time they went to her home, they told her that they would shoot both of our children and make her watch.

37. A short time later, Agent Klipfel became aware that something violent had happened to my wife. We found out that she had been raped by one of the officers. Klipfel moved my wife and children to Puerto Rico. My wife attempted suicide by trying to hang herself.

38. On January 15, 1993, Sgt. Byrne and Officer Smith came to the prison where I was incarcerated, Robinson Correctional Facility in Effingham, Illinois. They told me that they had "taken care" of Agent Klipfel and that their whole Department was up in arms over her allegations. The officers told me that the Superintendent of Police and the Mayor had all been briefed and were personally monitoring the investigation of Agent Klipfel. Sgt. Byrne told me that the Chicago Police were going to have Agent Klipfel arrested shortly, but until then they had had her suspended with assurances from the ATF that they would transfer her from the State. Sgt. Byrne also told me that the Chicago Police were putting a case together on her husband, and that both Agents Klipfel and Casali were so discredited, that no one would believe a word that came out of their mouths. Sgt. Byrne told me that his bosses had been meeting regularly with Agent Klipfel and her bosses. Sgt. Byrne also told me that it was Agent Klipfel who stole the money from my safety deposit box and that she was trying to use the gun found in the safety deposit box to place additional charges on my case. Sgt. Byrne told me that he learned that Agent Klipfel had come to the Chicago Police Department to get custody of the gun, because a friend of his called hi and said that a federal agent was trying to get the gun. Byrne told me that if I cooperated with him, he would get me a job with a construction company and get me out of jail shortly. The Chicago Police officers repeatedly asked me where my wife could be found.

39. Shortly after the visit, I learned that Sgt Byrne traveled to Puerto Rico looking for my wife. A short time later, I received a letter from Sgt. Byrne (which I turned over to Agent Klipfel), telling me, in thinly veiled terms, that he was close to locating my wife who was hiding in Puerto Rico, and that he knew the false name she was using. I was very frightened for her safety. A copy of the letter I received from Sgt. Byrne is attached to the exhibit volume as **exhibit 1.**

40. On or about June 15, 1993, Sgt. Byrne and Officer Walter Smith came again to Robinson Correctional Facility where I was incarcerated. They met with the Prison Internal Affairs Unit. About 20 minutes after their visit, my clearance to work at an outside prison warehouse and to work as a youth soccer coach was suspended. The prison then began blocking my telephone calls to the ATF office, Agent Klipfel's home, Agent Klipfel's attorney, my attorney, Agent Klipfel's cell phone and to local reporter Carol Marin, who was working on a police corruption story.

41. In early 1993, my cellmate who worked in the prison mailroom informed me that the prison mailroom was under orders to copy every letter, picture or other document that came into the prison for me, or was mailed out by me, for use by the Chicago Police Department. My cellmate informed me that no other inmates had their mail copied in a similar manner.

42. In a number of telephone conversations I had with my attorney Daniel Coyne, throughout early 1993, Coyne told me that he was a close friend of Sgt. Byrne and that Byrne had told him to have me stay away from Klipfel; that she was corrupt, and that the Chicago Police Department Internal

Affairs Unit was getting ready to arrest her. Coyne told me that many officers were angry about her allegations and that I should keep my mouth shut or bad things could happen to me like they happened to Agent Klipfel. He told me "theses are the things for which people get run over by a bus." Attorney Coyne also warned me that there were thousands of Chicago Police Officers that I would have to contend with if I kept in contact with Agent Klipfel.

43. It is common knowledge among gang associates, past and present, and among the members of my family and community that the Chicago Police Department "looks the other way" when it comes to the conduct of police officers engaging in criminal activities. Chicago Police Officers are rarely caught, prosecuted or disciplined. Officers often depend on the income they receive from stealing from gang members to supplement their income. Gang members and associates tolerate the corrupt police conduct in order to keep from being arrested and to keep the officers from harassing them. This attitude has been in existence for my entire life, and my mother told me that Chicago Police Officers engaged in similar criminal conduct when she was a young girl.

