IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| DIANE L. KLIPFEL and MICHAEL V. CASALI, | ) ) ) | |
| Plaintiffs, | ) ) | No. 94 C 6415 |
| v. | ) ) | Judge MANNING |
| ROBERT RUBIN, et al., | ) ) ) | |
| Defendants. | ) | |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION
TO CITY'S MOTION FOR SUMMARY JUDGMENT**

**I.  Introduction**

This case is about a bad cop and how he was finally brought to justice. This case is also about a 6-year struggle by two whistleblower federal agents, doggedly trying to do their job to bring that police officer to justice, despite the harshest of retaliations. But most of all, this case is about a failed system, a "criminal enterprise" police department and its policymakers that did all that it could to sweep this battle under the rug, assist in the retaliation and allow many more years of crime and permit many more years of damaging retaliation against plaintiffs. This is not just the story of the crimes of a single police officer; it is the saga of the sordid culture of the City of Chicago that, through its police department, used its considerable power to ruin these two federal agents and to perpetuate a culture of doing whatever was necessary to protect its own.

When the federal grand jury finally brought down Joseph Miedzianowski with an indictment in 14 counts, he was charged and subsequently convicted under RICO, with the Chicago Police Department as the criminal enterprise. The City of Chicago now has

the unenviable task of trying to convince the Court that this selfsame criminal enterprise did nothing wrong. Hardly.

In its Motion for Summary Judgment, the City posits a simple enough proposition: 1) the City by ordinance forbids officers to violate the law; 2) the Police Department has a general order to investigate and discipline misconduct; and 3) whatever this police officer may have done, the City opposes crimes committed by its officers, and is therefore not responsible for the officer's misconduct directed toward plaintiffs. Finally, the City argues that Miedzianowski's conduct was outside the scope of his employment.

Contrary to that proposition, plaintiffs have gathered over 100 exhibits and thousands of pages of documents, all as evidence that the City knew or should have known of this officer's misconduct and treatment of the plaintiffs. This is a textbook case of failure to discipline, failure to supervise, and assistance in misconduct even by supervisory department personnel. Evidence of "deliberate indifference" abounds. And woven throughout this case is the damage to plaintiffs caused by the reprehensible "code of silence."[1] There is pervasive evidence that the City had knowledge of the Chicago Police Department's custom of covering up misconduct and retaliating against good cops who "ratted" on other cops. Moreover, the City cannot escape liability based upon scope of employment as the record is replete with evidence that Miedzianowski was only able to violate plaintiffs' Constitutional rights because he was acting as a police officer. And, as fully set out in plaintiffs' 56.1(b)(2) statement of additional facts, Miedzianowski's

---

[1] Plaintiffs have prepared an extensive Rule 56.1(b)(2) filing, detailing overwhelming evidence of the City's wrongful conduct. This Memorandum will highlight just a portion of the evidence which, if believed by a jury, justifies judgment for plaintiffs. Indeed, a review of a single exhibit, the deposition of Brian Patrick Netols, the Assistant United States' Attorney who prosecuted Miedzianowski, discloses more than adequate factual bases upon which to deny the City's motion. (Pl. Local Rule 56.1(b)(2) Statement of Additional Facts, at 49-65; Ex. 5). Citations to paragraphs in plaintiffs' Rule 56.1 filing will be referred to as "Pl. X."

2

motive was not merely self preservation; he fought to protect the City's custom of cover-up and silence. Indeed, this was no aberration; no isolated incident. Rather, the City's policy of inaction is well documented and oft-repeated. The City asserts, in its motion, that there are insufficient facts to support plaintiffs' claim. The City is wrong.

## II. Background Fact Summary[2]

Plaintiffs Klipfel and Casali were 20 year veterans (and Group Supervisors) of the United States Bureau of Alcohol, Tobacco, and Firearms. They were decorated agents[3] and enjoyed reputations as competent, professional, honest, truthful, and capable agents, with no history of disciplinary action. Pl. 1-8. Beginning in 1990, Agent Klipfel worked in a task force, along with members of the Chicago Police Department, with the purpose of targeting certain Latin street gangs in Chicago. Chicago Police Officers Miedzianowski and Galligan were detailed to work in the ATF Task Force with Agent Klipfel. Pl. 9.