44. There is no doubt whatsoever that high ranking members of the Chicago Police Department know of the culture of tolerance within the ranks for illegal activity by the officers. It has been going on for generations and it is common knowledge among the gangs that the Chicago Police Department allows such conduct to continue unchecked. Chicago Police Officers know that they will not face repercussions for such criminal activity and I observed that even after complaints were made to Internal Affairs, Chicago Police officers were generally not disciplined.

45. Many officers have told me, including Sgt Byrne, Officer Miedzianowski, Officer Walter Smith, Lt. Kijowski, Officer McDonald, Officer Dennis Palaz, Officer Rodriguez and others that they believed that they could continue to rob drug dealers and gang members, with impunity, because the chances of them being prosecuted by any authority, for such conduct was virtually none. Street officers who work with gang members have told me that that, generally, gang members and drug dealers have little creditability within the legal system, so the officers have no incentive to conform their conduct to the law. As Sgt Byrne told me "nobody's never going to believe e drug dealer."

46. After being released from prison in 1995, I was so frightened of Chicago Police Officers that I lived and worked under an assumed name and moved frequently,

47. I have provided information for this affidavit from my memory and without review of documents. If I was provided with a copy of my Chicago Police Department arrest sheets, I could better identify the dates of these occurrences.

48. The incidents of corruption detailed in this affidavit are just a few of the incidents I personally experienced when working with the Chicago Police Department.

FURTHER AFFIANT SAYETH NAUGHT.

Darrin Pippin
DARRIN PIPPIN

SUBSCRIBED AND SWORN TO BEFORE ME THIS 9th DAY OF June, 2005.

Meghan M. Timmerman
NOTARY PUBLIC

"OFFICIAL SEAL"
Meghan M. Timmerman
Notary Public, State of Illinois
My Commission Exp. 08/27/2009

STATE OF MARYLAND )
) SS.
COUNTY OF FREDERICK )

AFFIDAVIT

I, James Pate, having been duly sworn, under penalty of perjury, state:

1. I am over the age of 21 and if called to testify, would testify to the information contained in this affidavit, based on my personal knowledge and recollection. This affidavit is being made of my own free will.
2. I have been a professional news reporter for 28 years and during my career I have written articles that were published by the Washington Times, Soldier of Fortune magazine, and the National Rifle Association publications. I have done investigative and journalistic work used in broadcasts by ABC's "20/20" and CBS's "60 Minutes." I have spent most of my career covering the military, federal law enforcement agencies, and national security issues. I have investigated and written dozens of articles regarding various Bureau of Alcohol, Tobacco & Firearms (ATF) criminal cases, including articles dealing with issues of malfeasance and corruption in the ATF.
3. In late 1995, I contacted Michael Casali and Diane Klipfel regarding writing an article about them for Soldier of Fortune magazine. I had not previously met Michael Casali or Diane Klipfel before. At not time during my contact with them were we social acquaintances.
4. I traveled to Chicago in late 1995 and interviewed both Mr. Casali and Ms. Klipfel for a three-part series of articles that appeared in the May, June and July issues of Soldier of Fortune magazine. During their interviews, Mr. Casali and Ms. Klipfel revealed allegations of corruption they had made regarding personnel in both ATF and the Chicago Police Department. They reported that ATF proposed to fire them in retaliation for making allegations of corruption against ATF and the Chicago Police Department.
5. In the process of gathering information for my articles, I interviewed Chicago Police Department Assistant Deputy Superintendent Raymond Risley, accused Chicago Police Officers Joseph Miedzianowski and Michael Byrne, and former drug dealer Darrin Pippin.
6. On or about April 30, 1996, I interviewed Mr. Risley by telephone. During the interview, Mr. Risley made several allegations of misconduct against Diane Klipfel. He insisted that Diane Klipfel improperly drove Darrin Pippin's automobile and that it was currently in her driveway. Mr. Risley clearly stated that Ms. Klipfel and Mr. Casali regularly drove Mr. Pippin's automobile. Also, Mr. Risley clearly implied that Ms. Klipfel had an inappropriate sexual relationship with Mr. Pippin.
7. Mr. Risley's statements gave me the impression that the Chicago Police Department Internal Affairs Division had been conducting surveillance of Mr. Casali and Ms. Klipfel's residence. I subsequently traveled to their home and observed a leased Lincoln automobile in their driveway that was not Darrin Pippin's vehicle. In fact, it was a different color than Mr. Pippin's vehicle and Mr. Pippin confirmed that it was not his car during my subsequent interview with him.