### A. *Evidence of Miedzianowski's Corruption:*

In February, 1992, Klipfel, Miedzianowski and other members of the Chicago Police Department's Organized Crime Narcotics Unit executed a search warrant on the homes of Darrin Pippin and his mother. While the officers and agents executed the warrants, Pippin accused Miedzianowski of stealing money and jewelry from his home. When Klipfel confronted Miedzianowski about the theft allegations, he screamed, kicked in the side of her car, threatened to kill her and her family, and warned of retaliation against Klipfel and Casali. Pl. 10-11.

---

[2] See plaintiffs' 56.1(b)(2) statement of additional facts for a more complete statement of the facts.

[3] During the 1980's, plaintiff Casali was assigned to a drug and gun investigation in Miami. In a horrific shoot out with members of a drug trafficking cartel, Agent Casali's partner was killed and Agent Casali lost hearing in both ears. Agent Casali received the Director's Award for his heroism. (See Manrose opinion, Pl. 47)

3

In April, 1992, Agent Casali learned from an informant that Miedzianowski was involved in supplying a street gang with firearms and narcotics stolen in the execution of search warrants, and was also involved in covering up a murder. Pl. 20.

### B. *Plaintiffs' First Amendment Right to "Blow the Whistle:"*

As required by her job, Klipfel reported the Pippin allegations (and subsequent corruption) to her ATF supervisors, Adamcik and Vince. Pl. 11-12, 14. She also reported the allegations to ATF Internal Affairs Special Agent Hemseth. And, Klipfel reported to the Department of Treasury Office of Inspector General that her supervisors, Adamcik and Vince, were accepting gifts and favors from Miedzianowski and Galligan as well as details of the police officers' involvement in illegal dealings with street gangs. Pl. 11-12, 14, 16-18.

Agent Casali, also required to report misconduct, reported to his supervisors, Agents Vince and Adamcik, regarding his knowledge of Miedzianowski's criminal activities. He also reported Miedzianowski's crimes to AUSA Stephen Sinnott. Based upon Casali's information, Sinnott ordered Adamcik to end ATF's working relationship with Miedzianowski. Pl. 21-24, 26-27.

Casali and Klipfel both made timely disclosures of the Chicago police misconduct to ATF. Pl 28-31. ATF stipulated that the disclosures were made during an MSPB proceeding in which Casali was certified as a "whistleblower" for his reporting of Miedzianowski's activities.[4] Pl. 11, 31.

---

[4] The MSPB is the Merit System Protection Board, an administrative court where federal employees may appeal personnel actions. Judge Manrose's opinion followed a one week evidentiary trial on plaintiff Casali's appeal of ATF's 1996 Notice of Proposed Termination.

### C. *Retaliation Against Plaintiffs by CPD and Resulting Harm to Plaintiffs' Careers:*

Contrary to ATF policy, Adamcik leaked Klipfel's allegations to the Chicago Police Department. Then, in June and November, 1992, Agents Vince and Adamcik met with members of the CPD, including Miedzianowski and his supervisors, Sergeant Korte and Captain Parisi, to discuss the Klipfel and Casali allegations. Pl. 13, 25, 35, 120.

In September, 1993, plaintiffs learned that Miedzianowski had fabricated a false report against Klipfel, threatening to kill an informant if the informant refused to file a false report against Klipfel. Additionally, Miedzianowski accompanied the intimidated informant to CPD's Internal Affairs Division ("IAD"), and participated in the IAD interview. Pl. 19. Miedzianowski and other CPD officers falsely accused Klipfel of stealing while executing the Pippin warrant and other warrants. Pl. 32, 37. A CPD supervisor, Sgt., Korte came to ATF to complain about Klipfel. Pl. 33. CPD Officer Byrne falsely told Pippin's defense counsel that Klipfel was the thief. Byrne and Officer Smith told Pippin the same thing. Pl. 37, 39.

The organized campaign of retaliation against Klipfel was so rabid that other ATF agents expressed concerned that they could no longer work with Agents Klipfel and Casali. Pl. 38. Calling her a "lunatic" and "racist", Miedzianowski and Galligan spread false statements against Klipfel to other CPD gang crimes officers and to TV reporter Carol Marin. Pl. 38, 40-43, 64. In its failed attempt to protect Miedzianowski and the reputation of CPD, CPD members intimidated any and all accusers. Pl. 181-192.