EXHIBIT
39

8. Mr. Risley also stated that the Chicago Police Department Internal Affairs Division thoroughly investigated the allegations made by Ms. Klipfel and Mr. Casali against the accused Chicago Police Officers, including Miedzianowski. Mr. Risley unequivocally stated that his office was unable to substantiate the allegations.
9. Mr. Risley stated that his investigation did uncover evidence of misconduct by one or more ATF agents, including Ms. Klipfel and Mr. Casali. Mr. Risley said that he brought that evidence to the federal government for prosecution.

FURTHER AFFIANT SAYETH NOT.

James L. Pate

JAMES PATE

Subscribed and sworn to before me this 10th day of May, 2005.

John W King

Notary Public

JOHN W. KING
NOTARY PUBLIC STATE OF MARYLAND
My Commission Expires February 13, 2006

STATE OF ILLINOIS )
) SS.
COUNTY OF COOK )

AFFIDAVIT

I, Juan Antonio Juarez, being first duly sworn on oath, state:

1. I am an individual over the age of 21 fully competent to testify to the facts stated herein which are based on my own personal knowledge.
2. I was a Chicago Police Officer, assigned to the 14th District of Chicago, Illinois, from 1990 to 1992.
3. From 1992 until 1997 I was assigned to the narcotics unit of the Organized Crime Division and remained there until I resigned on April 13, 1997.
4. The "code of silence," also referred to as the "blue wall," is an unwritten policy within the Chicago Police Department by which police officers refuse to report the misconduct of fellow officers. To uphold this code, many officers not only remain silent regarding the misconduct of other officers, but also give false information in reports and during Internal Affairs Department ("IAD") and Office of Professional Standards ("OPS") investigations in order to protect fellow officers.
5. During my time as an officer with the Chicago Police Department, it was my experience that Chicago Police Officers did not fear discipline from OPS or IAD because they knew that they would be shielded by the code of silence.
6. In my experience as a Chicago Police Officer, the CPD had an unwritten policy of protecting police officers and shielding them from discipline or prosecution.
7. Members of the Chicago Police Department that I worked with did not have much regard for the integrity of the work performed by OPS and the Internal Affairs Department.
8. OPS and the Internal Affairs Department did not seem to act as a deterrent to wrongful conduct by police officers at all.
9. The lack of fear of discipline from OPS was something many officers joked about and OPS was often referred to as "the Kangaroo Court" within the Department, because all complaints bounced right out.
10. Chicago Police Officers knew that they could count on protection in the form of silence and collusion from fellow officers when IAD and OPS complaints arose. Other officers would not come forward with information they may have had or would even lie and falsify reports to corroborate the accused officer's version of the facts.
11. During my training with the Chicago Police Department, my Field Training Officer instructed me that if any physical altercation arose with an arrestee, I should always state in the report that the arrestee initiated it, whether they did or not.
12. I was told by other Chicago Police Department Officers not ever to break the code of silence and report misconduct of officers because "you don't want to make waves." It was explained to me that the last thing you want to do is "rat out"



another officer because if you did, you would be all alone: you would lose all of the support of your fellow officers, you would be shunned in the department and at police functions and other officers would not consider you worthy to work with.