The campaign of retaliation by many CPD officers and also by CPD supervisors spread throughout the Police Department and the Chicago ATF office. Pl. 44-45. Assistant Deputy Superintendent Risley accused plaintiffs of criminal conduct to ATF, to

5

the Superintendent of the Chicago Police Department, a United States Senator, the federal Department of Justice, NBC, and to numerous other government and media entities. Pl. 158-180. During the Chicago Police Department's campaign to destroy plaintiffs' reputations, Risley also wrongly disclosed confidential information. Pl. 180.

Ultimately, the Chicago Police Department's allegations were used to convince ATF to move forward with disciplinary action against Klipfel and Casali. For the next twenty-five months, plaintiffs were stripped of their supervisory positions and were not allowed to engage in law enforcement activity. ATF took away their guns and badges, their government automobiles, lowered their performance ratings and even posted their positions as vacant. Plaintiffs were deliberately idled and forced to report to work each day and sit in a windowless storage closet while members of law enforcement taunted them. Ultimately, MSPB Judge Stephen Manrose found the Chicago Police Department's allegations of plaintiffs' misconduct to be meritless. Pl 46-48.

### III. City Policies

#### A. *The Blue Wall of Silence:*

The City completed its Motion for Summary Judgment years before it reviewed any of the hundreds of thousands of pages of documents produced in this case and before extensive depositions of defendant Miedzianowski, prosecuting U.S. Attorney Brian Netols and others. Unfortunately, that meant that the City submitted its motion without knowledge of plaintiffs' indisputable evidence of the City's own policies and misdeeds that caused the violations of plaintiffs' rights. One such policy, the "blue wall of silence" or "code of silence" has been a factor in virtually every case brought by the U.S. Attorney against crooked Chicago police officers; it has been a part of CPD culture for decades. The code tells officers not to report crimes by other officers and also not to stop criminal

6

activity committed by police officers. It also functions as a code of mutual cooperation. Police officers must not testify against each other and must assist fellow officers who get in trouble. At least 21 officers have been criminally prosecuted by the federal government from 1995 through 2004. Prior to indictment, CPD IAD investigated most of the Chicago Police Officers, but CPD sustained none of the charges. Pl. 49-82. Even former CPD Superintendent Leroy Martin admitted that the Code of Silence exists within CPD. Pl. 82.

The code of silence was definitely a factor in the criminal prosecution of Miedzianowski. Pl. 58. Other CPD Officers knew of Miedzianowski's criminal conduct, but failed to report him. Miedzianowski was not alone; the "code of silence" protected other officers as well. Pl. 62, 66-79. Indeed, the head of CPD Internal Affairs, Assistant Superintendent Risley, believed that accused officers were under no obligation to report allegations of misconduct to superiors. Pl. 81. As more fully set out below, it was the code that created a safe atmosphere for Miedzianowski to operate a criminal enterprise for more than 14 years. In fact, from training to retirement, Chicago police officers are expected to exhibit such fierce loyalty to the department that turning a blind eye to crime within the ranks is required. Pl. 66-79.

**B.** *City's Failure to Supervise and Discipline:*

Miedzianowski's supervisors, including high-level policy-making officials, knew of his misconduct, ignored it, and failed to act. One of his supervisors, then-Detective Commander Phil Cline, did report some misconduct, but no action was ever taken. IAD never even interviewed Commander Cline. Cline himself believed the CPD was not properly supervising Miedzianowski. Pervasive failure to supervise its own employees ultimately caused the CPD to disband the gang crimes unit, of which Miedzianowski was

7

a member, in 2000. Pl. 99-121. The CPD general orders prohibiting unlawful conduct (and upon which the City now attempts to anchor its defense) were not even distributed to individual CPD officers. Pl. 122.

Contrary to the City's position that the Miedzianowski scandal was a single, isolated incident, the City was fully aware of deep and pervasive corruption within the CPD, especially gang infiltration. Although the City knew that CPD officers were involved in drug dealing and associating with gang members, it was common knowledge that they would rarely be caught, prosecuted, or disciplined. Pl. 198-245. After repeated media reports of the relatively few cases of corruption that were exposed, the Mayor of Chicago created the Webb Commission on Police Integrity to recommend policy changes. Pl. 246-288. The Webb Commission recommendations included important changes in supervision and training to combat the problem of departmental corruption, but changes pertaining to supervision and training were never implemented. Pl. 284-288.