13. After working with officers whom I witnessed brutalized citizens or stole, I was told by fellow Chicago Police Officers not to report the crime but simply to inform the watch commander I had "conflicting personalities" with these officers to ensure I would never be assigned to work with those officers again.
14. During my time as a Chicago Police Officer, virtually no officers I knew ever violated the code of silence by airing complaints outside the chain of command.
15. While assigned to the Chicago Police Department Narcotics Unit, I witnessed various officers stealing cash, drugs and other property during searches conducted pursuant to warrants.
16. It was common knowledge among officers within the Chicago Police Department that sometimes the amount of money, drugs and/or other property inventoried after a search warrant was only a fraction of what was actually found because officers stole a portion of what was recovered before conducting an inventory of the items.
17. During my assignment to narcotics, I participated in searches where I witnessed a great deal more cash at the scene than was later inventoried by my fellow officers. None of the officers I witnessed stealing off of those search warrants were ever reported by fellow officers, to the best of my knowledge, nor did I.
18. In my experience as a Chicago Police Officer, the Chicago Police Department has a deeply engrained policy of rallying around and supporting its officers when a complaint is received against them.

FURTHER AFFIANT SAYETH NAUGHT.

JUAN ANTONIO JUAREZ

SUBSCRIBED AND SWORN TO BEFORE ME THIS 24th DAY OF August, 2005.

NOTARY PUBLIC

ROSE L. LAMPO
Commission # 1585025
Notary Public - California
Monterey County
My Comm. Expires Jun 28, 2009

c) Darrin Pippin.
Address and phone number are being withheld due to past threats to his life by defendants Miedzianowski and Byrne.

Darrin Pippin is a material witness to criminal offenses committed by Officer Defendants as well as criminal admissions of guilt. He is a witness to the threats by both against the plaintiffs and others.

d) Thomas Lambert, Assistant Special Agent in Charge, ATF Boston Field Division
10 Causeway Street, Room 701, Boston, MA 02222-1047, (617) 565-7042

In 1990, ASAC Lambert was the Agent Cashier for the Chicago Field Division. In this capacity, he approved of monthly investigative expenditures made by Miedzianowski.

e) Jose Rivera, aka "Kiki". ATF confidential informant.
Address and phone unknown.

Rivera was threatened by Miedzianowski into making false allegations against Klipfel. He recanted his allegations when requested to take a polygraph.

f) Carol Marin, News Reporter, WBBM, Channel 2 TV, Chicago, Illinois 60611

Marin will testify that she received information on or about June 6, 1995 which came from Miedzianowski, who said that Casali and Klipfel had been fired. She can testify that on this date she aired a show which featured Casali and Klipfel, their disclosures of corruption within the Chicago Police Department and ATF and the reprisal against them.

Additionally, Marin will testify that on June 6, 1995, she received an anonymous fax message entitled, "VERY IMPORTANT", before her show aired.

g) Carol _______ Last Name, Address and Phone unknown.

She will testify concerning the attempted break-in to the apartment of SA Sandra Hernandez by Miedzianowski. She will testify that Chicago Police Department Internal Affairs attempted to coerce her into changing her photo ID of Miedzianowski.

h) Sandra Hernandez. ATF Special Agent, Baltimore, Maryland

SA Hernandez will testify concerning attempts by the Officer Defendants and others to retaliate against the plaintiffs as a result of the reporting of criminal misconduct committed by Officer Defendants. She will also testify concerning other improper activities of the Officer Defendants

i) James Kalkman, ATF Special Agent, Chicago, formerly with Internal Affairs.

SA Kalkman was an Internal Affairs investigator with ATF who will testify concerning retaliatory, defamatory and malicious complaints from or caused by the Officer Defendants regarding Plaintiffs. He will testify concerning the corruption and criminal misconduct of Miedzianowski and other defendants.

j) David Kuphal. ATF Special Agent, Chicago, formerly with Internal Affairs.