In fact, in April, 1992, when Matt Rodriguez became CPD superintendent, there was a three-year backlog of IAD sustained matters awaiting review. And, of the criminal police officers that were ultimately indicted by the federal government, CPD IAD dismissed their investigations against them. The department's IAD was so mistrusted that the U.S. Attorney's Office did not even notify CPD Command Staff of the federal investigation of Miedzianowski. Pl. 93.

CPD's supervision of its officers appears even more dismal in light of the numerous "unsustained" complaints against Miedzianowski for past misconduct. Pl. 58-61. Miedzianowski had twenty or more internal affairs complaints filed against him, and more than twenty excessive force cases, but the CPD failed to investigate these charges. Pl. 83-84, 91. In one particularly egregious incident, Miedzianowski, angry at a

8

particular ATF agent, broke into her babysitter's home, believing it to be the home of the Agent. When a witness identified Miedzianowski as the individual who broke into the home, the two CPD IAD officers interviewing the witness took no action, failed to report Miedzianowski as the perpetrator and pleaded with the witness to change her story. Pl. 85-90.

CPD IAD was completely ineffective in disciplining or supervising Miedzianowski and other officers. The 1993 IAD investigation of Miedzianowski stemming from plaintiffs' allegations was, by the City's own admission, deeply flawed. Deviating from department technique and general orders, IAD did not review past allegations against Miedzianowski, did not include an interview of the complainants (federal agents), and terminated the investigation without even interviewing the accused officers, although relying upon Miedzianowski for information. Risley admitted the investigation violated appropriate procedure. Miedzianowski improperly had access to investigative documents, and was allowed to be present during some witness interviews. Although the United States Attorneys' Office thought the investigation to be ineffective, the CPD approved the process at its highest supervisory levels. Pl. 139-157. The U.S. Attorney's Office has stated that CPD IAD was similarly ineffective in each and every case of criminal conduct by a Chicago Police Officer prosecuted by the U.S. Attorney. Pl 50-53. In fact, just as with many other Chicago Police Officers, the Chicago Police Department did not bring the crooked Officer Miedzianowski to justice, the U.S. Attorney had to do the job.

9

## IV. Argument

### A. *Monell and General Theories of Municipal Liability:*

Twenty-five years after *Monell v. Department of Social Services*, 436 U.S. 658, 98 S.Ct. 2018 (1978), the evidentiary burden on these plaintiffs is relatively clear. First, where a constitutional deprivation is visited on plaintiffs pursuant to governmental policy or custom, that policy or custom need not be made by the city's lawmakers, but can be set by those whose acts may fairly be said to represent official policy. *Id.*, 436 U.S. at 694, 98 S.Ct. at 2037-2038. If the policy itself is unconstitutional, even a single incident of misconduct may prove the existence of the deficient policy and justify liability. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 106 S.Ct. 1292 (1986); *Owen v. City of Independence*, 445 U.S. 622, 100 S.Ct. 1398 (1980). Where the policy itself is not unconstitutional, such as a "policy" of inadequate training, fault by the city and the causal connection between the policy and the constitutional deprivation can still be established with additional proof. The policy must be the moving force behind the violation and there must be an affirmative link between the policy and the constitutional violation. *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823-4, 105 S.Ct. 2427, 2434, 2436-2437 (1985). Finally, for liability to attach to the City, there needs to be evidence of a "deliberate indifference" to the rights of persons affected by the substandard policy. *City of Canton v. Harris*, 489 U.S. 378, 109 U.S. 1197 (1989). The "deliberate indifference" requirement is met when plaintiffs show the city's actions were inadequate, the inadequacies were likely to result in the denial of constitutional rights, that it was obvious that additional or different actions were needed, and that no additional or different actions were taken. However, in some cases, the need for the City to take some action may be so

10

obvious that failure to do so could properly be described as "deliberate indifference." *Id.*, 489 U.S. at 388-389, 109 U.S. at 1204-1205.

Courts have repeatedly held that retribution against whistleblowers is adequate evidence to meet the *Monell* burden for First Amendment retaliation and impose §1983 liability against the municipality. *Blair v. City of Pomona*, 223 F.3d 1074 (9th Cir. 2000); *Jeffes v. Barnes*, 208 F.3d 49 (2d Cir. 2000), *cert. den.*, 531 U.S. 813, 121S. Ct. 47 (2000); *Sharp v. City of Houston*, 164 F.3d 923 (5th Cir. 1999); *Thomas v. City of New Orleans*, 687 F.2d 80 (5th Cir. 1982).

The facts in *Blair* are very similar to the case at bar and provide an excellent analysis. A good police officer learned of crimes committed by other police officers and reported his information to supervisors. Soon thereafter, the officer was subjected to threats, thefts, and harassment, some anonymous, some not. When the harassment caused him to no longer be able to handle the job, the officer was terminated and he brought suit under §1983. The court, in considering the City's motion for summary judgment, held that the plaintiff had demonstrated a sufficient *Monell* claim (223 F.3d at 1079):

> ...Blair must satisfy five conditions: (1) that he had a constitutional right; (2) that he was deprived of this right by an adverse employment action; (3) that the City had a custom created by those who may fairly be said to determine official policy; (4) that the custom amounted to at least deliberate indifference to Blair's constitutional rights; and (5) that the custom was the moving force behind the constitutional violation. [citing cases].
> Blair had the right under the First Amendment to inform his superiors of misconduct in the police department. [citing case]. This right is uncontested, so Blair has satisfied the first condition. The second, third, fourth, and fifth conditions are ordinarily to be determined by a jury if there are disputed facts in their regard. [citing cases]. Hence on this appeal from summary judgment, our inquiry is whether Blair presented sufficient evidence, if all inferences were drawn in his favor, for a jury to conclude that the policy-makers of the City approved a custom or policy amounting to at least deliberate indifference to his right to inform his

11

> supervisors of misconduct and that this custom or policy caused the violation of his right.
> ...Blair was subjected to a series of acts that a reasonable factfinder could infer were inflicted by members of the Department with the knowledge and tacit connivance of those running the Department....[listing the harassment that ensued].
> This evidence, if believed by the jury, would be sufficient to establish that the Department had the custom of chastising whistleblowers and constitute adverse employment action. It would also be sufficient to establish that the Department had failed to train its members not to retaliate against whistleblowers. It would be open to the jury to conclude that one or more of these customs or policies was made by those in charge of the Department who were aware of the police code of silence; that the custom or policy amounted to at least deliberate indifference to Blair's right to speak; and that the policy was the moving force resulting in the constitutional deprivation suffered by Blair. [citing cases].

The *Blair* court then went on to conclude (223 F.3d at 1080-1081):

> The evidence presented to the district court, if believed at trial and the inferences if drawn by the jury, would justify the conclusion that the Department had a custom, approved by its policy-makers, of at the very least deliberate indifference to the right of a member of the Department to report to a superior the misconduct of a fellow officer. The seriousness of such a custom and the need of a civil rights remedy for it is underlined by what has been observed around the country as to the code of silence in police departments. [citing cases]....It is a formidable barrier to the investigation of complaints about the police....

Plaintiffs easily meet *Monell's* requirements for purposes of summary judgment. First, as clearly set out in *Blair*, plaintiffs in the case before this Court, federal law enforcement agents, had the right to inform their superiors of misconduct in the Chicago Police Department. The City does not contest plaintiffs' right to report so plaintiffs have satisfied the first condition. The remaining requirements for a plaintiff to overcome *Monell* are generally to be determined by a jury if there are disputed facts, *Blair, supra,* so the inquiry is whether plaintiffs, with all inferences drawn in their favor, presented sufficient evidence for a jury to conclude that the City approved a custom or policy

amounting to at least deliberate indifference to plaintiffs' right to whistleblow and that the custom caused the violations to plaintiffs' rights. *Blair, supra.*

### 1. Plaintiffs Have Compiled an Ample Record Containing Substantial and Uncontroverted Evidence of the City's Custom of Failure to Discipline, Failure to Train and Supervise, and Acquiescence in or Promotion of "Blue Wall of Silence" Policy[5]

The failure to discipline police officers for police misconduct is a sufficient basis to establish municipal liability. *Gentile v. County of Suffolk*, 926 F.2d142, 152-153 (2d Cir. 1991). As described in *Williams v. City of Chicago*, 658 F. Supp. 147, 152 (1987):

> Recurring similar incidents may permit an inference, despite a lack of direct evidence of policymaker involvement, that responsible authorities have encouraged or approved such conduct, or at least that they knew or should have known of such conduct and were deliberately indifferent to it. [citing cases]. If so, the conduct of the low-level employees is fairly attributable in part to policymakers. The policymakers' stance can then fairly be described as a custom or policy of the municipality which helped to legally cause the deprivation. [citing case] (supervisors' failure to establish procedures which would uncover police misconduct); Such liability may well be better described as liability on the basis of custom (a habitual practice, a pattern of conduct) rather than policy (a conscious choice of a course of action, formally adopted by decision makers), as the Seventh Circuit has suggested. [citing cases]. But it is municipal liability nonetheless.

Thus, plaintiffs' myriad of facts regarding the Chicago Police Department's failure to train, discipline and supervise its officers militate against the City's contention that it did not have such policies. Plaintiffs have uncovered facts which indicate that the City failed to establish procedures to break the code of silence and uncover police misconduct. The Mayor of the City of Chicago knew that the Police Department was infiltrated by gangs, but did not act to root them out. Pl. 198-210. The Chicago media carried stories of police corruption for years, but the code of silence continued unabated.

---

[5] In ruling on the City's motion, the Court must view the facts in favor of the non moving party [plaintiffs] and draw all reasonable inferences on their behalf. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)

13

Pl. 246-300. Even Raymond Risley, the former head of CPD IAD told the Chicago Tribune that his efforts to root out mob influence in CPD were stalled by top officials and that they spied on him in retaliation. Pl. 273.

The Seventh Circuit expressly recognizes and condemns a police department's "code of silence" (a/k/a "blue wall of silence"). See *Simon v. City of Naperville*, 88 F. Supp. 2d 872 (N. Dist. Il. 2000); *McLin v. City of Chicago*, 742 F. Supp. 944 (N. Dist. Il. 1990); *Myatt v. City of Chicago*, 1991 U.S. Dist. LEXIS 7056 (N. Dist. Il. 1991). Oft cited too is *United States v. Ambrose*, 740 F.2d 505 (7th Cir. 1984), where Judge Grady expressly found the code of silence in the Chicago Police Department: "it is not simply a code of silence; it is a code of mutual cooperation. Not only will policemen not testify against each other, but they come to the assistance of a fellow officer who gets in trouble....within the [Chicago Police Department] it is a fact and it was even admitted from the witness stand that there is a code of silence and that most policemen observe it."

A plaintiff may prove the City's *Monell* causation by showing that while policy makers themselves may engage in facially lawful action, they indirectly caused the misconduct of subordinate municipal employees by reason of the policymakers' acquiescence in a longstanding practice or custom which constitutes the standard operating procedure of the entity. Where these facts are presented, causation becomes a question for the jury. *Jeffes v. Barnes, supra,* 208 F.3d at 61-62. *Jeffes* concerned "deliberate indifference" to a pattern of harassment by sheriff's personnel against a co-employee. While there may not be an actual written policy of "not taking steps to train its employees," where the need for better training, or better discipline procedures, or better supervision is obvious, and the inadequacy so likely to result in the denial of constitutional rights, then the failure to provide proper training, disciplinary procedures,

14

or supervision, then the policy makers can reasonably be said to be deliberately indifferent to the need.

Chicago should have known and did know that Miedzianowski was a bad police officer, that training and supervision of its police officers was inadequate, and that the "code of silence" was operative, used to protect bad officers and punish whistleblowers. Mayor Daley established the Webb Commission to determine new ways to root out officers like Miedzianowski and then he failed to implement the Commission's recommendations. Pl. 305. In each and every case where Chicago Police Officers have been indicted by the U.S. Attorney's Office, the code of silence has been a factor keeping the officers from justice and allowing crime to go unpunished. Pl. 51, 56-57. And, in each and every case of a corrupt officer, the City of Chicago previously failed to discipline or supervise. Pl. 52. Plaintiffs have provided more than adequate evidence in their Statement of Additional Facts to show a dispute of material fact regarding the City's policies and the City's motion should be denied.

### 2. *The City's Policies and Deliberate Indifference Were the Cause of Plaintiff's Constitutional Injuries*

A jury could easily conclude that the damages plaintiffs suffered were inflicted as a result of conduct by CPD members, with the knowledge and tacit approval of those running the Department. A jury could also conclude that CPD failed to train, supervise and discipline its members so that they did not retaliate against whistleblowers. The facts are that those in charge of CPD were aware of the Code of Silence, rendering them, at minimum, deliberately indifferent to plaintiffs' right to speak out about corruption within the ranks. Each time the Chicago Police Department filed a formal complaint against the plaintiffs, falsely charging plaintiffs with criminal activity, the Department's policy became the cause of plaintiffs' injuries. In an odd twist, the City also argues that

15

Miedzianowski's prior discipline history did not include complaints of retaliation so the City did not know that Miedzianowski was violating plaintiffs' rights. But the City totally misunderstands the nature of its own misconduct. The City's failure to root out corruption through training, supervision and discipline, combined with the code of silence, facilitated plaintiffs' injuries. Responsible persons at the City knew of CPD's inadequacies, but were indifferent, allowing CPD members to directly injure the plaintiffs. It is important to remember that these plaintiffs were federal law enforcement agents against whom the Chicago Police Department filed false complaints that threatened plaintiffs' safety, their livelihood and their reputations. CPD senior management officials expressly concurred and actively participated in these acts. Pl. 46, 79, 155, 156, 158–160.

Causation should not be in doubt when viewed with the facts: the plaintiffs' allegations against Miedzianowski were true (Pl. 94 – 98, 133); the timing of the allegations perpetrated by Miedzianowski and the CPD were made almost immediately after plaintiffs' disclosures were revealed (Pl. 32, 33, 35, 43 – 47, 158 – 174); the allegations against plaintiffs' were false, fabricated, without merit and concerned crimes actually committed by Miedzianowski and Galligan (Pl. 47, 144, 145, 161 – 171); and the CPD failed and actually refused to conduct a valid investigations into plaintiffs' allegations against Miedzianowski (Pl. 139–157). The only conclusion is that the City's Blue Wall of silence policy and other failures to train and supervise, directly caused the retaliation against plaintiffs, in violation of their First Amendment rights.

**B.** *Because Miedzianowski's Misconduct Centered On His Usage of the City's Code of Silence Policy, His Acts Fell Within the Scope of Employment*

Relying upon *Wright v. City of Danville*, 174 Ill.2d 391 (1996), the City argues that Miedzianowski's defamation of plaintiffs was outside the scope of his employment, permitting the City to avoid responsibility to indemnify. However, because the evidence supports a finding that the City not only knew of, but perpetuated the code of silence (and/or with deliberate indifference to its operation), Micdzianowski's wrongful acts were motivated by and performed, in large part, in furtherance of the City's policy.[6] If the tort was in furtherance of his employment, that is, if the employee's motive, or at least *a* motive in committing the tort, was to serve the employer, then indemnification shall be enforced. *Doe v. City of Chicago*, 360 F.3d 667, 670 (7th Cir. 2004). *Doe* also states that summary judgment on the issue of indemnification is inappropriate until liability has been adjudicated. *Id.*, at 673.

The City concedes that the police officer's acts were within the scope of employment if done, at least in part, to serve the employer's interest. *Pyne v. Witmer*, 129 Ill.2d 351(1989); Restatement (Second) of Agency, Sec. 228 (1958). Moreover, an employee's acts, even if unauthorized, may be within the scope of employment if the employer can expect the acts based on the nature of the work the employer has authorized. *Id*, §229, Cmt. b. Based upon Miedzianowski's prior activities of repeated, undisciplined misconduct (Pl. 83, 322) and because his acts were, in large part, authorized by, and in furtherance of the City's custom/policy to protect officers from discipline and to protect CPD's reputation, Miedzianowski's misconduct is within the scope of employment.

---

[6] Plaintiff's have presented an overwhelming factual case to establish the City's *Monell* liability. Indemnification is a second and independent ground upon which to support City responsibility.

17

Plaintiffs have also offered extensive factual evidence that Miedzianowski's acts were within the scope of employment. Pl. 316-340. Always acting under color of law as a police officer (Pl. 316-340), his intent in retaliating against plaintiffs, by his own words, was to protect and further the cause of the Chicago Police Department. Pl. 323. Miedzianowski claims that he reported plaintiffs for their alleged criminal activities because he had to as a Chicago Police officer. Pl. 324.

Plaintiffs seek to hold Miedzianowski liable for using the department's investigative and complaint process to assist in perpetuating a system that allowed crime within the department to flourish. Pl. 316-340. This case is not about a single rogue cop on a free-lance criminal exploit. On the contrary, several members of the Chicago Police Department, including supervisory personnel, helped Miedzianowski to retaliate against plaintiffs expressly using CPD's power and authority. CPD actually notified ATF Internal Affairs that plaintiff Klipfel would be arrested when CPD finished its investigation. Pl. 165. Obviously, Miedzianowski's authority (or any member of CPD's authority) to affect such an arrest could only be authorized by the Department and within the scope of employment. As in the City's attack upon plaintiffs' *Monell* claim, the City prepared its motion prior to the introduction of facts that clearly show evidence of scope. The wrongful acts of harassment were to enforce City policies, including the code of silence. As such, they most certainly fell within the scope of employment. *Blair v. City of Pomona*, supra, 223 F.3d at 1081.[7],[8]

---

[7] Plaintiffs recognize the State of Illinois law as described in *Doe v. City of Chicago*, 360 F.3d 667 (7th Cir. 2004), wherein the court posited the proposition that scope should be interpreted broadly when it involves police officers, a proposition still awaiting state court consideration. However, the fact that liability is grounded not in some aberrational singular crime or criminal, but in the wrongful City policies, sets this case apart and brings it within the *Blair v. Pomona* rationale. 360 F.3d 672-673.

[8] If this Court were to determine at summary judgment that Miedzianowski was not acting within the scope of his employment, the City would still be liable under the alternate theory of "apparent authority." Restatement (Second) of Agency §219 (1958). ("A master is not subject to liability for the torts of his

18

## IV. Conclusion

The City's Motion for Summary Judgment is woefully inadequate to stop plaintiffs from having their day in Court. On *Monell*, plaintiffs have presented ample evidence to indicate that there is, at minimum, a material fact dispute regarding the City's custom or deliberate indifference to crime by its officers. Plaintiffs have clear evidence of the City's code of silence and failures to train, supervise and discipline. Those customs caused plaintiffs harm. In regard to scope, the evidence clearly supports plaintiffs' contention that Miedzianowski and the other officers who attempted to destroy plaintiffs' reputations did so with the authority of the entire Chicago Police Department. The City of Chicago's Motion must be denied.

Date: November 4, 2005

Respectfully submitted,
MICHAEL CASALI
DIANE KLIPFEL

By: ____Sally S____
One of their Attorneys

Sally H. Saltzberg
P. Michael Loftus
Attorneys for Defendant
Loftus & Saltzberg, P.C.
53 West Jackson, Suite 1515
Chicago, Illinois 60604
(312) 913-2000

Michael Kreloff, of counsel

---

servants acting outside the scope of their employment, unless…(d) the servant purported to act or to speak on behalf of the principal and there was reliance upon apparent authority, or he was aided in accomplishing the tort by the existence of the agency relations.")

STATE OF ILLINOIS )
                                      ) SS.
COUNTY OF COOK )

## CERTIFICATE OF SERVICE

The undersigned, an attorney, hereby certifies that she caused a copy of the foregoing **Plaintiffs' Local Rule 56.1(b)(3) Response to Defendant City of Chicago's Statement of Undisputed Facts, Plaintiffs' Local Rule 56.1(b)(2) Statement of Additional Undisputed Facts, Plaintiff's Memorandum of Law in Opposition to City's Motion for Summary Judgment and Ten (10) Exhibit Binders**, to be served on all counsel of record via hand delivery on this 4th day of November 2005.

                                                                    Sally H. Saltzberg

Andrea M. Buford
Buford Law Office, LLC
6 East Monroe, Suite 1301
Chicago, IL 60603

Arnold Park
City of Chicago Corporation Counsel
30 North LaSalle Street, Suite 900
Chicago, IL 60602