**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

**F I L E D**

**JAN 2 7 2006**

**MICHAEL W. DOBBINS**
**CLERK, U.S. DISTRICT COURT**

DIANE L. KLIPFEL and MICHAEL
V. CASALI,

           Plaintiffs,

    v.

ROBERT RUBIN, et al.,

           Defendants.

)
)
)
)
)
)
)
)
)
)

No.    94 C 6415

Judge MANNING

**PLAINTIFFS' LOCAL RULE 56.1(b)(2) STATEMENT**
**OF ADDITIONAL UNDISPUTED FACTS**

### I.    BACKGROUND FACTS

1.    Plaintiff Casali is a current employee of the Bureau of Alcohol, Tobacco and Firearms, ("ATF") employed as a special agent assigned to the Chicago, Illinois Field Division Office. While currently a firearms instructor coordinator, as a federal criminal ATF investigator, his duties included detection, investigation and arrest of suspects who committed firearms, explosives, narcotics and other related criminal violations. (Casali Deposition, pp. 5–6, exhibit 1; ATF Answer to Fourth Amended Complaint, ¶9, exhibit 2)

2.    Plaintiff Klipfel is a former employee of the ATF now on retirement disability. Formerly, plaintiff Klipfel was a supervisory special agent assigned to the Chicago Field Division. As a federal criminal ATF investigator, her duties included detection, investigation and arrest of suspects who committed firearms, explosives, narcotics and other related criminal violations. (City of Chicago's Answer to Fourth Amended Complaint, ¶10, exhibit 3; ATF Answer to Fourth Amended Complaint, ¶10, exhibit 2)

3. On or about October 23, 1976, Klipfel was hired as a Special Agent, Criminal Investigator, by the ATF. On or about February 28, 1990, she became Group Supervisor of ATF Chicago Group III, and held that position until July 1, 1992, when she became Group Supervisor of ATF Oak Brook Group I. Since joining ATF, Klipfel was rated "fully successful" or higher in each of her performance evaluations. At all relevant times, Agent Klipfel reported to Assistant Special Agent in Charge ("ASAC") Jimmie Adamcik or ASAC Tom Lambert and Special Agent in Charge ("SAC") Joe Vince. (ATF Answer to Fourth Amended Complaint, ¶11, exhibit 2; Klipfel Deposition, pp. 331-332, exhibit 4)

4. On or about May 24, 1976, Casali was hired as a Special Agent, Criminal Investigator, by the ATF. On or about May 5, 1991, he became Group Supervisor of ATF Chicago Metro Group II and Group VI, where he remained until 1997. In 1997, Casali became ATF Firearms Instructor Coordinator for the Chicago Field Division and has held that position ever since. Since joining ATF, Casali has been rated "fully successful" or higher in each of his performance evaluations. At all relevant times, Agent Casali reported to Assistant Special Agent in Charge ("ASAC") Jimmie Adamcik and Special Agent in Charge ("SAC") Joe Vince. (ATF Answer to Fourth Amended Complaint, ¶12, exhibit 2; Casali Deposition, pp. 5-6, exhibit 1)

5. At all times prior to February 1, 1992, Klipfel enjoyed a reputation as a competent, professional, honest, truthful and capable agent and supervisor of ATF. (Brian Netols Deposition, pp. 13, 54, exhibit 5)

2

6. At all times prior to February 1, 1992, Casali enjoyed a reputation as a competent, professional, honest, truthful and capable agent and supervisor of ATF. (Brian Netols Deposition, p. 12, exhibit 5)

7. At no time prior to February 1, 1992, had any complaints been made to ATF Internal Affairs ("IA") regarding plaintiff Klipfel. At no time prior to February 1, 1992 had plaintiff Casali had any complaints sustained against him by ATF Internal Affairs ("IA"). (ATF Answer to Fourth Amended Complaint, ¶16, exhibit 2; Klipfel Deposition, pp. 331-332, exhibit 4; Klipfel Statement to ATF Internal Affairs, pp. 1, exhibit 6; Testimony of Diane Klipfel, *Michael V. Casali v. US Department of the Treasury*, MSPB Docket Number CH-1221-96-0936-B-1, p. 137, exhibit 7)

8. Prior to February 1, 1992, neither Klipfel nor Casali had ever had any disciplinary action imposed upon either of them by ATF. At all times relevant hereto, SAC Vince was Special Agent In Charge of the Chicago Division Office and was the highest-ranking supervisor of Klipfel and Casali in the Chicago Division Office. (ATF Answer to Fourth Amended Complaint, ¶16, exhibit 2)

9. On or about February 28, 1990, Klipfel was group supervisor to Chicago Metro III group of the ATF and proposed the formation of a task force specifically targeting Latin street gangs in Chicago, Illinois (the "Task Force"). Chicago Police Department ("CPD") Officer Miedzianowski and CPD Officer Galligan were assigned to the Task Force. (City of Chicago's

3

Answer to Fourth Amended Complaint, ¶17, exhibit 3; ATF Answer to Fourth Amended Complaint, ¶17, exhibit 2; Klipfel Deposition, pp. 331-332, exhibit 4; Klipfel Statement to ATF Internal Affairs, pp. 3 -4, exhibit 6)

10.     On or about February 20, 1992, Klipfel, together with one ATF special agent ("SA"), CPD Officer Miedzianowski, and officers from the CPD Organized Crime Narcotics Unit, executed a search warrant on the home of Darrin Pippin in the Northern District of Illinois. (Miedzianowski's Answer to the Fourth Amended Complaint, ¶22, exhibit 8; ATF Answer to Fourth Amended Complaint, ¶ 21, exhibit 2; City of Chicago's Answer to Fourth Amended Complaint, ¶21, exhibit 3; City of Chicago Local Rule 56.1 Statement of Undisputed Facts, ¶10, exhibit 9; Klipfel Deposition, pp. 56, 164-165, 331–332, exhibit 4; Klipfel Statement to ATF Internal Affairs, pp. 22 - 23, exhibit 6; Pippin Affidavit, ¶26, exhibit 10)

## II.     PLAINTIFFS' DISCLOSURES

11.     On or about February 21, 1992, in a telephone conversation, Agent Klipfel reported to ATF ASAC Jimmie Adamcik, the following information regarding police corruption that Ms. Klipfel observed on the previous date in connection with the execution of several search warrants:

a)     On or about February 19, 1992, SA Laurie Jolley informed Klipfel that she was obtaining two search warrants; one for Darrin Pippin's (hereinafter referred to as "Pippin") residence located at 4533 North Drake, Chicago, Illinois, and the other for the residence of Pippin's mother, Frances Sanchez, located at 5028 North Kimball, Chicago, Illinois. Pippin was wanted for having failed to appear on the date that he was to begin serving a six-year narcotics related sentence. The warrants were to be served the next day on February 20, 1992. The group serving the warrants consisted of Klipfel, SA Jolley, Miedzianowski, Byrne and CPD officers Smith and Lasch. During the execution of the search warrant at Pippin's residence, Miedzianowski found a key on Pippin for a safety deposit box at Albany Park Bank located at 3400 W. Lawrence Ave., Chicago, Illinois. While

4

Klipfel and Pippin were at the ATF office, Byrne and Miedzianowski obtained a search warrant for the safe deposit box and searched it. Later that day, while still in ATF custody, Pippin stated to Klipfel that CPD Officer Byrne and CPD Officer Miedzianowski had stolen thousands of dollars and other property while serving these warrants.

b)       When confronted about this by Klipfel, who demanded that all the money and other property be inventoried as recovered assets, CPD Officer Miedzianowski screamed at her, threatening Klipfel, her husband and their children, and Miedzianowski refused to inventory the money.   CPD Officer Miedzianowski, in the company of CPD Officer Byrne, kicked the door of Klipfel's automobile and screamed:

> "Bitch, you're stupid.  There are four of us here who will say you stole the money and stole off every search warrant you've ever been on.  Four against one.  Your husband and you both work in the City.  Remember that, always remember that.  And you better watch your darling kids.  Your house could get lit up.  That bastard (pointing to Pippin) will never back you up after he gets his ass poked in jail, and 'she' (SA Jolley) will back us on everything. She'll be our witness.  Nothing happened, but the only thing that will happen is you'll get fired.  Gamboa's going to hear about this. Adamcik will back us all the way and your ass will be out in the street.  We own fucking Adamcik."

Agent Klipfel immediately requested of ASAC Adamcik that CPD Officers Miedzianowski and Galligan, who were detailed to ATF, be sent back to their unit in the CPD.  (City of Chicago Local Rule 56.1 Statement of Undisputed Facts, ¶13, exhibit 9; Klipfel Deposition, pp. 67, 251- 263, 268, 331 – 332, exhibit 4; Klipfel Statement to ATF Internal Affairs, pp. 24 - 42, exhibit 6; Pippin Affidavit, ¶29, exhibit 10; ATF Stipulations, *Michael V. Casali v. US Department of the Treasury*, MSPB Docket Number CH-1221-96-0936-B-1, pp. 101, 103, exhibit 11; Klipfel testimony, *Michael V. Casali v. US Department of the Treasury*, MSPB Docket Number CH-1221-96-0936-B-1, pp. 113-114, exhibit 7)

12.     Beginning on or about February 21, 1992, Klipfel reported to ASAC Adamcik information regarding subsequent acts of corruption committed by certain CPD officers including, but not limited to CPD Officer Miedzianowski. (City of Chicago Local Rule 56.1 Statement of Undisputed Facts, ¶¶11, 12, 14, 16, exhibit 9; U.S. Dept. of the Treasury's Response to Miedzianowski's interrogatories, #9, exhibit 12; Klipfel Deposition, pp. 331 – 332, exhibit 4; Klipfel Statement to ATF Internal Affairs, pp. 42, 45 – 46, 76, exhibit 6; ATF Stipulations, *Michael V. Casali v. US Department of the Treasury*, MSPB Docket Number CH-1221-96-0936-B-1, pp. 101-103, exhibit 11)

13.     Contrary to established ATF policy, ASAC Adamcik secretly called the CPD officers' commanding officer and leaked Klipfel's accusations. (Klipfel Deposition, pp. 74–76, 331 332, exhibit 4; Klipfel Statement to ATF Internal Affairs, pp. 45 - 46, exhibit 6; Klipfel testimony, *Michael V. Casali v. US Department of the Treasury*, MSPB Docket Number CH-1221-96-0936-B-1, p. 115, exhibit 7)

14.     On or about March 18, 1992, Klipfel again reported to SAC Vince and ASAC Adamcik the same information she had reported on February 21, 1992, regarding the allegations of Chicago police corruption. Klipfel also reported to SAC Vince and ASAC Adamcik that CPD Officer Miedzianowski had threatened to kill Klipfel, Casali and their children. (City of Chicago's Local Rule 56.1 Statement of Undisputed Facts, ¶13, exhibit 9; U.S. Dept. of the Treasury's Responses to Miedzianowski's interrogatories, #9, exhibit 12; Klipfel Deposition, pp. 331–332, exhibit 4; Klipfel Statement to ATF Internal Affairs, pp. 52 - 57, exhibit 6; Klipfel

6

testimony, *Michael V. Casali v. US Department of the Treasury*, MSPB Docket Number CH-1221-96-0936-B-1, pp. 116-117, exhibit 7; ATF Stipulations, *Michael V. Casali v. US Department of the Treasury*, MSPB Docket Number CH-1221-96-0936-B-1, pp. 101, 103, exhibit 11)

15.     On or about October 20, 1992, Klipfel reported to ATF Internal Affairs, her knowledge of sexual harassment in ATF management. Specifically, Klipfel reported sexual harassment allegations by Sandra Hernandez against her supervisor, John Gamboa, and the corruption prevalent in the Chicago ATF management that delayed Hernandez from reporting the harassment. Officer Miedzianowski was a close friend and ally of Agent Gamboa. (U.S. Dept. of the Treasury's Response to Miedzianowski's interrogatories, #9, exhibit 12; ATF Answer to Fourth Amended Complaint, ¶49, exhibit 2; Affidavit of Diane Klipfel to ATF Internal Affairs, ATF IA report 930007, exhibit 13; Klipfel testimony, *Michael V. Casali v. US Department of the Treasury*, MSPB Docket Number CH-1221-96-0936-B-1, pp. 125-127, exhibit 7)

16.     On or about October 29, 1992, Klipfel reported that SAC Vince and ASAC Adamcik were accepting gifts and favors from the CPD officers assigned to ATF who were alleged to be involved in illegal dealings with Chicago street gangs. (ATF's Answer to Fourth Amended Complaint, ¶56, exhibit 2; Affidavit of Diane Klipfel made to the Office of the Inspector General, OIG report of investigation #I-CE-93-002, exhibit 14; ATF Stipulations, *Michael V. Casali v. US Department of the Treasury*, MSPB Docket Number CH-1221-96-0936-B-1, exhibit 11)

7

17. On or about January 16, 1993, Klipfel reported to ATF IA Agent Hemsath, the allegations of police corruption regarding CPD Officers Joe Miedzianowski and John Galligan who were assigned to ATF. (U.S. Dept. of the Treasury's Response to Miedzianowski's interrogatories, #7, #9, exhibit 12; ATF's Answer to Fourth Amended Complaint, ¶29, exhibit 2; Affidavit of Edward Hemsath, exhibit 15; ATF Stipulations, *Michael V. Casali v. US Department of the Treasury*, MSPB Docket Number CH-1221-96-0936-B-1, exhibit 11; Klipfel testimony, *Michael V. Casali v. US Department of the Treasury*, MSPB Docket Number CH-1221-96-0936-B-1, pp. 129-130, exhibit 7)

18. On or about January 21 and 22, 1993, Klipfel provided ATF IA with extensive information regarding the corruption of CPD Officer Miedzianowski and other CPD police officers assigned to ATF. (U.S. Dept. of the Treasury's Response to Miedzianowski's interrogatories, #7, #9, exhibit 12; ATF's Answer to Fourth Amended Complaint, ¶30, exhibit 2; Affidavit of Edward Hemsath, pp. 1 - 2, exhibit 15; ATF Stipulations, *Michael V. Casali v. US Department of the Treasury*, MSPB Docket Number CH-1221-96-0936-B-1, exhibit 11)

19. On or about September 22, 1993, Klipfel reported to a representative of the United States Attorneys Office, information she had received that CPD Officer Miedzianowski had coerced an ATF confidential informant into making false allegations to ATF IA and CPD Internal Affairs Division ("IAD") about Agent Klipfel in order to deflect a CPD IAD investigation of the Chicago Police Officers. According to the informant, Miedzianowski fabricated false allegations against Klipfel that the informant then reported to CPD IAD and ATF IA. Officer Miedzianowski told the informant that Agent Klipfel was "messing everything up"

8

and that if Agent Klipfel was not silenced, Officer Miedzianowski's criminal conduct would become public. The informant believed that Officer Miedzianowski would kill the informant if the informant refused to file a false report against Agent Klipfel. Subsequent to Agent Klipfel's disclosures, plaintiffs learned that Officer Miedzianowski drove the informant to CPD IAD, sat next to the informant during his IAD interview and actually participated in the IAD interview. The informant gave the same false statement regarding Agent Klipfel to ATF IA. (U.S. Dept. of the Treasury's Response to Miedzianowski's interrogatories, #9, exhibit 12; Klipfel testimony, *Michael V. Casali v. US Department of the Treasury*, MSPB Docket Number CH-1221-96-0936-B-1, pp. 135 - 136, exhibit 7; Affidavit of Jose Rivera, exhibit 16)

20.     During April 1992, plaintiff Casali was the group supervisor of the ATF Chicago II group. During that time, Group II was involved in an undercover investigation into firearms and narcotics trafficking offenses being committed by the Latin Lovers Street Gang in Chicago, IL. During the investigation, Casali learned from an informant that Officer Miedzianowski was involved in supplying the gang with firearms and narcotics stolen from search warrants and in covering up a murder. (ATF's Answer to Fourth Amended Complaint, ¶34, exhibit 2; Michael Casali Deposition, pp. 94, 120–123, exhibit 1; Michael Casali testimony, *Michael V. Casali v. US Department of the Treasury*, MSPB Docket Number CH-1221-96-0936-B-1, pp. 176-180, exhibit 17; Statement of Michael Casali, submitted to ATF IA and Treasury OIG, pp. 1 3, exhibit 18; Brian Netols' Deposition, pp. 63 –65, exhibit 5)

21.     On or about June 1, 1992, SA Casali reported to SAC Vince the information SA Casali learned regarding the illegal acts committed by CPD Officer Miedzianowski who was still assigned to ATF. (U.S. Dept. of the Treasury's Response to Miedzianowski's interrogatories, #10, exhibit 12; ATF's Answer to Fourth Amended Complaint, ¶35, exhibit 2; Michael Casali Deposition, pp. 94, 120–123, exhibit 1; Michael Casali testimony, *Michael V. Casali v. US Department of the Treasury*, MSPB Docket Number CH-1221-96-0936-B-1, pp. 176-180, exhibit 17; Statement of Michael Casali, submitted to ATF IA and Treasury OIG, pp. 3, exhibit 18; Brian Netols' Deposition, pp. 60–62, exhibit 5; ATF Stipulations, *Michael V. Casali v. US Department of the Treasury*, MSPB Docket Number CH-1221-96-0936-B-1, exhibit 11)

22.     On or about June 1, 1992, SAC Vince ordered Casali not to contact any outside agencies regarding his disclosure of police corruption and SAC Vince took no further action on this information during the following three weeks. (ATF's Answer to Fourth Amended Complaint, ¶36, exhibit 2; Michael Casali testimony, *Michael V. Casali v. US Department of the Treasury*, MSPB Docket Number CH-1221-96-0936-B-1, p. 183, exhibit 17; Statement of Michael Casali, submitted to ATF IA and Treasury OIG, p. 3, exhibit 18; Brian Netols' Deposition, pp. 60 62, exhibit 5)

23.     On or about June 22, 1992, Casali again reported to SAC Vince and ASAC Adamcik the criminal allegations of narcotics and firearms violations being committed by Miedzianowski and other CPD officers assigned to ATF, including the cover-up of a narcotics-related murder. (U.S. Dept. of the Treasury's Response to Miedzianowski's interrogatories, #10, exhibit 12; ATF's Answer to Fourth Amended Complaint, ¶37, exhibit 2; Michael Casali

10

testimony, *Michael V. Casali v. US Department of the Treasury*, MSPB Docket Number CH-1221-96-0936-B-1, pp. 183-186, exhibit 17; Statement of Michael Casali, submitted to ATF IA and Treasury OIG, pp. 3-4, exhibit 18; Brian Netols' Deposition, pp. 60–62, exhibit 5)

24.     On or about June 22, 1992, SAC Vince and ASAC Adamcik asked Casali to identify any others who knew of these allegations and ordered Casali not to contact ATF IA nor the FBI, the authorities that had primary jurisdiction to investigate his allegations of police corruption. (ATF's Answer to Fourth Amended Complaint, ¶38, exhibit 2; Michael Casali Deposition, p. 124, exhibit 1; Statement of Michael Casali, submitted to ATF IA and Treasury OIG, p. 4, exhibit 18; Brian Netols' Deposition, pp. 60–62, exhibit 5)

25.     At the request of the Chicago Police Department, on June 24, 1992 a meeting was held at Chicago Police Department Gang Crimes North Unit between SAC Vince, ASAC Adamcik, Sergeant Donald Korte (Miedzianowski's and Galligan's immediate supervisor), CPD Officer Miedzianowski and CPD Officer Galligan to discuss the Klipfel and Casali disclosures. (Miedzianowski's Answer to Fourth Amended Complaint, ¶39, exhibit 8; ATF's Answer to Fourth Amended Complaint, ¶35, exhibit 2; Michael Casali Deposition, pp. 96-99, exhibit 1; Joseph Miedzianowski July 8, 2004 deposition, pp. 96-99, exhibit 19)

26.     On or about June 26, 1992, Casali reported to AUSA Steve Sinnott, a representative of the United States Attorney's Office, Chicago, Illinois, the information regarding the conduct of CPD Officer Miedzianowski. (Deposition of Steve Sinnott, pp. 6-10, exhibit 20; Letter from AUSA Sinnott to SA Edward Hemsath, ATF Internal Affairs, exhibit 21; U.S. Dept.

of the Treasury's Response to Miedzianowski's interrogatories, #8, exhibit 12; ATF Stipulations in the case of *Michael V. Casali v. US Department of the Treasury*, MSPB Docket Number CH-1221-96-0936-B-1, exhibit 11; Statement of Michael Casali, submitted to ATF IA and Treasury OIG, p. 5, exhibit 18; Brian Netols Deposition, pp. 63–65, exhibit 5)

27.    On or about July 6, 1992, Casali provided SAC Vince, ASAC Adamcik and a representative of the United States Attorney's Office with a taped, undercover telephone conversation with a suspect who identified a CPD officer as a source of supply for guns and silencers. The suspect's tapes and earlier admissions implicated Officer Miedzianowski. As a result, the representative of the United States Attorney's Office immediately ordered ASAC Adamcik to end Officer Miedzianowski's involvement with ATF. (U.S. Dept. of the Treasury's Response to Miedzianowski's interrogatories, #9-10, exhibit 12; ATF's Answer to Fourth Amended Complaint, ¶41, exhibit 2; Stephen Sinnott Deposition, pp.10-17, exhibit 20; Statement of Michael Casali, submitted to ATF IA and Treasury OIG, pp. 6–7, exhibit 18; Brian Netols Deposition, pp.63–65, exhibit 5)

28.    ATF allowed the CPD officers to remain in their assignment to ATF for another six months. Finally, on or about January 8, 1993, a directive from ATF Headquarters, Washington, D.C., mandated the termination of the detail of CPD Officer Miedzianowski and CPD Officer Galligan to the ATF Chicago III group as a direct result of the Casali and Klipfel disclosures. (ATF's Answer to Fourth Amended Complaint, ¶42, exhibit 2; Stephen Sinnott Deposition, pp.19-20, exhibit 20; Joseph Miedzianowski Answer to Fourth Amended Complaint, ¶42, exhibit 8)

29.     On or about January 22, 1993, Casali reported to ATF Internal Affairs his knowledge of police corruption and the corruption of ATF managers. (U.S. Dept. of the Treasury's Response to Miedzianowski's interrogatories, #6, #8, #9, exhibit 12; ATF's Answer to Fourth Amended Complaint, ¶ 44, exhibit 2; ATF Stipulations in the case of *Michael V. Casali v. US Department of the Treasury*, MSPB Docket Number CH-1221-96-0936-B-1, exhibit 11; Michael Casali testimony, *Michael V. Casali v. US Department of the Treasury*, MSPB Docket Number CH-1221-96-0936-B-1, p. 189 - 197, exhibit 17; Statement of Michael Casali, submitted to ATF IA and Treasury OIG, exhibit 18; Brian Netols Deposition, pp. 63–65, exhibit 5)

30.     On or about November 29, 1993, Casali met with an agent from the Department of the Treasury's Office of Inspector General, ("OIG"), an oversight agency, and reported all of the aforesaid violations and misconduct on the part of the CPD officers. (U.S. Dept. of the Treasury's Response to Miedzianowski's interrogatories, #6, #8, #10, exhibit 12; ATF Answer to Fourth Amended Complaint, ¶45, exhibit 2; ATF Stipulations in the case of *Michael V. Casali v. US Department of the Treasury*, MSPB Docket Number CH-1221-96-0936-B-1, exhibit 11; Michael Casali testimony, *Michael V. Casali v. US Department of the Treasury*, MSPB Docket Number CH-1221-96-0936-B-1, p. 193 - 196, exhibit 17)

31.     In 1997, as part of a Merit System Protection Board hearing on Casali's whisteblowing claim against ATF, ATF stipulated that agents Casali and Klipfel made timely disclosures to ATF of the Chicago Police Officers' criminal conduct. (ATF Stipulations in the

13

case of *Michael V. Casali v. US Department of the Treasury*, MSPB Docket Number CH-1221-96-0936-B-1, exhibit 11)

### III. THE CITY OF CHICAGO RETALIATES:

32.     CPD Officer Miedzianowski and other members of the Chicago Police Department repeatedly falsely told agents that it was Klipfel who stole the property from Pippin while executing a search warrant and that she had stolen before while executing search warrants. (City of Chicago Local Rule 56.1 Statement of Undisputed Facts, ¶¶17, 18, exhibit 9; Edward Hemsath Affidavit, exhibit 15; Raymond Risley Deposition, p. 80, exhibit 22; June 9, 1993 Risley Memorandum to Superintendent Rodriguez, exhibit 23; Diane Klipfel Deposition, p. 336, exhibit 4; Joseph Miedzianowski July 8, 2004 Deposition, pp. 199 -201, 269-270, exhibit 19; February 9, 1993 Miedzianowski Cause for Concern Memo to ADS Risley, p. 4, exhibit 24; February 22, 1993 Miedzianowski Memo to ADS, Internal Affairs, exhibit 25; November 9, 1992 Incident Report #930024, re: Diane Klipfel, exhibit 26; SAC Vince November 9, 1992 Memorandum to the Office of Internal Affairs, exhibit 27; Investigation Referral Memorandum 930053, exhibit 28; Report of Investigation 930053, exhibit 29; Investigation Referral Memorandum 930079, exhibit 30; Report of Investigation #930079, exhibit 31; Investigation Referral Memorandum #930096, exhibit 32; Report of Investigation #930096, exhibit 33, Investigation Referral Memorandum #930095, exhibit 34; Report of Investigation #930095, exhibit 35;  Affidavit of Jose Rivera, exhibit 16; November 20, 1996 Deposition of James Kalkman, p. 18, exhibit 36)


33.     On March 24, 1992, Klipfel was berated by SAC Vince and ASAC Adamcik regarding her complaint against the CPD officers and was told by Vince that Lieutenant Eugene

Karczewski of the CPD, who was CPD Officer Byrne's supervisor in the CPD Organized Crime Unit, was coming to ATF to lodge a complaint against Klipfel about the way that she had treated CPD Officers Byrne and Miedzianowski. SAC Vince was highly agitated as a result and stated that Klipfel was "ruining his political agenda with the Chicago Police Department." (Klipfel Deposition, pp. 331-332, exhibit 4; Klipfel Statement to ATF Internal Affairs, pp.55-57, exhibit 6)

34.     On three different occasions in November and December, 1992 Agent James Grady (a cousin of Galligan) told Klipfel that he would not enter her office since he was afraid of being accidentally shot by CPD Officer Miedzianowski when he fired through the window to kill her. (Klipfel Deposition, pp. 331-332, exhibit 4; Klipfel Statement to ATF Internal Affairs, p.105, exhibit 6)

35.     On November 6, 1992, CPD Officer Miedzianowski, CPD Sgt. Korte and SAC Vince met at the ATF Oak Brook office to discuss Klipfel's allegations against Miedzianowski. (Miedzianowski Answer to 4th Amended Complaint, ¶74, exhibit 8; Miedzianowski's July 8, 2004 Deposition, p. 140, exhibit 19; SAC Vince November 9, 1992 Memorandum to the Office of Internal Affairs, exhibit 27; Joseph Vince Deposition, pp. 183 - 191, exhibit 37)

36.     On November 9, 1992, a black plastic rat was left on Klipfel's desk. The rat was on top of a white piece of paper with the typewritten name "Klipfel". (Diane Klipfel Deposition, pp. 130-131, 331-332, exhibit 4; Klipfel Statement to ATF Internal Affairs, p. 111, exhibit 6)

15

37. On November 9, 1992, CPD Officer Byrne visited Darrin Pippin's attorney Daniel Coyne and told Coyne that it was Klipfel that had stolen Pippin's money and vehicle on the search warrant executed on February 20, 1992. (Diane Klipfel Deposition, pp. 331–332, exhibit 4; Klipfel Statement to ATF Internal Affairs, p. 111, exhibit 6; Affidavit of Darrin Pippin, ¶42, exhibit 10)

38. On November 16, 1992, ATF Agent Mark Bartholomew stated that Klipfel was the "Anti-Christ" of the Chicago ATF because of the information that Miedzianowski, Galligan and other members of the Chicago Police Department were disseminating about her and Bartholomew expressed concern that Klipfel would no longer be able to function as an ATF agent because of her destroyed reputation. (Diane Klipfel Deposition, pp.133, 331-332, exhibit 4; Klipfel Statement to ATF Internal Affairs, p. 115, exhibit 6)

39. On January 15, 1993, CPD Officer Byrne and CPD Officer Smith visited Darrin Pippin at the Robinson Correctional Facility. The officers told Mr. Pippin that they had "taken care" of Ms. Klipfel and that their whole Department was up in arms over her allegations. The officers told Mr. Pippin that the Superintendent of Police and the Mayor of Chicago had all been briefed and were both personally monitoring the investigation of Ms. Klipfel. Sgt. Byrne stated that Ms. Klipfel would soon be arrested by the Chicago Police and that she had already been suspended. Sgt. Byrne also said that the Chicago Police were putting a case together on Agent Casali and that both agents were already so discredited that no one would believe a word that

16

came from their mouths. Sgt. Byrne told Mr. Pippin that it was Agent Klipfel who stole the money from his safe deposit box. (Pippin affidavit, ¶38, exhibit 10; Raymond Risley Deposition, pp. 85 – 86, exhibit 22; IAD CR#197823, attachment 44, exhibit 38)

40.     On February 5, 1993, plaintiffs learned that Miedzianowski repeatedly told other CPD gang crimes officers not to work with ATF, and especially not to work with Diane Klipfel because she was a rat and may be wearing a wire. (Klipfel Statement to ATF Internal Affairs, p. 140-141, exhibit 6)

41.     When discussing Ms. Klipfel with others, Mr. Miedzianowski admits that "lunatic" was one of the nicer words Mr. Miedzianowski used. (Miedzianowski Deposition, p. 461, exhibit 19)

42.     On February 11, 1993, Carol Marin, a Chicago television reporter, contacted Klipfel and told Klipfel that she had received information that Klipfel was a "crazy neurotic bitch, a racist" and that Marin had received an anonymous ATF report on the Darrin Pippin warrant. (Diane Klipfel Deposition, p. 331–332, exhibit 4; Klipfel Statement to ATF Internal Affairs, p. 143, exhibit 6)

43.     On March 2, 1993, Klipfel was notified that she was the subject of an ATF Internal Affairs investigation based on CPD Officers Miedzianowski and Galligan's allegations

17

that she had made racial remarks and held a racist meeting over one and one-half years earlier. (Diane Klipfel Deposition, pp. 331-332, 426, 464, exhibit 4; Klipfel Statement to ATF Internal Affairs, p. 151, exhibit 6)

44.    On numerous occasions, the Chicago Police Department caused false statements and innuendoes to circulate throughout the City of Chicago Police Department and the Chicago office of ATF concerning both Casali and Klipfel. (Miedzianowski Deposition, p. 211, exhibit 19; Miedzianowski To/From Memo of Feb. 9, 1993, exhibit 24; Raymond Risley Deposition, pp.80, 85-85, exhibit 22; June 9, 1993 Memorandum from Raymond Risley to Superintendent Rodriguez, exhibit 23; CPD Internal Affairs Report #197823, exhibit 38)

45.    Miedzianowski and many members of the Chicago Police Department, including several high ranking members, manufactured, spread and caused to be spread statements concerning plaintiffs which they knew or should have known were totally false; including, but not limited to, that one or more of the plaintiffs had committed crimes, was to be indicted, arrested, fired, demoted or transferred.  The purpose of these statements was to destroy the credibility and careers of the plaintiffs so that their allegations against the Chicago Police Officers would not be believed or investigated.  Several Chicago Police Officers and the City of Chicago ostracized both plaintiffs, and told other agents and employees of ATF that they too would be ostracized if they associated with either plaintiff. (Edward Hemsath Affidavit, exhibit 15; Affidavit of Darrin Pippin, exhibit 10; Affidavit of James Pate, exhibit 39; Raymond Risley Deposition, p. 80, exhibit 22; June 9, 1993 Memorandum from Raymond Risley to Superintendent Rodriguez, exhibit 23)

18

46.     In a memorandum from Raymond Risley to Chicago Police Superintendent Rodriguez, Mr. Risley attached a document entitled: "Criminal Conduct" which contained numerous accusations of criminal conduct by plaintiffs. (June 9, 1993 Memorandum from Raymond Risley to Superintendent Rodriguez, exhibit 23)

47.     On August 2, 1994 both Casali and Klipfel received Notices of Proposed Removal from ATF, which were based on information primarily fabricated by the Chicago Police Department and forwarded to ATF. After issuing the Notices of Proposed Removals, for the next 25 months, ATF stripped plaintiffs of their supervisory positions and did not allow them to engage in law enforcement activity. ATF confined plaintiffs to a storage closet for more than two years where they were deliberately idled. On February 28, 1997, the Merit Systems Protection Board found the Chicago Police Department's allegations to be without merit and certified plaintiff Casali as a whisteblower pursuant to the Whisteblower Protection Act, 5 USC §2302 (b)(8). (MSPB Opinion of Judge Stephen Manrose, Docket Number CH-1221-96-0936-B-1, exhibit 40)

48.     On or about June 6, 1995 CPD Officer Miedzianowski contacted Carol Marin concerning Casali and Klipfel and falsely stated to Ms. Marin that Casali and Klipfel had been fired from the ATF. On the same day, Miedzianowski sent a letter to Carol Marin and U.S. Congressman Harris Fawell's local office, via facsimile transmission, containing several false statements concerning Klipfel. (Letter attached as exhibit 41)

## IV. THE CITY OF CHICAGO'S KNOWLEDGE AND SUPPORT OF POLICE OFFICER MISCONDUCT

### A. The Blue Wall of Silence:

49.     The Chicago Police Department's practice of allowing certain police misconduct to go unchecked is an endemic, unwritten, policy that has been part of CPD culture for decades. Many Chicago Police Officers did not fear investigations by CPD Internal Affairs. (Netols Deposition, pp. 18-19, exhibit 5; Affidavit of Juan Antonio Juarez, exhibit 42)

50.     The Public Corruption Unit of the U.S. Attorneys' Office prosecuted, at least, 21 Chicago Police Officers for criminal conduct, between 1995 and 2004. (Netols Deposition, p. 62, exhibit 5)

51.     The Blue Wall of Silence was a factor in other cases the U.S. Attorney prosecuted against members of the Chicago Police Department. (Netols Deposition, pp. 29-32, 71-76, exhibit 5)

52.     In most of the cases where Chicago Police Officers were criminally prosecuted by the U.S. Attorneys' Office, the officers had been previously investigated by CPD IAD for similar or exactly the same conduct. CPD IAD did not sustain any of its own internal affairs investigations of these subsequently indicted officers. (Netols deposition, pp. 25-27, 75-76, exhibit 5)

53.     The U.S. Attorney is aware that the "blue wall of silence" or "code of silence"

exists at the Chicago Police Department. (Netols Deposition, pp, 29-32, 72-74, exhibit 5)

54.     One prosecutor from the U.S. Attorneys' Office of Public Corruption defined the

term "blue wall of silence" as:

> a belief by members of law enforcement that there's a code that defines certain
> things you do and don't do, and one of the things you don't do is report the
> criminal activities of other police officers...The code also includes not just not
> reporting the criminal activities, but actually not interrupting or stopping the
> criminal activities if you come about them." (Netols Deposition, p. 30, exhibit 5)

55.     The U.S. Attorney indicted and obtained convictions against Chicago Police

Officers for failing to report or stop crimes they witnessed by fellow Chicago Police Officers.

(Netols Deposition, pp. 29-30, exhibit 5)

56.     The Blue Wall of Silence has been a factor in virtually every other Chicago Police

Department case investigated by the U.S. Attorneys' Office. (Netols Deposition, pp. 29-32,

exhibit 5)

57.     In virtually each and every case where officers were subsequently charged with

criminal activity, there were other police officers who were aware of those activities.   (Netols

Deposition, p. 31, exhibit 5)

58.     The Blue Wall of Silence was a factor in the criminal case against Joseph

Miedzianowski. The U.S. Attorney proved, at Miedzianowski's criminal trial, that Chicago

Police Officers had evidence of other police officers' criminal conduct, but they did not take it any further. (Netols Deposition, pp. 30, 73-74, exhibit 5)

59.     At Miedzianowski's criminal trial, a Chicago Police Officer testified that while he was debriefing an arrestee about the source of narcotics and a firearm, Miedzianowski stepped forward at the interview and told the arrestee not to answer any more questions and to ask for a lawyer. The Officer then testified that he informed someone up the CPD chain of command about Miedzianowski's conduct, but the supervisor did not take any action against Miedzianowski. Ultimately, the evidence revealed that Miedzianowski was the source of the narcotics that the arrestee had in his possession. That is an example of police officers having been confronted with evidence of other police officers' criminal conduct and not taking it any further. (Netols deposition, p. 73-74, exhibit 5)

60.     In the incident described by the Chicago Police Officer at Miedzianowski's criminal trial where Miedzianowski silenced an arrestee, the Chicago Police Supervisor did not initiate an internal affairs investigation of Miedzianowski. (Netols deposition, p. 73, exhibit 5)

61.     None of the Chicago Police Officers contemporaneously informed of plaintiffs' allegations against Miedzianowski reported to CPD IAD that Miedzianowski had been accused of theft by a federal agent. (Risley deposition, p. 149, exhibit 22)

62.     Another example of the Blue Wall of Silence is the case of CPD Officers Placencio and Oliveras. The officers were aware that three other officers had taken cocaine from one location and had kept a portion of it for themselves. Neither Officer Placencio nor Officer

22

Oliveras turned in their fellow officers for their criminal activities. (Netols deposition, p. 74, exhibit 5; Press Release from US Attorneys Office, dated February 26, 2003, exhibit 43; Chicago Tribune Article, dated May 29, 2003, exhibit 44)

63.     Members of the Chicago Police Department have threatened the livelihood or safety of citizens because citizens filed complaints against Chicago Police Officers. (Netols Deposition, pp. 31-32, 70, exhibit 5)

64.     Officers Miedzianowski, Galligan, Smith and Byrne attempted to intimidate their accusers. (Netols Deposition, p. 32, exhibit 5; Pippin Affidavit, pages 5-7, exhibit 10)

65.     Darrin Pippin, a former narcotics dealer, feared for his life from members of the Chicago Police Department. (Netols Deposition, pp. 33-34, exhibit 5; Pippin Affidavit, exhibit 10)

**B. Other Chicago Police Officers Reveal the Blue Wall of Silence:**

66.     The "code of silence," also referred to as the "blue wall," is an unwritten policy within the Chicago Police Department by which police officers refuse to report the misconduct of fellow officers. To uphold this code, many officers not only remain silent regarding the misconduct of other officers, but also give false information in reports and during Internal Affairs Department ("IAD") and Office of Professional Standards ("OPS") investigations in order to protect fellow officers. (Affidavit of Juan Antonio Juarez, exhibit 42)

67.     Former Chicago Police Officer Juan Antonio Juarez was with the Chicago Police Department from 1990 through 1997. During his time as an officer with the Chicago Police Department, it was his experience that Chicago Police Officers did not fear discipline from OPS or IAD because they knew that they would be shielded by the code of silence. (Affidavit of Juan Antonio Juarez, exhibit 42)

68.     In Officer Juarez' experience as a Chicago Police Officer, the CPD had an unwritten policy of protecting police officers and shielding them from discipline or prosecution. (Affidavit of Juan Antonio Juarez, exhibit 42)

69.     Members of the Chicago Police Department with whom Officer Juarez worked, did not have much regard for the integrity of the work performed by OPS and the Internal Affairs Department. (Affidavit of Juan Antonio Juarez, exhibit 42)

70.     OPS and the Internal Affairs Department did not seem to act as a deterrent to wrongful conduct by police officers at all, in the 1990's. (Affidavit of Juan Antonio Juarez, exhibit 42)

71.     During Officer Juarez' time at the Chicago Police Department, the lack of fear of discipline from OPS was something many officers joked about and OPS was often referred to as "the Kangaroo Court" within the Department, because all complaints bounced right out. (Affidavit of Juan Antonio Juarez, exhibit 42)

24

72.     During Officer Juarez' time at the Chicago Police Department, Chicago Police Officers knew that they could count on protection in the form of silence and collusion from fellow officers when IAD and OPS complaints arose. Other officers would not come forward with information they may have had or would even lie and falsify reports to corroborate the accused officer's version of the facts. (Affidavit of Juan Antonio Juarez, exhibit 42)

73.     During Officer Juarez' training with the Chicago Police Department, his Field Training Officer instructed him that if any physical altercation arose with an arrestee, he should always state in the report that the arrestee initiated it, whether they did or not. (Affidavit of Juan Antonio Juarez, exhibit 42)

74.     Officer Juarez was told by other Chicago Police Department Officers not ever to break the code of silence and report misconduct of officers because "you don't want to make waves." Other CPD officers explained to Officer Juarez that the last thing you want to do is "rat out" another officer because if you did, you would be all alone: you would lose all of the support of your fellow officers, you would be shunned in the department and at police functions and other officers would not consider you worthy to work with. (Affidavit of Juan Antonio Juarez, exhibit 42)

75.     After working with officers whom Officer Juarez witnessed brutalized citizens or stole, he was told by fellow Chicago Police Officers not to report the crime but simply to inform

the watch commander that he had "conflicting personalities" with these officers to ensure that he would never be assigned to work with those officers again. (Affidavit of Juan Antonio Juarez, exhibit 42)

75.     During Officer Juarez' time as a Chicago Police Officer, virtually no officers he knew ever violated the code of silence by airing complaints outside of the chain of command. (Affidavit of Juan Antonio Juarez, exhibit 42)

76.     While assigned to the Chicago Police Department Narcotics Unit, Officer Juarez witnessed various officers stealing cash, drugs and other property during searches conducted pursuant to warrants. (Affidavit of Juan Antonio Juarez, exhibit 42)

77.     It was common knowledge among officers within the Chicago Police Department that sometimes the amount of money, drugs and/or other property inventoried after a search warrant was only a fraction of what was actually found because officers stole a portion of what was recovered before conducting an inventory of the items. (Affidavit of Juan Antonio Juarez, exhibit 42)

78.     During Officer Juarez' assignment to narcotics, he participated in searches where he witnessed a great deal more cash at the scene than was later inventoried by his fellow officers. None of the officers he witnessed stealing from those search warrants were ever reported by fellow officers, to the best of his knowledge. (Affidavit of Juan Antonio Juarez, exhibit 42)

26

79.     In his experience as a Chicago Police Officer, the Chicago Police Department has a deeply engrained policy of rallying around and supporting its officers when a complaint is received against them. (Affidavit of Juan Antonio Juarez, exhibit 42)

80.     A co-defendant of Officer Miedzianowski identified other Chicago Police Officers as involved in illegal drug activities. Some of those officers were not indicted or convicted. (Netols Deposition, p. 39, exhibit 5; Padilla 302, exhibit 45)

81.     Assistant Deputy Superintendent Risley, the former head of CPD Internal Affairs, believes that accused officers are not obligated to report allegations of misconduct to their superiors at the Chicago Police Department. (Risley deposition, p. 149, exhibit 22)

82.     Former Chicago Police Department Superintendent Leroy Martin and David Fogel, Administrator of CPD's Office of Professional Standards, both codefendants in the same civil lawsuit, admitted that the Code of Silence exists within the Department. (July 18, 1990 Opinion of District Court Judge Iliana Rovner, *McLin v. City of Chicago, et al*, 89 C 9253, p.9, exhibit 46)

## C.     Miedzianowski's History at the Chicago Police Department:

83.     The Chicago Police Department failed to investigate prior allegations of criminal conduct by Miedzianowski and other officers and has a history of allowing police corruption to go unchecked. The City of Chicago received at least twenty or more internal affairs complaints and more than twenty excessive force complaints regarding Miedzianowski dating back to at

27

least 1983. Most of the excessive force complaints involved brutal beatings and threats to kill. The City of Chicago also defended Miedzianowski against numerous civil lawsuits alleging Miedzianowski's criminal conduct including excessive force and threats to kill. The City of Chicago settled the corresponding civil suits. (City of Chicago's Answer to Plaintiffs' Fourth Amended Complaint, No. 91, exhibit 3; computer list of CR's on Joseph Miedzianowski, exhibit 47)

84.     In *People v. Cordero*, 214 Ill.App.3d 1007; 158 Ill.Dec. 687, 574 N.E.2d 800 (1st Dist., 1991), the Illinois Appellate Court upheld a ruling by Judge Urso in the trial court in which Judge Urso suppressed a search warrant obtained by Officers Miedzianowski and Galligan. Judge Urso found that the Chicago Police Officers' statements, appearing in their affidavit supporting the search warrant, were "in reckless disregard for the truth." (*People v. Cordero*, p. 1011, exhibit 48). CPD did not discipline the police officers for their role in the case.

85.     On December 18, 1992, a break-in occurred at the apartment that ATF Agent Sandra Hernandez listed as her residence with ATF. She used a false address because she was afraid of several corrupt Chicago Police Officers including Miedzianowski and Galligan. (Granko Affidavit, exhibit 49)

86.     Hernandez' babysitter, Carol Granko, observed the person who had broken into the apartment, and, on January 7, 1993, Ms. Granko identified Chicago Police Officer Joseph Miedzianowski to ATF Internal Affairs agents as the man she observed fleeing from the apartment. (Granko Affidavit, exhibit 49)

87.     On or about March 4, 1993, two Chicago Police Internal Affairs officers also interviewed Granko about the break-in at her apartment building. The CPD IAD officers were hostile to Ms. Granko and repeatedly asked her for the identity of the ATF Internal Affairs agents who had previously interviewed her. (Granko Affidavit, exhibit 49)

88.     After Granko selected a photograph of Miedzianowski as the burglary suspect, the Chicago Police Department Internal Affairs officers became visible irritated. They openly expressed anger that Ms. Granko identified Miedzianowski as the perpetrator and encouraged her to change her recollection. (Granko Affidavit, exhibit 49)

89.     Despite the eyewitness account, the Chicago Police Department did not bring charges or further investigate Officer Miedzianowski for the break-in. (Wendy Issac (Marrello)[1] Deposition, p.26, exhibit 50; Miedzianowski's computerized list of CR numbers, exhibit 47)

90.     The Chicago Police Department protected Joseph Miedzianowski even when a federal agent received information that 3 kilograms of cocaine were arriving at an apartment building owned by Joseph Miedzianowski's mother. (Jaquez affidavit, exhibit 51)

91.     Miedzianowski never received discipline of any kind from the Chicago Police Department stemming from more than 20 IAD and OPS investigations. (Miedzianowski Deposition, pp. 401-402, exhibit 19)

---

[1] Wendy Issac was the IAD officer assigned the Miedzianowski case, and was identified by her previous name of Wendy Marrello in 1993 – 1994. She will be referred to as Issac (Marrello) in this document.

29

92.     Joseph Miedzianowski distributed stolen goods to other members of the Chicago Police Department to help guarantee their silence. (Netols Deposition, p. 35, exhibit 5)

93.     During its investigation of Joseph Miedzianowski, the U.S. Attorney did not inform members of the Chicago Police Department command staff, because of the previously compromised IAD investigation. It was restricted knowledge. (Netols Deposition, pp. 36-37, exhibit 5)

94.     On April 23, 2001, Miedzianowski was convicted of engaging in racketeering and narcotics conspiracy, dating back continuously at least 14 years and including the three years that he was assigned to ATF. (6th Superceding Indictment, exhibit 52; Netols Deposition, p.14, exhibit 5; Miedzianowski's Answer to Fourth Amended Complaint, ¶92, exhibit 8)

95.     When Miedzianowski was sentenced, matters of public record included criminal activity which dated back virtually to when he entered the Chicago Police Department as a police officer. (Netols Deposition, p. 81, exhibit 5)

96.     The enterprise in the RICO conspiracy of which Mr. Micdzianowski was convicted was the Chicago Police Department. (6th Superceding Indictment, exhibit 52; Netols deposition, p. 15, exhibit 5)

30

97.     At trial, the government proved that Miedzianowski and other people conspired to operate the activities of the Chicago Police Department through racketeering acts.   (Netols deposition, pp. 81-82, exhibit 5)


98.     The allegations against Miedzianowski brought by plaintiffs Casali and Klipfel, combined with plaintiffs' reputations at the U.S. Attorneys' Office, provided some of the impetus for the federal investigation of Miedzianowski.   (Netols deposition, pp. 11, 54, exhibit 5)


**D.      The City of Chicago's Failure to Supervise:**

99.     Superintendent Matt Rodriguez acknowledges that he was ultimately responsible for everything that took place at the Chicago Police Department.   (Rodriguez Deposition, p. 85, exhibit 53)


100.    Media surrounding criminal allegations against Miedzianowski and other police officers surfaced by February 1993, but the City of Chicago and its highest level, policy-making officials, ignored the news reports, acquiesced in the conduct and failed to act.   (Risley Deposition, pp. 168-169, exhibit 22; June 9, 1993 Risley Memorandum to Superintendent Rodriguez, exhibit 23; Netols Deposition, p. 24, exhibit 5)


101.    Miedzianowski's supervisors knew about his conduct and failed to supervise him. Commander Phil Cline was the Detective Commander of Area 5 when Miedzianowski was assigned to Area 5.   Commander Cline also previously worked as a Lieutenant in the gang crimes unit and supervised Miedzianowski.   Commander Cline suspected that Miedzianowski

31

was leaking information to gangbangers on more than one homicide investigation. (Cline FBI 302, exhibit 54, Cline deposition, pp. 17, 56–58, 69-70, exhibit 55, Edmond Stack Deposition, p. 42, exhibit 56)

102.    Specifically, Commander Cline suspected that Miedzianowski leaked a witness statement to gang members and that Miedzianowski stole a general progress report, which he then provided to a suspect's attorney. (Cline deposition, pp. 57–58, 69-70, exhibit 55)

103.    Commander Cline believed that he reported Miedzianowski's misconduct to CPD IAD, but Commander Cline does not know and did not follow up to determine whether CPD took any action against Miedzianowski. (Cline deposition, pp. 57, 61, 70, 74, exhibit 55)

104.    In fact, CPD IAD did not sustain any of Commander Cline's allegations against Miedzianowski, (CPD IAD report CR#227263, exhibit 57)

105.    Despite the mandates of IAD's investigative procedures, Commander Cline was not interviewed by CPD IAD in connection with either incident. (Cline deposition, pp. 60, 71, exhibit 55)

106.    Commander Cline did not believe that Sgt. Edmund Stack, Miedzianowski's immediate supervisor, did an adequate job in supervising his team. (Cline deposition, pp. 103-104, exhibit 55)

107.    In the presence of Sgt. Edmund Stack, Miedzianowski's immediate supervisor, Miedzianowski threw a typewriter at the head of a fellow officer, Officer Zaharius. Miedzianowski believed that Officer Zaharius was sympathetic to the plaintiffs.    Despite witnessing the incident, Sgt. Stack, Miedzianowski's supervisor, did not report the incident. (T-III Wiretap Transcript, p. 14, exhibit 58; Joseph Miedzianowski Deposition, pp. 356–357, exhibit 19; List of Miedzianowski CR's, exhibit 47)

108.    Sgt. Stack, Miedzianowski's immediate supervisor for many years, knew that Miedzianowski had felons in his home and that Miedzianowski socialized with known felons. (Miedzianowski Deposition, pp. 398-400, exhibit 19)

109.    Sgt. Stack thought that Miedzianowski was too close to gang members (Stack 2/10/05 deposition, pp. 54–55, exhibit 59; Edmund Stack FBI 302 Statement, exhibit 60)

110.    Sgt. Stack also testified that despite being Miedizanowski's immediate supervisor during much of the time period of the RICO conspiracy (1985-1998), he had no knowledge of Miedzianowski's criminal conduct, nor did he report Miedzianowski for any of the crimes listed in the Sixth Superceding Indictment for which Miedzianowski was subsequently convicted (Deposition of Edmond Stack, pp. 114-116, plaintiffs' exhibit 59)

111.    After Miedzianowski's arrest, Stack was never told, verbally or in writing, that he would be the subject of disciplinary action for his failure to supervise Miedzianowski (Deposition of Edmond Stack, p. 222, plaintiffs' exhibit 59)

112. Stack testified that, knowing all that he knew, that his supervision of Miedzianowski was acceptable by Chicago Police Department standards (Deposition of Edmond Stack, pp. 222–223, plaintiffs' exhibit 59).

113. Despite their concerns about Miedzianowski, Sgt. Stack and Commander Cline continued to give Miedzianowski very high semi-annual performance ratings. (Miedzianowski performance ratings, exhibit 61; Edmund Stack 5/27/04 Deposition, pp. 46–59, 72–73; exhibit 56; Philip Cline Deposition, pp. 23–24, 26-28, exhibit 55)

114. In truth, Miedzianowski did very little police work for a long period of time, beginning in approximately 1992. (Netols deposition, p. 85, exhibit 5; Philip Cline Deposition, p. 92, exhibit 55)

115. Police Superintendent Terry Hillard, Superintendent of the Chicago Police Department, stated to the Chicago Tribune that he had to disband the gang crimes unit, of which Miedzianowski was a member, because of the Chicago Police Department's failure to supervise the unit. (Chicago Tribune, March 15, 2000, exhibit 62)

116. Other supervisors with actual knowledge of Miedzianowski's violations of plaintiffs' rights and who failed to discipline him include: Sgt. Korte, Miedzianowski's supervisor at CPD Gangs Crimes North Unit. Sgt. Korte sat with Miedzianowski and SAC Joe Vince of ATF, on November 6, 1992 and complained about plaintiff Klipfel's allegations against

34

Miedzianowski in an attempt to silence Klipfel. (Joseph Vince Deposition, pp.183–189, exhibit 37; Vince 11/9/92 memo, exhibit 27; Joseph Miedzianowski Deposition, pp.140–141, exhibit 19)

117. Chicago Police Lt. Karczewski, as far back as March 1992, was so incensed by plaintiff Klipfel's theft allegations against Miedzianowski, that, instead of disciplining Miedzianowski, he called ATF SAC Joe Vince and demanded an apology from Klipfel. (Diane Klipfel Deposition, pp. 331–332, exhibit 4; Klipfel Statement to ATF Internal Affairs, pp. 56-57, exhibit 6)

118. Miedzianowski wrote a memo to Assistant Deputy Superintendent Risley of Chicago Police Internal Affairs in which he admitted that ATF had informed him and other Chicago Police Officers of Klipfel's theft allegations not long after they were made in February 1992. (February 12, 1993 Memorandum from Joseph Miedzianowski to ADS Risley, exhibit 63)

119. None of Miedzianowski's supervisors whom ATF contemporaneously informed of plaintiffs' allegations against Miedzianowski reported to CPD IAD that Miedzianowski had been accused of theft by a federal agent. (Risley deposition, p. 149, exhibit 22)

120. And, at a meeting in the summer of 1992, with CPD Captain Joe Parisi and CPD Sergeant Korte in attendance, ATF discussed the Klipfel allegations of theft by Miedzianowski. (Joseph Miedzianowski Deposition, pp. 236, 257-258, exhibit 19; February 12, 1993 Memorandum from Miedzianowski to ADS Risley, exhibit 63)

121. But, not until almost a year after CPD officers and supervisors learned of Klipfel's theft allegations against Miedzianowski, and only after Miedzianowski was removed from the ATF task force and sent back to the Chicago Police Department, did the Chicago Police Department open an investigation of Klipfel's allegations. (197823 IAD Cover Sheet, exhibit 38; Wendy Issac (Marrello) Deposition, p. 26, exhibit 50)

122. Despite their duty to supervise Miedzianowski, when CPD issued general orders prohibiting unlawful conduct, CPD did not even distribute such general orders to individual officers as they were issued; Miedzianowski was not aware of each new general order. (Miedzianowski Deposition, p. 512, exhibit 19)

## E. CPD's Failure to Train and to Discipline:

123. Matt Rodriguez became superintendent of the Chicago Police Department on April 13, 1992. (Rodriguez Deposition, p. 13, exhibit 53)

124. The Superintendent of the Chicago Police believed that every infraction by a police officer meant that the Department's training was not adequate. (Rodriguez Deposition, p. 104, exhibit 53)

125. When Matt Rodriguez became superintendent in April 1992, there was a large backlog with respect to disciplinary cases that needed to be reviewed by the superintendent. (Rodriguez Deposition, p. 18, exhibit 53)

36

126.    The backlog of disciplinary cases included only those cases that had been determined to be sustained by IAD. (Rodriguez Deposition, p. 21, exhibit 53)

127.    It took over three years, from April, 1992, for the Chicago Superintendent of Police to review the backlog of disciplinary cases. (Rodriguez Deposition, p. 18, exhibit 53)

128.    Superintendent Rodriguez did not know why there was such a serious backlog of disciplinary cases and thought that it might have been the standard before he became superintendent. (Rodriguez Deposition, p. 19, exhibit 53)

129.    The Chicago Superintendent of Police believed that discipline of police officers should be meted out as close to the malfeasance as possible. (Rodriguez Deposition, p. 19, exhibit 53)

130.    Other corrupt Chicago Police Officers have indicated that they were not concerned about the consequences of CPD IAD investigations. (Netols deposition, pp. 57, exhibit 5)

131.    Of the 21 Chicago Police Officers prosecuted by one U.S. Attorney, they all had large numbers of CPD IAD investigations that did not result in them receiving discipline or being removed from the job. (Netols deposition, p. 62, exhibit 5)

37

132.    The U.S. Attorneys Office determined that the internal complaints investigated and dismissed by CPD IAD against Chicago Police Officers who were subsequently indicted by the U.S. Attorney, were true. (Netols deposition, p. 62, exhibit 5)

133.    Much, if not all that was alleged by Klipfel and Casali against Miedzianowski, proved to be true. (Netols deposition, pp. 63-65, exhibit 5)

134.    In wiretap's of Miedzianowski's home telephone, Miedzianowski was heard to talk and brag about previous acts of brutality against citizens he did not believe treated him the way he thought he should be treated or because he found it amusing. (Netols deposition, p.67, exhibit 5)

135.    As overheard on the Title-III wiretap, Miedzianowski threatened to burn down CPD Lt. Daniel Sampila's summer home if Sampila did not quit f__cking with him. (Daniel Sampila deposition, pp. 83-84, exhibit 65)

136.    Other Chicago Police Officers said that Joseph Miedzianowski was the most brutal police officer they had ever seen and he was that way from his first day on the job. (Netols deposition, p. 70, exhibit 5). None of those officers reported Miedzianowski to CPD IAD for his violent conduct. (computer list of CR's on Joseph Miedzianowski, exhibit 47)

137.    By agreement with the U.S. Attorneys' office, ATF Internal Affairs Investigators did not allow Raymond Risley or his officers to attend meetings regarding their investigations of

38

CPD officers because they believed that Mr. Risley and/or other members of the CPD Internal Affairs Department were leaking information back to the accused officers who were not authorized to have such information. (Hemsath Affidavit, exhibit 15)

138.    In January, 2003, U.S. Attorney Patrick J. Fitzgerald wrote to the warden of the Metropolitan Correctional Center in Chicago, Illinois, informing him that Joseph Miedzianowski posed a serious security threat to law enforcement officers and that he was an integral player in a plot to murder a Federal Agent and a Federal witness. (January 2, 2003 letter, exhibit 64)

## F.    CPD IAD Deliberately Compromised its Investigation of Plaintiffs' Allegations to Undermine Plaintiffs' Credibility:

139.    The 1993 Chicago Police Department internal affairs investigation of Miedzianowski did not include an interview of the complainants. (Risley Deposition, p 180, exhibit 22; Wendy Isaac (Marrello) deposition, p. 47, exhibit 50)

140.    The 1993 Chicago Police Department internal affairs investigation of Miedzianowski did not include a review of Miedzianowski's past cases, although Risley falsely represented to the Superintendent of Police that it did. (June 9, 1993 Memoradum from Raymond Risley to CPD Superintendent Rodriguez; Karczewski deposition, pp. 184-188, exhibit 66; Wendy Isaac (Marrello) deposition, pp. 101-107, exhibit 50, CPD IAD Investigation #197823, exhibit 38: Miedzianowski List of Case Reports, exhibit 67)

141.    CPD IAD terminated its investigation of the officers without interviewing the accused officers. That deviates from accepted investigative technique. (Rodriguez Deposition,

p. 60, exhibit 53; Wendy Isaac (Marrello) deposition, p. 40, exhibit 50; CPD General Order 93-03-03, exhibit 68)

142. In truth, the Chicago Police Department Internal Affairs Division relied on Miedzianowski for information. (CPD IAD 197823 attachment 28, exhibit 69)

143. The 1993 Chicago Police Department internal affairs investigation of Miedzianowski did not include interviews of eyewitnesses to the theft allegations, in violation of G.O. 93-03-03. (Risley deposition, pp. 122, 124-125, exhibit 22; CPD General Order 93-03-03, exhibit 68)

144. During its 1993 IAD investigation of Miedzianowski, the Chicago Police Department Internal Affairs Division permitted witnesses to be interviewed in the presence of the accused, Miedzianowski. For example, a confidential informant who testified at Miedzianowski's CPD IAD investigation, Jose Rivera, aka "Kiki," related:

1. Miedzianowski picked up Rivera and drove him to the Chicago Police Department IAD where Rivera met Officer Wendy Marrello and two other officers. Miedzianowski went into the office with Rivera and Miedzianowski actually retold the story they had agreed on. Miedzianowski made an official statement and signed it in front of Rivera. The officers asked Rivera a series of questions and gave him a statement to sign in the presence of Miedzianowski. (Rivera Affidavit, exhibit 16)

2. Miedzianowski was in the IAD room with Rivera during the entire IAD interview. (Rivera Affidavit, exhibit 16)

145. While testifying at Miedzianowski's criminal trial, Assistant Deputy Superintendent Risley admitted that CPD IAD's investigation of plaintiffs' allegations against

40

Miedzianowski violated Chicago Police Department procedure, but Risley took no corrective action. (Trial transcript of Raymond Risley in U.S. v. Miedzianowski, pp. 5458 - 5461, exhibit 70)

146.     Raymond Risley falsely testified in Miedzianowski's criminal trial that the Chicago Police Department was unable to thoroughly investigate Miedzianowski because ATF "gag-ordered" its agents, including plaintiffs. (Trial transcript of Raymond Risley in U.S. v. Miedzianowski, pp. 5459 – 5460, exhibit 70).

147.     In truth, Michael Casali and Diane Klipfel were never gag-ordered by ATF, nor were they advised that they could not participate in a Chicago Police Department investigation. (Plaintiffs' Response to Defendant City of Chicago's First Set of Interrogatories, #11, exhibit 71; Jimmy Adamcik deposition, pp.252–253, 256, exhibit 72; Joseph Vince deposition, p. 228, exhibit 37)

148.     Another witness who testified before CPD Internal Affairs and ATF Internal Affairs, on behalf of Miedzianowski, Hector Hernandez, now also admits that he gave his statement to CPD Internal Affairs in the presence of Miedzianowski who sat next to him while he gave his statement to CPD IAD Officers. (Netols deposition, pp. 23-24, exhibit 5)

149.     After conversations with CPD, ATF Internal Affairs believed that CPD IAD was conducting an investigation of Diane Klipfel rather than the accused officers she complained about. (Hemsath Affidavit, exhibit 15)

41

150.    On February 18, 1993, ATF Agent Richard Marianos was interviewed at the CPD IAD, ostensibly regarding Officers Miedzianowski and Galligan. (Marianos Affidavit, exhibit 73)

151.    During CPD IAD's interview of ATF Agent Marianos, CPD IAD Officer Wendy Isaac (Marrello) asked Agent Marianos more questions about Agent Klipfel and it was clear to Agent Marianos that CPD IAD was investigating Klipfel and not the accused officers. CPD Officer Morrello appeared to pursue only derogatory information about Agent Klipfel and asked whether Klipfel had made any racial statements. (Marianos Affidavit, exhibit 73)

152.    The same day, almost immediately after the interview at CPD IAD, Agent Marianos received a call from CPD Officer Miedzianowski. Officer Miedzianowski was irate and read directly from Marianos' statement to CPD IAD, given just one hour earlier. Mr. Miedzianowski clearly had a copy of Agent Marianos' witness statement. (Marianos Affidavit, exhibit 73; Miedzianowski's Answer to Fourth Amended Complaint, ¶ 84, exhibit 8).

153.    The United States Attorneys' Office believed that the CPD IAD investigation of Joseph Miedzianowski in 1993 was ineffective. (Netols deposition, p. 24, exhibit 5)

154.    ATF IA felt that CPD's investigation of its officers contained misleading and untruthful information. (Nov. 20, 1996 Deposition of James Kalkman, pps. 35, 60, exhibit 36)

155. CPD approved the compromised IAD investigation of Miedzianowski at several supervisory levels including attorneys, assistant superintendents, assistant deputy superintendents and the Superintendent. (Raymond Risley deposition, pp.168–169, exhibit 22; Karczewski deposition, pp 15–16, 27-28, exhibit 66)

156. The CPD command staff that reviewed the final CPD IAD report exonerating Miedzianowski of misconduct never sent the report back to IAD for revision or additional investigation. (Isaac (Marrello) deposition, p. 26, exhibit 50)

157. The U.S. Attorneys' Office also found: "The search of Miedzianowski's residence revealed evidence that before the prior investigation [the CPD IAD investigation of plaintiffs' allegations] was completed, Miedzianowski received copies of witness statements and other reports generated in the course of that investigation. ...he was not authorized to have these documents." "This and other evidence obtained during the instant investigation indicates that, at best, the prior investigation was compromised in that Miedzianowski was kept informed of the progress of the prior [IAD] investigation as it occurred." (Government's Consolidated Response To The Motions of Defendants Miedzianowski and Omar to Suppress Title III Wiretap Evidence, exhibit 74; Netols deposition, pp. 27-28, exhibit 5)

## G. CPD Denigrated Plaintiffs' Reputation to Several Other Governmental Agencies and the Media:

158. The Chicago Police Department spoke to other government agencies to whom plaintiffs had complained about Miedzianowski's conduct in an attempt to stifle plaintiffs. For example, on March 5, 1993, CPD Internal Affairs Assistant Deputy Superintendent Risley and

43

CPD Lt. Karczewski met with the four accused officers, including Miedzianowski. Raymond Risley told the accused officers that the Superintendent of the Chicago Police Department had already given his approval for Risley and Karczewski to take Miedzianowski's allegations against plaintiffs to the U.S. Attorneys Office. (Joseph Miedzianowski deposition, pp. 292, 297, exhibit 52; Miedzianowski March 7, 1993 memo, exhibit 75)

159.     On March 11, 1993, Assistant Deputy Superintendent Risley of CPD Internal Affairs, authorized by the Superintendent of the Chicago Police Department, met with Treasury Inspector General Timothy Clifford, U.S. Department of Justice Attorney Green and ATF Internal Affairs Agents Hemseth and Kalkman and stated that plaintiff Klipfel was a racist and made other derogatory comments and criminal allegations about Klipfel. (Risley deposition, p. 40, exhibit 22; Eugene Karczewski deposition, pp. 168–170, exhibit 66; March 12, 1993 memo from Karczewski to Risley, exhibit 76; Miedzianowski Deposition, pp.199, 235, 269, 292-296, exhibit 19; Miedzianowski's Cause for Concern memos to Risley dated February 9, 12 and 22, 1993, exhibits 24, 25 and 64; Miedzianowski's March 7, 1993 memo to Risley, exhibit 75)

160.     Even ATF acknowledged the City of Chicago's animus against plaintiffs in a brief filed on September 30, 1996 entitled: "Agency's Response to Appellant's Motion to Dismiss the Agency's Motion to Certify an Interlocutory Appeal."

> [Casali] has made serious allegations of corruption against certain police officers in the Chicago Police Department. As a result of these allegations, ATF's Chicago Field Division believes that the Chicago Police Department harbors intense hostility toward [Casali]. (Agency Brief, page 5).

(Agency Brief, Casali MSPB hearing, exhibit 77)

161. Beginning in fall, 1992, several Chicago police officers reported false allegations of misconduct by the plaintiffs to ATF. (Deposition of James Kalkman, p. 18, exhibit 36; Hemsath Affidavit, exhibit 15)

162. The allegations against plaintiffs by the Chicago Police Department included allegations of theft and other criminal conduct with new allegations being lodged by members of the Chicago Police Department, against plaintiffs, nearly every week. (Hemsath Affidavit, exhibit 15; Risley Memo, June 9, 1993, exhibit 22)

163. Chicago Police Department Assistant Deputy Superintendent Raymond Risley, was unknowingly taped by the FBI during a telephone call he had with Miedzianowski on October 5, 1998. During the conversation, ADS Risley clearly stated that he had spoken to NBC News Reporter Carol Marin about plaintiffs. Risley said:

> ... if you scratch the surface on her [plaintiff Klipfel], you realize she's a stone f---king wacko. I told Carol Marin, I said, how can you possibly defend anyone that lets a drug dealer's wife and children move in with her and holds money for them. And I showed, I showed the bi__ch the currency exchange checks." ... "She completely ignored it and went with the story in favor of Diane.

(T-III Transcript, p. 6, exhibit 58)

164. Mr. Risley gave the interview to Carol Marin while the Internal Affairs investigation of Miedzianowski was still pending. He told Ms. Marin that there was "a problem" with Ms. Klipfel's credibility. (Risley deposition, pp. 137-140, exhibit 22)

165. The Chicago Police Department informed ATF that they would arrest Diane Klipfel when they finished their investigation. (Hemsath Affidavit, exhibit 15)

166. ATF IA found no basis for the complaints against Ms. Klipfel and determined that some of the thefts were committed by Officers Miedzianowski and Galligan. (Nov. 20, 1996 Deposition of James Kalkman, p. 18, exhibit 36; Hemsath Affidavit, exhibit 15)

167. An ATF investigator determined that he had never had that many allegations in a short time period against one person [Diane Klipfel] come up unsubstantiated. (Nov. 20, 1996 Deposition of James Kalkman, p. 18, exhibit 36)

168. The allegations against Ms. Klipfel came directly or indirectly from the Chicago Police Department. (Nov. 20, 1996 Deposition of James Kalkman, p. 18, exhibit 36; Hemsath Affidavit, exhibit 15)

169. There were at least eight separate investigations of Ms. Klipfel as a result of allegations by the Chicago Police Department. (Nov. 20, 1996 Deposition of James Kalkman, p. 26, exhibit 36)

170. The City of Chicago did not even conduct a cursory investigation of Miedzianowski's allegations against plaintiffs before making an official misconduct referral to ATF. (Hemsath Affidavit, exhibit 15)

171. In support of CPD's retaliation and attempts to silence plaintiffs, and in violation of plaintiffs' Constitutional rights, on June 9, 1993, one year before CPD IAD officially closed

its investigation of plaintiffs' allegations against Miedzianowski, Ray Risley sent a memo to Chicago Police Superintendent Matt Rodriguez containing many false statements, including those of Jose Rivera. In the memo, Risley, after conducting virtually no investigation of plaintiffs' allegations against Miedzianowski, recommended that plaintiff Klipfel be prosecuted for a number of crimes, from theft to narcotics delivery. (Risley Memo, June 9, 1993, exhibit 23)

172.    Risley conducted no investigation or inquiry regarding the lack of any evidence supporting the witnesses' allegations, but falsely stated to Superintendent Rodriquez that Diane Klipfel, on more than one occasion, gave jewelry and cocaine to a gang member. Risley also recommended that the CPD reexamine its relationship with ATF. (Risley Memo, June 9, 1993, exhibit 23; Risley Deposition, pp.166-168, exhibit 22)

173.    Risley also contacted U.S. Senator John Glenn whom Risley believed was about to commence hearings regarding plaintiffs' allegations. Risley disparaged the plaintiffs to Senator Glenn's office in an attempt to tell "their side of the story." (Risley Deposition, pp. 159-161, exhibit 22, T-III Wiretap transcript, p. 9, exhibit 58)

174.    CPD's practice of filing complaints against those who complained against its officers was not limited to plaintiffs. An FBI agent who was investigating members of the Chicago Police Department suffered a similar fate. (Netols deposition, pp. 33, 69-70 exhibit 5)

47

175. On or about April 30, 1996, a reporter for Soldier of Fortune magazine interviewed Assistant Deputy Superintendent Raymond Risley. The reporter told Mr. Risley that he was writing an article on the plaintiffs. During the interview, Mr. Risley made several false allegations of misconduct against Diane Klipfel. He insisted that plaintiffs regularly improperly drove Darrin Pippin's automobile and that Pippin's auto was currently in their driveway. Also, Mr. Risley clearly implied that Ms. Klipfel had an inappropriate sexual relationship with Mr. Pippin. (Pate affidavit, exhibit 39)

176. Mr. Risley implied to the reporter that the Chicago Police Department Internal Affairs Division had been conducting surveillance of Mr. Casali and Ms. Klipfel's residence. (Pate affidavit, exhibit 39)

177. The reporter traveled to plaintiffs' home and observed a leased Lincoln automobile in their driveway that was not Darrin Pippin's vehicle. In fact, it was a different color than Mr. Pippin's vehicle and Mr. Pippin confirmed that it was not his car during the reporter's subsequent interview with him. (Pate affidavit, exhibit 39)

178. Mr. Risley also told the reporter that the Chicago Police Department Internal Affairs Division thoroughly investigated the allegations made by Ms. Klipfel and Mr. Casali against the accused Chicago Police Officers, including Miedzianowski. Mr. Risley unequivocally told the reporter that his office was unable to substantiate the allegations. (Pate affidavit, exhibit 39)

48

179. Risley went on to state to the reporter that CPD's Internal Affairs Department had uncovered evidence of criminal behavior by one or more ATF agents, including Ms. Klipfel and Mr. Casali. Mr. Risley said that he brought that evidence to the federal government for prosecution. (Pate affidavit, exhibit 39)

180. When Mr. Risley divulged the contents of the alleged confidential investigation of the Chicago police officers to the press, he engaged in conduct that was inconsistent with the goals of the Chicago Police Department. (Rodriguez Deposition, p. 55, exhibit 53)

## H. CPD Intimidates Other Eyewitnesses to its Officers' Misconduct:

181. The night that Agent Klipfel took Darrin Pippin to Cook County Jail, CPD Officer Walter Smith had him removed from his cell and brought to him. Officer Smith told Pippin that he and the other Chicago Police Officers had delivered $7,000 to Pippin's wife, Jeanette. Officer Smith advised Pippin to keep his mouth shut, and, in return, he and the other officers would work on getting Pippin out of jail. He told Pippin to have his wife go to Puerto Rico and keep her mouth shut. He asked Pippin if Agent Klipfel was planning on going to the FBI. (Pippin Affidavit, exhibit 10)

182. CPD Officers Byrne and Smith appeared at a number of Pippin's court appearances stemming from the February 20, 1992 arrest. They told Pippin that they knew he was in contact with Agent Klipfel. They told Pippin that he could get killed in prison if he did not keep his mouth shut, but if he cooperated with them, they would help him get out of prison.

The officers told Pippin to make sure that his wife also kept quiet and that both of their sons, ages 1 and 2, could be killed if Pippin talked about the robberies by the police officers. (Pippin Affidavit, exhibit 10)

183. Several days later, Officer Walter Smith and Officer Miedzianowski delivered the jewelry they stole from the Pippin safety deposit box to Pippin's wife, valued at approximately $33,000. (Pippin Affidavit, exhibit 10)

184. After Pippin's arrest and imprisonment, he was afraid that he would be killed in prison and/or his wife would be killed by the officers. His wife was terrified of the officers. Sgt. Byrne, Officer Miedzianowski and Officer Walter Smith repeatedly came to his wife's home. They told her that if she did not forget all about what happened, they would shoot her. Another time they went to her home, they told her that they would shoot their children and make her watch. (Pippin Affidavit, exhibit 10)

185. Jeanette Pippin, the wife of Darrin Pippin, revealed to several federal agencies that after Diane Klipfel reported the theft at the Pippins' home by the Chicago Police Officers, a group of Chicago Police Officers, including Joseph Miedzianowski, Walter Smith and Michael Byrne, came to Jeanette Pippin's home and raped her, making her pregnant. (Hemsath Affidavit, exhibit 15; Pippin Affidavit, exhibit 10)

186. After the rape and the subsequent birth of the child, Jeanette Pippin attempted suicide. (Pippin Affidavit, exhibit 10)

50

187. On January 15, 1993, Sgt. Byrne and Officer Smith came to the prison where Pippin was incarcerated, Robinson Correctional Facility in Effingham, Illinois. The officers told Pippin that they had "taken care" of Agent Klipfel and that their whole Department was up in arms over her allegations. The officers also told Pippin that the Superintendent of Police and the Mayor had all been briefed and were personally monitoring the investigation of Agent Klipfel. Sgt. Byrne told Pippin that the Chicago Police were going to have Agent Klipfel arrested shortly, but until then they had had her suspended with assurances from the ATF that they would transfer her out of the State. Sgt. Byrne also told Pippin that the Chicago Police were putting a case together on Mr. Casali, and that both Agents Klipfel and Casali were so discredited, that no one would believe a word that came out of their mouths. Sgt. Byrne told Pippin that his Chicago Police bosses had been meeting regularly with Agent Klipfel and her bosses. Sgt. Byrne told Pippin that it was Agent Klipfel who had stolen the money from Pippin's safety deposit box and that she was trying to use the gun found in the safety deposit box to place additional charges on Pippin. The Chicago Police officers repeatedly asked Pippin where his wife could be found. (Pippin Affidavit, exhibit 10)

188. To further the Chicago Police Officers' intimidation of Pippin, shortly after the jail visit, Pippin learned that Sgt Byrne traveled to Puerto Rico looking for Pippin's wife. A short time later, Pippin received a letter from Sgt. Byrne telling Pippin, in thinly veiled threatening terms, that Sgt. Byrne was close to locating Pippin's wife who was hiding in Puerto Rico, and that Sgt. Byrne had discovered the false name she was using. (Pippin Affidavit, exhibit 10; letter Pippin received from Sgt. Byrne, exhibit 78)

189. On or about June 15, 1993, Sgt. Byrne and Officer Walter Smith came again to Robinson Correctional Facility where Pippin was incarcerated. They met with the Prison Internal Affairs Unit. About 20 minutes after their visit, Pippin's clearance to work at an outside prison warehouse and to work as a youth soccer coach was suspended. The prison then began blocking Pippin's telephone calls to the ATF office, Agent Klipfel's home, Agent Klipfel's attorney, Pippin's attorney, Agent Klipfel's cell phone and to local reporter Carol Marin, who was working on a police corruption story. (Pippin Affidavit, exhibit 10)

190. In early 1993, Pippin's cellmate who worked in the prison mailroom informed Pippin that the prison mailroom received orders from the Warden to copy every letter, picture or other document that came into the prison for Pippin, or was mailed out by Pippin, for use by the Chicago Police Department. Pippin's cellmate informed him that no other inmates had their mail copied in a similar manner. (Pippin Affidavit, exhibit 10)

191. In a number of telephone conversations Pippin had with his own attorney, Daniel Coyne, throughout early 1993, Coyne told him that he was a close friend of Sgt. Byrne and that Byrne had warned Coyne to have Pippin stay away from Klipfel; that she was corrupt, and that the Chicago Police Department Internal Affairs Unit was getting ready to arrest her. Coyne told Pippin that many officers were angry about Klipfel's allegations and that Pippin should keep his mouth shut or bad things could happen to him like they happened to Agent Klipfel. Coyne told Pippin "theses are the things for which people get run over by a bus." Attorney Coyne also warned Pippin that there were thousands of Chicago Police Officers that he would have to contend with if he kept in contact with Agent Klipfel. (Pippin Affidavit, exhibit 10)

192.     Officers Miedzianowski, Galligan, Smith and Byrne attempted to intimidate their accusers. (Netols deposition, p, 33, exhibit 5)

I.     **What Was at Stake:**

193.     The reputation of the Chicago Police Department was at risk if the plaintiffs' allegations against sworn CPD Officers were verified. (Raymond Risley deposition, pp. 81, 83, exhibit 22; Eugene Karczewski deposition, pp. 97–98, exhibit 66; Miedzianowski Deposition, p. 279, exhibit 19; Miedzianowski's February 22, 1993 memo to Risley, exhibit 25; T-III Wiretap Transcript of Joseph Miedzianowski and John Galligan on 9/15/98, p.5, exhibit 79)

194.     The relationship between CPD and ATF became strained as a result of the plaintiffs' disclosures. (Raymond Risley June 9, 1993 memo to Supt. Rodriguez, exhibit 23; August 12, 1993 Report of Interview with John Kline, CPD Deputy Superintendent for Legal Affairs, exhibit 80; December 13, 1993 Statement of Michael V. Casali, exhibit 81)

195.     CPD objected to ATF investigating the CPD officers. (Deposition of James Kalkman, p. 35, exhibit 36)

196.     Assistant Deputy Superintendent Risley told Superintendent Rodriguez that the CPD should end its relationship with ATF. (Rodriguez Deposition, p. 80, exhibit 53)

197.     Miedzianowski recalls a document generated either by Superintendent Rodriguez to ADS Risley or by ADS Risley to the U.S. Attorneys' Office stating that the Chicago Police

53

Department should cease all operations with all federal agencies pending the outcome of the investigations related to plaintiffs. (Miedzianowski Deposition, pp. 391-392, exhibit 19)

## V. CPD'S HISTORY OF GANG INFILTRATION AND CORRUPTION WITHIN ITS RANKS

## A. The Mayor of the City of Chicago and the Superintendent of Police Were Aware of Gang Infiltration into the Ranks of the Chicago Police Department:

198. The Superintendent of the Chicago Police Department discussed gang infiltration into the ranks of the Chicago Police Department with the Mayor of the City of Chicago. (Rodriguez Deposition, p. 107, exhibit 53)

199. The Superintendent of the Chicago Police Department and the Mayor of the City of Chicago discussed what could be done to overcome the problem of gang infiltration into the ranks of the Department. (Rodriguez Deposition, p. 108, exhibit 53)

200. In 1995, in a series of Chicago Sun Times headline exposes, the newspaper detailed its own investigation of gangs moving into the ranks of the Chicago Police Department. The Sun Times concluded that street gangs had infiltrated the ranks of the Chicago Police Department and that CPD was largely helpless to weed them out. (1995 Sun Times articles, exhibit 82)

202. The Sun Times quoted Police Superintendent Matt Rodriguez as: "We can't deny we have individuals who are members, fraternize or associate with street gangs." (1995 Sun Times articles, exhibit 82)

54

203.    The Sun Times reported that, in 1995, it questioned Mayor Daley regarding gang infiltration into the ranks of the Chicago Police Department. The mayor's press secretary said that Mayor Daley was "taking street gang infiltration of the Police Department very seriously." "The mayor believes all street gangs are criminal organizations." ... "The mayor is aware that some neighborhood residents are reluctant to report gang activity out of fear of rogue cops." (1995 Sun Times articles, exhibit 82)

204.    Superintendent Rodriguez did not recall any specific programs coming out of the discussion with the Mayor about gang infiltration into the ranks. (Rodriguez Deposition, p. 108, exhibit 53)

205.    Superintendent Rodriguez had to shake up the management of the 14th District because gangs had infiltrated the 14th District. (Rodriguez Deposition, p. 108, exhibit 53)

206.    Superintendent Rodriguez admitted that the Chicago Police Department made mistakes at the inception of Miedzianowski's career and throughout his career. (Rodriguez Deposition, p. 111, exhibit 53)

207.    Superintendent Rodriguez acknowledged that the problem of gang infiltration into the ranks of the Chicago Police Department or the problem of officers associating with felons existed prior to 1992. (Rodriguez Deposition, p. 119, exhibit 53)

208.     There has been a history in Chicago and in other major cities of collusion between gang members and police officers. It is not good. (Rodriguez Deposition, p. 120, exhibit 53)

209.     Mayor Daley was aware of the gang infiltration problem and took it very seriously. (Rodriguez Deposition, p. 122, exhibit 53)

210.     Everyone believes that there is a blue curtain preventing certain police officers from facing discipline.     That perception is the greatest contribution to organized crime. (Rodriguez Deposition, p. 127, exhibit 53)

## B.     A Former Drug Dealer Reveals a History of Corruption within the Ranks of CPD:

211.     At the age of 15, Darrin Pippin began selling marijuana and then, later, cocaine with his mother, Francis Sanchez. As an associate of the Imperial Gangsters Street Gang, Pippin sold cocaine, managed drug distribution sites, and managed financial matters for the David Ramirez narcotics enterprise. In about 1985 until 1991, he performed similar duties for the Juan Martir narcotics enterprise, yet another Imperial Gangster organization. As a gang associate for almost 20 years, he learned a great deal about conducting a criminal enterprise in the City of Chicago. In particular, he personally met a number of Chicago Police officers and quickly learned about the Chicago Police Department's attitude toward gang members and narcotics organizations. (Pippin Affidavit, exhibit 10)

212.     Those who worked with the gangs in the narcotics trade knew that many members of the Chicago Police Department actually assisted gang members with their narcotics business in exchange for cash and drugs. Pippin's friends and he regularly observed sworn Chicago Police Officers commit

crimes without repercussions. It was generally understood, on the street, that the Chicago Police Department did not prosecute its own officers, regardless of the strength of any evidence. The officers Pippin worked with often represented that they had no fear of getting "caught" for committing crimes and they certainly did not fear repercussions from Chicago Police Internal Affairs. The attitude of the officers Pippin observed was that the Chicago Police Department looked the other way when it came to officers committing crimes. (Pippin Affidavit, exhibit 10)

213.    For example, the 14th District of the Chicago Police Department was known throughout Pippin's gang and others as a district where many of the officers were corrupt. 14th District Chicago Police Officer Rodriguez, also known as Chano, was a uniformed Chicago Police officer, an active member of the Spanish Lord Street Gang, and a cousin of narcotics distributor David Ramirez. Officer Rodriguez worked in the narcotics enterprise for about 10 years from the early 1980's until the early 1990's. David Ramirez paid Officer Rodriguez for his services in cash and cocaine. Pippin personally worked with Officer Rodriguez on a daily basis. On about 15 occasions, Rodriguez drove Pippin from one site to the other while Pippin carried large amounts of drug-related cash. Officer Rodriguez made the decision to personally transport Pippin because he felt that Pippin would be safer having an armed police escort in a squad car, while carrying large amounts of drug money. Officer Rodriguez expressed his concern that Pippin would be robbed by other Chicago police officers. To assist the narcotics trafficking, Officer Rodriguez picked up cocaine from where it was stored, at Fullerton and Laramie, and delivered it to where it was sold at Cortland and Kimball in Chicago. When the gang ran low on cocaine, David Ramirez or Pippin would call Officer Rodriguez who would make up to 5 or 6 deliveries a day, in uniform, driving a marked Chicago Police squad car, to the drug site. Officer Rodriguez never had a partner with him and never expressed concern about a Chicago Police Department supervisor checking

up on him. In fact, although the drug site had been raided by Chicago Police on a regular basis, Officer Rodriguez told Pippin that he was not concerned about being seen making deliveries because he was a Chicago Police officer. (Pippin Affidavit, exhibit 10)

214.    In addition to facilitating drug trafficking, Officer Rodriguez also stole drugs and money from narcotics dealers. In 1986 or 1987, Pippin personally assisted Officer Rodriguez, David Ramirez, Angel Collazo, and Archie (Last Name Unknown) in "ripping off' David Ramirez' cocaine connection for 9 kilos of cocaine. Officer Rodriguez' share was one kilo of cocaine. (Pippin Affidavit, exhibit 10)

215.    Other examples of corrupt Chicago Police Officers include: Lt. Kijowski of the Chicago Police Department's 14th District, and his "crew" which included Officer Dennis Palaz, Officer McDonald (now in Area 5 Homicide) and another unknown officer. In the mid 1980's, they regularly demanded that they be paid $2,000 per week for protection against the Chicago Police raiding the Cortland and Kimball site. When the officers came to collect their weekly payment, Lt. Kijowski, Officer Palaz or Officer McDonald would arrive at the drug site, occasionally sitting on the porch while Pippin and other drug sellers made enough sales to meet the $2,000 quota. After each sale, they would hand the cash to the officers, until they had reached the weekly agreed upon $2,000. At times while Lt. Kijowski's crew was there, Officer Rodriguez, who was not involved with Lt. Kijowski's crew, would make deliveries of cocaine to Pippin's gang when they ran low. (Pippin Affidavit, exhibit 10)

216.    Pippin was present in the early to mid 1980's when Lt Kijowski, investigating a contract murder and aware that the Imperial Gangsters knew of it, told William Martinez, and David Ramirez that "they could continue to sell drugs only if Pippin told him who did the murder and where the gun used

was." David Ramirez gave Lt. Kijowski the name of the murderers, both Spanish Lord Gang members, and the location of the gun used. The gang members were arrested and Pippin and his associates were allowed to continue their narcotics business. (Pippin Affidavit, exhibit 10)

217.    Pippin was present in the mid 80's when Officer McDonald pulled over a man to whom he had just sold 8 ounces of cocaine. Officer McDonald offered to let the man go if he arranged to immediately pay Officer McDonald $5,000 and give him the 8 ounces of cocaine. Raul Cruz, the arrestee's cousin, brought the $5,000 to the scene and paid Officer McDonald. Officer McDonald took the cocaine and allowed Cruz' cousin and the arrestee to leave without charges. (Pippin Affidavit, exhibit 10)

218.    In 1995, after Officer McDonald transferred to Area 5 Homicide, Pippin teased him, saying, "Now you are in Homicide, you aren't getting all that good dope money coming in anymore." Officer McDonald told Pippin that, in reality, the money was better in fixing homicide cases. (Pippin Affidavit, exhibit 10)

219.    In 1987, one of Lt. Kijowski's crewmembers, a Chicago Police Officer Pippin and his associates Pippin called "Commando," pulled Pippin over and poured bleach and fabric softener throughout the interior of Pippin's vehicle. Pippin reported this to Chicago Police Department's Internal Affairs Division, and then had to go into hiding because he quickly learned from friends that Lt. Kijowski's officers began looking for him, threatening to hurt him. Pippin had to stay out of the area until

Lt. Kijowski arranged for a sit down with David Ramirez, where it was agreed that Pippin would withdraw the IAD complaint against his officer, Lt. Kijowski's men would stop harassing Pippin's family and friends, and Lt. Kijowski would not physically harm Pippin. (Pippin Affidavit, exhibit 10)

220. In 1985, Pippin learned that Chicago Police Officer Arciola a/k/a Arcio, again of the Chicago Police Department's 14th District, went to the home where gang member Raul Cruz was known to store large amounts of drugs and cash and was selling narcotics. Officer Arciola handcuffed Cruz to a water pipe in the ceiling of the basement, kicked out his support chair and left him swinging in the air, with the pressure of the handcuffs cutting into his hands until he told Officer Arciola where he had hidden his cash and drugs. Arciola then located the cash and drugs and set Cruz free without charges. (Pippin Affidavit, exhibit 10)

221. On two occasions, in about 1988 and 1989, another gang member, Juan Martir, and his brother Orlando Martir, were raided by Chicago Police Officers Heideman and Christine Spiros. The officers stole about $60,000 from the Martirs. To avoid prosecution, Juan and Orlando Martir also began to work as informants for the officers, setting up a number of Spanish Cobra gang members who were narcotics dealers. However, later Pippin learned that the Martirs also set up the gang members to have money and narcotics stolen by the same Chicago Police officers. (Pippin Affidavit, exhibit 10)

222. In about 1988, Chicago Police Sgt. Michael Byrne raided Pippin's home at 3404 W. Cortland, Chicago. Sgt. Byrne also raided a separate upstairs apartment, where he found a gun that belonged to Fernando Vargas. Sgt. Byrne found narcotics in Pippin's apartment and he brought the gun to Pippin and offered to forego drug and gun charges if Pippin would set up David Ramirez for Sgt. Byrne

60

to rob. Byrne told Pippin that he knew that David Ramirez had gold and cash around, and he wanted Pippin to help him get it. Pippin discussed with Sgt. Byrne the fact that David Ramirez was making up to $120,000 per week, just from the Cortland and Kimball drug site. Pippin agreed to help Sgt. Byrne, and all charges against Pippin were later dropped. (Pippin Affidavit, exhibit 10)

223.   Pippin managed David Ramirez' drug sales funds and he knew about a number of safety deposit boxes where David Ramirez stored his cash. Sgt. Byrne knew that Pippin had the information and Pippin provided Sgt. Byrne and his crew of Chicago Police officers (which included Officer Walter Smith and two unknown officers), with information about at least 4 safety deposit boxes containing drug money. One box, at the Cole Taylor Bank located on Milwaukee Avenue, contained about $200,000. Sgt. Byrne raided the box and gave Pippin $2,000 from the take. David Ramirez' stepfather, Jose Milette, who rented the box, told Pippin that the officers had stolen all of the money. Sgt. Byrne and his crew stole about $240,000 from the other safety deposit boxes that Pippin told them about. Sgt. Byrne gave Pippin cash payments for providing information about the boxes. (Pippin Affidavit, exhibit 10)

224.   From about 1985, until 1991, Pippin provided information to Sgt. Byrne and his crew, which resulted in approximately 20 search warrants on locations where gang members were selling narcotics. Sgt. Byrne and his crew robbed these dealers and after each warrant, Sgt Byrne gave Pippin an ounce or two of cocaine, which he then sold, keeping the profits. (Pippin Affidavit, exhibit 10)

225.   In about 1989, Pippin accompanied Sgt. Michael Byrne and Officer Walter Smith on a search warrant in the 2000 block of North Avers. Pippin had provided the officers with information that there were at least 9 kilos of cocaine and a large amount of cash on the premises. Officer Smith and Sgt.

61

Byrne had Pippin dress in a Chicago Police Department raid jacket, clearly marked POLICE, as well as a Chicago Police raid hat, and accompany them inside the house during the raid to help them search for drugs and cash to rob. Pippin located the items for them, and the officers took them without inventorying them, or arresting the dealers. The same day, Officers Byrne and Smith executed two other warrants based on information Pippin provided, one in the 3900 block of Diversey, and one on Montrose and Austin. At both locations, the officers found cash and narcotics, which they informed Pippin they stole. (Pippin Affidavit, exhibit 10)

226.    In 1991, Sgt. Byrne, Officer Smith, Officer Joseph Miedzianowski and another officer assigned to Sgt. Byrne, raided Pippin home at 1749 Lawndale, where they stole $7,000 and jewelry. They came to Pippin's house just as he was leaving with the $7,000 to buy cocaine as he was completely out. The officers brought an ounce of cocaine to Pippin's house that they claimed was his and told Pippin that they would charge him with it and send him to prison. They told Pippin that they would let him go without charges if he agreed to set up more drug dealers to be robbed by their crews. Pippin agreed and asked for his $7,000 back. Sgt. Byrne laughed and said to: "consider it a tax write off." (Pippin Affidavit, exhibit 10)

227.    In 1987 and 1988, Pippin was the manager of The Squeaky Clean Car Wash, located at 2847 Pulaski. The car wash was both a working business and a large narcotics operation. Pippin handled both businesses. In about 1989, the car wash was robbed by two uniformed Chicago Police Officers in a squad car. Their names were possibly Kurtz and Reynolds and they were from the Chicago Police Department Public Housing Unit. They stole about $25,000 from the operation, a kilo of cocaine and a

cell phone. Pippin knows that the officers did not report the matter, nor did they complete an inventory of the narcotics. Juan Martir, who owned the car wash, reported the robbery to the Chicago Police Department. (Pippin Affidavit, exhibit 10)

228.    In about 1988, Officer Martinez of Area 6, Belmont and Western (who had a partner named Officer Fallon), had amassed a large cache of stolen jewelry at his house. His daughter, Lisette Martinez, began giving it to friends of Pippin who detailed the source to him. (Pippin Affidavit, exhibit 10)

229.    In 1991, Pippin was contacted by Sgt Michael Byrne's Lieutenant, in the Narcotics Section. The Lieutenant told Pippin that if he did not start setting up drug dealers to get robbed again, the officers in Narcotics would raid his house again. (Pippin Affidavit, exhibit 10)

230.    In 1991, Sgt. Stack, his female partner, and four other unknown officers, possibly of the Town Hall District, raided Pippin's home at 3900 Addison. They stole $26,000 in cash, jewelry, and 1 gram of cocaine. These items did not appear on an inventory and Pippin was not arrested. (Pippin Affidavit, exhibit 10)

231.    On February 20, 1992, Chicago Police Sgt Byrne, Officer Walter Smith, Officer Lasch and ATF Agents Diane Klipfel and Laurie Jolley raided Pippin's house at 4533 N. Drake. At that time, Chicago Police Officers stole about $8,000 in cash, about $20,000 in jewelry, a leather coat, cameras, tools and miscellaneous items from the house. They then went to Pippin's safety deposit box and stole $14,000. The officers tried to intimidate Pippin to keep the theft from the ATF Agents. The police

63

officers told Pippin that if he stayed quiet about the thefts, they would let him have half of the $14,000 in the box, so that his family would have money while he was in prison. Pippin agreed. When he inadvertently began to mention the safety deposit box to Agent Klipfel, Officer Miedzianowski punched Pippin to silence him. Pippin recalls starting to talk about the safe deposit box because he was so used to dealing with corrupt Chicago Police Officers who knew about the thefts from safe deposit boxes and from dealers. He actually forgot that the ATF agents were federal agents who were not supposed to know about the corruption within the Chicago Police Department. (Pippin Affidavit, exhibit10)

232.    Later on February 20, 1992, Pippin accompanied the same ATF agents to serve a warrant they had at his mother's house at 5023 Kimball. The Chicago Police Officers warned Pippin's mother and him to be quiet in front of the federal agents. This time, the Chicago Police Officers stole about $2,000 in cash, expensive jewelry and food stamps. Pippin's mother became angry that the officers were stealing from her again, and started screaming in front of both federal agents, protesting that the officers had stolen her food stamps and jewelry. (Pippin Affidavit, exhibit 10)

233.    Later on February 20, 1992, Pippin provided Sgt. Byrne with information about Gary Sanchez, a drug dealer who kept large amounts of cash at his residence. That same day, Sgt. Byrne, Officer Miedzianowski, Officer Smith, Officer Lasch and ATF agent Laurie Jolley served a search warrant on the Sanchez residence. Sanchez told Pippin that the officers stole about $10,000 in cash, cell phones, and guns from the residence, and that the officers never recorded the items on the police inventory. Later, Pippin read the affidavit that Sgt. Byrne used to obtain the Sanchez search warrant and

64

saw that Sgt. Byrne indicated that he had sent Pippin to the door of the house and watched him purchase an ounce of cocaine. This never happened and was simply fabricated by Sgt. Byrne. (Pippin Affidavit, exhibit 10)

234.    Later, on February 20, 1992, Pippin was alone with ATF Agent Klipfel, and he told her about the thefts. That same day, he observed a series of violent confrontations between Agent Klipfel and Officer Miedzianowski. He heard the officers threaten to harm Agent Klipfel's children, set her husband up with cocaine, firebomb her house and kill Pippin. They threatened her that if she reported the thefts as she told them she would, they would say that it was she who stole all the money and that no one would believe Pippin, as he was just a drug dealer. They also threatened her with making certain that she lost her job. The Chicago Police officers were violent and confrontational and screamed at Agent Klipfel. Klipfel remained calm and talked in a normal voice; although Pippin could see that she felt that we were in danger. Pippin saw Officer Miedzianowski kick in the side of Agent Klipfel's squad car. Pippin was so certain that Officer Miedzianowski would do them serious harm, that at one point, Agent Klipfel unhandcuffed Pippin and told him that if anything started to happen, that he should start running to save himself. (Pippin Affidavit, exhibit 10)

235.    One of the confrontations occurred in the parking lot of the Chicago Police Department's 17th District Police station, located at Pulaski and Sunnyside. The lot was very dark and empty. Klipfel confided in Pippin as he watched that she had a gun in her pocket and she kept her hand on it. At one point, Pippin observed Sgt. Byrne talking to Agent Klipfel, advancing at her, while she stepped backwards away from him, and the screaming Miedzianowski. At the same time an unmarked squad car, without lights, quietly rolled up behind Agent Klipfel. It appeared to Pippin that the officers were trying to

get Agent Klipfel near the unmarked squad, to push her in it. Pippin felt that she and he were both about to be killed. When Agent Klipfel realized that the vehicle was there, she moved immediately into a lit area where officers in the station could see her. (Pippin Affidavit, exhibit 10)

236.    That night, after Agent Klipfel took him to Cook County Jail, Officer Walter Smith had Pippin removed from his cell and brought to him. He told Pippin that he and the other officers had delivered $7,000 to his wife Jeanette. Officer Smith advised Pippin to keep his mouth shut, and, in return, he and the other officers would work on getting Pippin out of jail. He told Pippin to have his wife go to Puerto Rico and keep her mouth shut. He asked Pippin if Agent Klipfel was planning on going to the FBI. Officer Smith let Pippin call his wife to verify that Officers Byrne and Miedzianowski had delivered the money. (Pippin Affidavit, exhibit 10)

237.    During the meeting with Officer Smith, he signed Pippin up as an informant for the Chicago Police Department. He had Pippin complete and sign the necessary Chicago Police Department forms. Officer Smith told Pippin that they had to do this to cover their tracks, in light of Agent Klipfel's behavior. Up until February 1992, Pippin had never been signed up as an informant, even though he had provided information for years to the Chicago Police Department. (Pippin Affidavit, exhibit 10)

238.    Some time later Pippin had an opportunity to review the affidavit to the search warrant that was used to gain access to his house on February 20, 1992. It indicated that an informant had been at Pippin's home the night before. That simply was untrue and the affiant was fabricating the story. (Pippin Affidavit, exhibit 10)

66

239.    Several days later, Officer Walter Smith and Officer Miedzianowski delivered the
jewelry they stole from the safety deposit box to Pippin's wife, valued at approximately $33,000.
(Pippin Affidavit, exhibit 10)

240.    A short time later, Agent Klipfel became aware that something violent had happened to
Pippin's wife. Pippin found out that she had been raped by one of the officers. Klipfel moved Pippin's
wife and children to Puerto Rico. (Pippin Affidavit, exhibit 10)

241.    It is common knowledge among gang associates, past and present, and among the
members of Pippin's family and community that the Chicago Police Department "looks the other
way" when it comes to the conduct of police officers engaging in criminal activities. Chicago
Police Officers are rarely caught, prosecuted or disciplined. Officers often depend on the income
they receive from stealing from gang members to supplement their income. Gang members and
associates tolerate the corrupt police conduct in order to keep from being arrested and to keep the
officers from harassing them. This attitude has been in existence for Pippin's entire life, and his
mother told him that Chicago Police Officers engaged in similar criminal conduct when she was
a young girl. (Pippin Affidavit, exhibit 10)

242.    There is no doubt whatsoever that high ranking members of the Chicago Police
Department know of the culture of tolerance within the ranks for illegal activity by the officers. It has
been going on for generations and it is common knowledge among the gangs that the Chicago Police
Department allows such conduct to continue unchecked. Chicago Police Officers know that they will not

face repercussions for such criminal activity and Pippin observed that even after complaints were made to Internal Affairs, Chicago Police officers were generally not disciplined. (Pippin Affidavit, exhibit 10)

243. Many officers have told Pippin, including Sgt Byrne, Officer Miedzianowski, Officer Walter Smith, Lt. Kijowski, Officer McDonald, Officer Dennis Palaz, Officer Rodriguez and others that they believed that they could continue to rob drug dealers and gang members, with impunity, because the chances of them being prosecuted by any authority, for such conduct was virtually none. Street officers who work with gang members have told Pippin that generally, gang members and drug dealers have little creditability within the legal system, so the officers have no incentive to conform their conduct to the law. As Sgt Byrne told Pippin, "nobody's never going to believe a drug dealer." (Pippin Affidavit, exhibit 10)

244. After being released from prison in 1995, Pippin was so frightened of Chicago Police Officers that he lived and worked under an assumed name and moved frequently. (Pippin Affidavit, exhibit 10)

245. The incidents of corruption detailed by Pippin are just a few of the incidents he personally experienced when working with the Chicago Police Department. (Pippin Affidavit, exhibit 10)

## C. Media Reports on Chicago Police Department Corruption:

246.    The Chicago Police Department has a history of corruption that has gone unchecked for years. For example, some reports of Chicago Police corruption reported by the media, include:

<u>**2005**</u>

247.    The Chicago Tribune reported on January 28, 2005, that four veteran officers were arrested; they had allegedly staged traffic stops and tried to break into the home of rival drug dealers to rob them of drugs, guns and cash. (Prosecutors say the plans of Chicago police officers and accomplices accused in the drug conspiracy began unraveling on July 21, 2004, when they allegedly tried to rob a quartet of dealers who—unbeknownst to the corrupt officers were already under surveillance from undercover Chicago cops on another case). (CHI TRIB, Jan.28, 2005, James Janega, exhibit 83).

248.    The Chicago Tribune reported on April 26, 2005 that two former Chicago police officers were accused of helping mob boss Frank Calabrese keep track of his crew from prison. (CHI TRIB, Apr.26, 2005, John Kass, exhibit 83).

249.    The Chicago Tribune reported on February 4, 2005 that federal corruption charges had been brought against two Chicago Police Officers who witnessed the shooting death of Officer Eric Lee. They were charged with shaking down drug dealers (Officers Broderick Jones and Corey Flagg). Two other Chicago cops were also charged in the alleged scheme to rob and extort drugs, guns and money from drug dealers (Officers Eural J. Black, and Darek Haynes) (CHI TRIB, Feb. 4, 2005, Jeff Coen, Kevin Pang, exhibit 83).

250. The Associated Press reported on February 23, 2005 that Chicago police commander, Michael J. Acosta was charged with lying about favors done for a former city employee accused of taking payoffs. (AP Alert, Feb.23, 2005, exhibit 83).

251. The Chicago Sun Times reported on July 16, 2005 that Chicago police officer Edward K. Leak Jr. was held without bond after allegedly ordering the killing of Fred Hamilton. Six months earlier, Hamilton had made an anonymous call to the Chicago Police, accusing an officer of insurance fraud and saying that he feared the officer would kill him. (CHI SUN TIMES, Jul. 16, 2005, exhibit 83).

## 2004

252. The Chicago Tribune reported on May 16, 2004 that former Chicago police officer, Mario Morales, was sentenced to 24 ½ years in prison for stealing more than 200 pounds of marijuana and cash from a narcotics dealer and trying to hold up other drug dealers on three occasions. (CHI TRIB, May 16, 2004, exhibit 84).

253. The Chicago Sun Times reported on July 12, 2004 that nine former Chicago police detectives took the Fifth Amendment rather than answer questions about police torture for a pending civil lawsuit. (CHI SUN TIMES, July 12, 2004, exhibit 84).

254. The Chicago Sun Times reported on September 30, 2004 that Federal prosecutors charged three Chicago cops with stealing cocaine from an impounded car. Officers James

Benson was sentenced to 18 months in federal prison for his involvement and for planting drugs on a man whose arrest was dropped. (CHI SUN TIMES, Sept. 30, 2004, exhibit 84)

255.    The Chicago Sun Times reported on September 30, 2004 that Jerehiah Mearday filed criminal charges against two Chicago Police officers (James Comito, Jr. and Matthew Thiel) for breaking his jaw on September 26, 1997 when they struck him in the head with flashlights  Mearday was arrested in 1998 for possession of illegal drugs; Mearday accused officers of planting the drugs on him in retaliation for the brutality complaint. (CHI SUN TIMES, Sept. 30, 2004, exhibit 84).

**2003**

256.    The Chicago Defender reported on September 20, 2003 that the U.S. Attorney's Office announced the arrests of nine Chicago area police officers and one former detective in an undercover sting operation where they were caught allegedly stealing drug money and buying fake cocaine—alleged that each of the nine persons participated in an attempt to steal money and drugs from a person or car that they believed belonged to a drug dealer. (CHI DEFENDER, Sept. 20, 2003, Vol. XCVIII; Issue 97, exhibit 85).

257.    The Chicago Sun Times reported on January 25, 2003 that Chicago police officer Joseph Miedzianowski was sentenced to life in prison for his years of dealing drugs with gang leaders and undermining his fellow officers. (CHI SUN TIMES, Jan 25, 2003, exhibit 85).

258.    The Chicago Sun Times reported that Retired Chicago police officer John L. Smith accused of stealing at least 5 kilograms of cocaine from a police evidence room from 1995

to 1998—Nine count indictment says Smith hauled in $1,588,000 from 1995 to 1998 and failed to declare $580,000 of income on his taxes (he disguised other income as casino winnings). (CHI SUN TIMES, Feb. 7, 2003, exhibit 85).

259.    The Chicago Sun Times reported on January 28, 2005 that Chicago Police Officer James B. Benson pleaded guilty to a federal drug conspiracy charge. Fellow Grand Central tactical officer Peter L. Matich and Detective Jon F. Woodall both pleaded not guilty to the same charges. (CHI SUN TIMES, Jan 28, 2003, exhibit 85).

260.    The Chicago Sun Times reported on Feb. 14, 2003 that Chicago Police Officer Gregory V. Cameron was charged with taking protection money form drug dealers and another cop pleaded guilty in a separate investigation to stealing cocaine from an impounded car. (CHI SUN TIMES, Feb. 14, 2003, exhibit 85).

261.    The Chicago Tribune reported on May 2, 2003 that an expert for the plaintiff in a civil lawsuit over an alleged beating by an off-duty police officer testified that of 73 investigations by the Chicago Police Department's office of professional standards (OPS) for alleged excessive force, only three resulted in discipline or prosecution. (CHI TRIB, May 2, 2003, exhibit 85).

**2002**

262.    The Chicago Sun Times reported on September 10, 2002 that Chicago police officer Turan Beamon was charged with stealing $10,000 from what he thought was a drug

72

dealer's "loot." Beamon allegedly approached a government informant about helping him rip off a drug dealer. (CHI SUN TIMES, Sept. 7, 2002, exhibit 86)

263.    The Chicago Tribune reported on November 11, 2002, that Chicago District Officer Daniel Durst was found guilty of using excessive force against Kentin Waits and that Sgt. Michael Prusank failed to stop the beating. (CHI TRIB, Nov. 11, 2002, exhibit 86).

264.    The Chicago Tribune reported on April 13, 2002 that a federal judge sentenced former Chicago Police Officer John Galligan to 4 years and 9 months in prison for fabricating a search warrant and giving false testimony in the 1990s to hide his corrupt partner, Joseph Midezianowski's, theft of cocaine. (CHI TRIB, Apr. 13, 2002, exhibit 86).

### 2001

265.    10-year Chicago police veteran was stripped of his badge as internal affairs investigators look into allegations that he reduced charges against women he arrested Jan.6 on prostitution charges in exchange for sex. (CHI SUN TIMES, Jan. 30, 2001, exhibit 87).

266.    The Chicago Tribune reported on February 2, 2001 that two Chicago police officers, including a supervisor with nearly 30 years on the job, were arrested at a South Side housing development in a federal sting targeting the alleged theft of drugs, money and guns. (CHI TRIB, Feb. 2, 2001, exhibit 87).

267.    The Chicago Sun Times reported on February 9, 2001 that Chicago Police officer, Xavier Castro, charged with lying on police reports and to a grand jury apparently to cover up an illegal search involving the 1996 drug arrest of two men. The federal indictment alleges that

Castro was one of four officers who conspired to deprive Anselmo Echevarria and Miguel Herrera of their rights. (CHI SUN TIMES, Feb 9, 2001, exhibit 87).

268.    Chicago police officer Brian M. McCluskey pleaded guilty in federal court on Wednesday, October 31, 2001, to his role in a network that sold ecstasy. McCluskey worked in the Grand-Central police district on the city's northwest side. (CHI SUN TIMES, Nov. 8, 2001, exhibit 87).

**2000**

269.    The Chicago Sun Times reported on September 23, 2000 that James F. Galligan arrested on Sept. 22, 2000 for his involvement with the Miami-to-Chicago drug business: Galligan was charged with extortion, conspiracy, possession of cocaine with intent to distribute and a firearms violation. (CHI SUN TIMES, Sept. 23, 2000, exhibit 88).

270.    The Chicago Sun Times reported on March 28, 2001 that former Chicago Police officer John Labiak convicted of home invasion and trying to shake down an individual for $8000—convicted in July 2000 and sentenced to 16 years in prison. The trials of two other Chicago Police officers charged with Labiak, Rodney Carrigar and Ernest Hutchinson, ended in mistrials. (CHI SUN TIMES, March 28, 2001, exhibit 88).

271.    The Chicago Sun Times reported on May 28, 2000 that Chicago Police Lieutenant Costantino Verre is charged with felony perjury. (CHI SUN TIMES, May 28, 2000, exhibit 88).

74

272.    The Chicago Tribune reported on October 22, 2000 that Chicago Police Department Supt. Matt Rodriguez had substantial relationships with reputed mobster, Frank Milito. The article further reported that crime figures forged ties of money or friendship with certain Chicago police supervisors and officers during the last decade as key investigations drifted or were derailed. (CHI TRIB, Oct. 22, 2000, exhibit 88).

**1999**

273.    The Chicago Tribune reported that former high-ranking Chicago Police Commander Raymond Risley, who twice was a finalist for the superintendent's job, says his efforts to root out mob influence in the Police Department were stalled by top officials and that they spied on him in retaliation for his investigations. Raymond Risley, former chief of the department's organized crime unit claims Chicago officials suspected he cooperated with federal agents' investigation of corruption and leaked critical information to reporters. The result, Risley said, was a 2-year campaign of disinformation against him that included spying on him and his wife—also a Chicago police officer—at home and at work, even after he left the force. (CHI TRIB, Oct. 25, 1999, exhibit 89).

274.    USA Today reported on July 29, 1999 that, In Chicago, the FBI and Justice Department lawyers won 52 corruption convictions from 1994 through 1997, including 10 police officers who were robbing drug dealers and/or selling narcotics. (USA TODAY, Jul. 29, 1999, exhibit 89).

**1998**

275.     The Chicago Tribune reported on May 7, 1998 that evidence in the federal trial of four Austin District tactical officers for corruption charges showed that police found crack cocaine, heroin and marijuana in a search of Officer M.L. Moore's locker on the day he was indicted in December 1996. (CHI TRIB, May 7, 1998, exhibit 90).

276.     The Chicago Tribune reported on January 7, 1998 that a witness for the prosecution in the federal trial of several Austin police officers testified that he assisted the accused officers in pulling off the robbery of a West Side cocaine dealer in the dealer's residence. (CHI TRIB, Jan. 7, 1998, exhibit 90).

277.     The Chicago Tribune reported on August 14, 1998 that three Chicago police officers who allegedly demanded $8,000 from a couple in exchange for not arresting them on drug and weapons charges were indicted on charges of home invasion, armed robbery and official misconduct—the accused Chicago police officers were John Labiak, Rodney Carriger and Ernest Hutchinson. (CHI TRIB, Aug. 14, 1998, exhibit 90).

278.     The Chicago Tribune reported on June 10, 1998 that two former Chicago police officers were sentenced Tuesday to prison terms their lawyers characterized as life sentences for twice robbing undercover cops posing as drug dealers. (CHI TRIB, Jun. 10, 1998, exhibit 90).

279.     The Chicago Tribune reported on December 23, 1998 that a federal magistrate found probable cause to believe that veteran Chicago police officer Joseph Miedzianowski

presided over a Miami-to-Chicago drug operation and ordered him held in custody as a danger to the community pending his trial. (CHI TRIB, Dec. 23, 1998, exhibit 90).

280.    The Chicago Tribune reported that Chicago police officer, Alex Sierra, who used his badge, pistol and handcuffs to rob a Northwest Side grocery store in 1994 pleaded guilty to the charge of conspiracy to commit a robbery. (CHI TRIB, Feb. 14, 1998, exhibit 90).

### 1997

281.    Chicago Tribune reports the arrest of three 6th District tactical officers for conspiracy to commit robbery and sales of illegally confiscated narcotics. The seven count indictment details the officers' activities as they allegedly sold heroin and on two separate occasions robbed undercover agents of more than $23,000 of suspected narcotics money. (CHI TRIB, Dec. 23,1997, exhibit 91).

282.    The Chicago Tribune reported on November 17, 1997 that the former girlfriend of a Gresham District tactical police officer scheduled to go on trial on corruption charges has testified that she witnessed her boyfriend rob drug dealers of narcotics or cash as many as 50 times in recent years. (CHI TRIB, Nov. 17, 1997, exhibit 91).

283.    The Chicago Tribune reported on May 1, 1997 that three Gresham District tactical officers were suspended and expected to be fired amid allegations that they forced their way into a South Side home and beat and robber its occupants. The article further reported that, in unrelated matter, a fourth Gresham District officer was under investigation for allegedly raping a 19 year old college student at gunpoint. (CHI TRIB, May 1, 1997, exhibit 91).

284.    The Chicago Tribune reported on January 29, 1997 that Chicago Officer Lennon Shields was the first to enter a plea agreement and testify against his former colleagues in the so-called Austin & case. (CHI TRIB, Jan. 29, 1997, exhibit 91).

285.    The Chicago Tribune reported on November 26, 1997 that witness, Garry Brown, testified in federal court that he had just helped some Gresham District tactical police officers rip off a drug dealer of $11,000 in cash when he and one of the officers drove a few blocks away to meet two other officers who had taken part in the scheme. (CHI TRIB, Nov 26, 1997, exhibit 91).

### 1996

286.    Seven officers of the Tactical Unit of the 15th District were indicted on federal charges for allegedly using their positions, skills, and expertise as Chicago police officers to rob an extort money and narcotics from drug dealers on the City's west side. (Webb Commission Report, November 1997, p. 11, exhibit 92).

### 1995

287.    Chicago Police officer Sonia Irwin arrested and accused of taking part in a Gangster Disciple drug conspiracy (CHI SUN TIMES, October 8, 1995, exhibit 93)

288.    The Chicago Sun Times reported on October 8, 1995 that Two Shakespeare district police officers suspended pending IAD investigations into narcotics trafficking. (CHI SUN TIMES, Oct. 8, 1995, exhibit 93).

289.    SUN TIMES ARTICLE, Oct. 8, 1995—"in the last three years, at least 15 cops have been charged with crimes and forced to resign from the force. (CHI SUN TIMES, Oct. 8, 1995, exhibit 93).

290.    The Chicago Sun Times reported on October 8, 1995 that South Chicago district officer Delwin Bolton was alleged to have used his police car to stop and rob a narcotics dealer transporting drug money. (CHI SUN TIMES, Oct. 8, 1995, exhibit 93).

291.    The Chicago Sun Times reported on October 8, 1995 that Calumet District patrol officer Reginald Lee was arrested when he attempted to sell two pounds of cocaine to undercover detectives. (CHI SUN TIMES, Oct. 8, 1995, exhibit 93).

### 1994

292.    The Chicago Tribune reported on February 25, 1994 that three Chicago police tactical officers were under investigation by the Cook County state's attorney for allegedly planting nearly two pounds of cocaine on David Smith of Chicago's South Side. (CHI TRIB, Feb. 25, 1994, Exhibit 94).

293.    The Chicago Sun Times reported on June 22, 1994 that corruption in the Chicago Police Department was the subject of two federal investigations –one involving West Side drug dealing, the other Chinatown gambling. (CHI SUN TIMES, June 22, 1994, exhibit 94).

**1993**

294.    The Chicago Tribune reported on December 2, 1993 that a Chicago police detective was charged with bribery for allegedly collecting $10,000 from a factory owner he had been friends with for several years. Sgt. Christopher Zaglifa was arrested on the charges after picking up the alleged bribe at a factory on South Sangamon Street, officials said. (CHI TRIB, Dec. 2, 1993, exhibit 95).

295.    The Chicago Tribune reported on October 20, 1993 that former Chicago police officer Steven Manning was convicted of robbing and killing James Pellegrino of Mokena, Illinois. (CHI TRIB, Oct. 20, 1993, exhibit 95).

**1992**

296.    The Chicago Tribune reported on April 2, 1992 that details of undercover work begun by Chicago police officer Jesse Williams revealed a case of corruption that ruined the careers of five officers, one of which pleaded guilty to tax fraud. (CHI TRIB, Apr. 2, 1992, exhibit 96).

**1991**

297.    The Chicago Tribune reported on January 18, 1991 that Federal prosecutors contended that On Leong Association, a Chinese business organization, paid Chicago Police Officers $52,000 annually to protect its Chinatown gambling operations. (CHI TRIB, Jan. 18, 1991, exhibit 97).

298. The Chicago Sun Times reported on July 20, 1991 that federal informants claimed that 1st Ward powerhouse Pat Marcy was affiliated with reputed mobster Jack Cerone and did "favors" for a police officer ran a gambling operation, according to Court records. (CHI TRIB, Jul. 20, 1991, exhibit 97).

## 1989

299. Ten Wentworth District officers were convicted of taking thousands of dollars in protection money from gamblers and drug dealers. Two officers received ten-year sentences and the others were sentenced to between three and a half to five years in prison. (Webb Commission Report, p. 91 citing CHI SUN TIMES, Jan. 21, 1996, exhibit 92).

## 1984

300. Eight police officers were arrested in connection with the "Operation Greylord" investigation of court corruption. They were convicted on charges that they took bribes to help fix cases or to steer underrepresented clients to favored defense lawyers. (Webb Commission Report, exhibit 92).

## D. Report of the Commission on Police Integrity – Webb Commission Report:

301. On February 7, 1997, Mayor Richard M. Daley appointed the Commission on Police Integrity. This Commission was formed in response to the indictment of seven members of the Chicago Police Department on charges of conspiracy, racketeering and extortion in the 15th police district in Austin on the City's west side. The Mayor appointed Dan K. Webb to

81

chair the Commission and asked Sharon Gist Gillman, Fred Rice and Anita Alvarez to serve as Commission members. (Webb Commission Report, November 1997, p. 2, exhibit 92).

302. The stated charge of the Commission was to examine the root causes of police corruption, to review how other urban police departments approach the issue, and to propose possible changes to department policies and procedures. (Webb Commission Report, November 1997, p. 2, exhibit 92).

303. The Commission concluded that: "changes should be made in the standards for entry into the department, in the field training that takes place during the critical early period of an officer's career, and in how the department deals with potential trouble-makers within its ranks." (Webb Commission Report, November 1997, p. 2, exhibit 92).

304. The Webb Commission Report made the following recommendations (Webb Commission Report, November 1997, p. 2, exhibit 92):

> A. Hiring standards: The Commission recommends increasing the minimum requirements to a bachelors degree and a minimum of one year of work history before a candidate is accepted for employment as a Chicago police officer. A pool of more mature and educated officers with verifiable work histories will improve the quality of the police force, making them better equipped to handle today's problems and perhaps less likely to engage in misconduct.
>
> B. New Police Officers: The Commission recommends completely overhauling the field training officer program to improve training during

the new officer's critical first months. It also recommends extending the probationary period for new officers from 12 months to a full 18 months.

C. Monitoring Potential Problems: The Commission recommends establishing an "early warning" system to alert command personnel when an officer may be involved in a pattern of misconduct. The goal would be to stop small problems from becoming larger ones and to help officers who might be experiencing personal problems.

D. Management Issues: The Commission recommends a range of management process improvements, including revising the system then department uses for performance evaluations; establishing department-wide standards for selection of tactical officers; emphasizing supervisor accountability; and expanding training for new sergeants.

E. Mandatory Continuing Education: The Commission recommends mandatory continuing education or in-service training for officers of all ranks, to reflect the view that policing is a profession.

305.    Despite the City's knowledge of police corruption, as detailed in the Webb Commission Report, and despite the Commission's recommendations for change, the City of Chicago only implemented one change recommended by the Webb Commission and that was to increase educational standards. (Netols Deposition, p. 44, exhibit 5)

## E.  Chicago Police Department IAD/OPS Statistics

306.    Allegations of misconduct by Chicago Police Department members are allegedly investigated by the Internal Affairs Division (IAD) or, in the case of complaints alleging excessive force, the Office of Professional Standards (OPS). A Complaint Register (CR) number

is issued whenever a complaint is registered. Each complaint is investigated, and a determination is made as to whether there is sufficient evidence of wrongdoing to sustain the allegation and take disciplinary action. (Chicago Police Department, 1996 Annual Report, p. 42, exhibit 98).

## 1995

307. In 1995, 6,406 CR numbers were issued, each representing an alleged act of misconduct by a police officer within the Chicago Police department. Of that number, 1089, less than 17%, were sustained. Of the 6,406 CR numbers issued, 540 involved civil rights violations, only three of which were sustained. In other words, less than 1% of all reported civil rights violations in 1995 were sustained. (Chicago Police Department, 1996 Annual Report, p. 42, exhibit 94). Excessive force complaints retained by OPS (Office of Professional Standards) totaled 3,119, with only 244 of those cases being sustained. Of the remaining cases, 517 were deemed "unfounded," 51 were deemed "exonerated," and 2,267 were deemed "not sustained." (Chicago Police Department, 1996 Annual Report, p. 42, exhibit 98).

## 1996

308. In 1996, while the number of issued CR numbers increased to 7,151 the city sustained a lesser percentage of allegations at about 16.5% (1182 cases). In addition, as the number of civil rights violations reported in 1996 hit 1, 049, nearly double the amount from the previous year, the city only sustained 15 of those cases, less than 1.5%. (Chicago Police Department, 1996 Annual Report, p. 42, exhibit 94). Excessive force complaints retained by OPS totaled 3,138, with only 269 of those cases being sustained. Of the remaining cases, 530 were deemed "unfounded," 35 were deemed "exonerated," and 2,382 were deemed "not sustained." (Chicago Police Department, 1996 Annual Report, p. 42, exhibit 98).

**1997**

309.    In 1997, 6,940 allegations of misconduct were lodged with the IAD (Internal Affairs Department) of the Chicago Police Department. Of that number, 1,233 of the allegations were for civil right violations, only 8 of which were sustained. It is also important to note some investigations classified as "sustained" in a given year reflect cases initiated in a previous year. (This is true of the "sustained" statistics reported in all of the CPD's annual/biennial reports). Therefore, of the 8 civil rights violations sustained in 1997, some of those allegations may have been lodged with IAD in previous years. Finally, in 1997, OPS received 3,115 excessive force complaints, only 300 of which were sustained. (Chicago Police Department, 1997 Annual Report, p. 42, exhibit 99).

**1998**

310.    In 1998 IAD received 5,778 allegations of misconduct against its officers. 1,086 of those complaints were sustained. Of the total complaints lodged in 1998, 754 were for civil rights violations, only 11 of which were sustained (less than 2%). During 1998, OPS received 2,857 excessive force complaints, 203 of which were sustained. (Chicago Police Department, 1998 Annual Report, p. 36-37. exhibit 100).

**1999**

311.    In 1999 IAD received 5,063 allegations of misconduct against its officers, 693 of which were sustained. Of the total complaints lodged in 1999, 738 were for civil rights violations, only 3 of which were sustained (less than ½ %). During 1999, OPS received 2,623 excessive force complaints, 189 of which were sustained. (Chicago Police Department, 1999/2000 Biennial Report, p. 45-46, exhibit 101).

## 2000

312.     In 2000, 3,918 CR numbers were issued for alleged acts of misconduct by Chicago Police Department offices. Of that number, 536, or less than 14%, were sustained. Less than 2% of all civil rights violations reported in 2000 were sustained (8 out of 551). (Chicago Police Department, 1999/2000 Biennial Report, p. 45-46, exhibit 101). OPS retained a total of 2,777 excessive force complaints in 2000. Only 145 of those OPS cases were sustained. Of the remaining 2,632 retained cases, 613 were deemed "unfounded," 80 were deemed "exonerated," and 1,643 were deemed "not sustained." (Chicago Police Department, 1999/2000 Biennial Report, p. 46, exhibit 101).

## 2001

313.     In 2001, the number of CR numbers registered with CPD-IAD nearly doubled to 6,476. Of that number, only 1,673, were sustained. While 551 civil rights investigations were initiated in 2000, only 16 were sustained by IAD. OPS retained a total of 2,683 excessive force complaints in 2001, only 170 of which were sustained. Of the remaining 2,513 retained cases, 281 were deemed "unfounded," 70 were deemed "exonerated," and 1,827 were deemed "not sustained." (Chicago Police Department, 2001 Annual Report, pp. 44-45, exhibit 102).

## 2002

314.     In 2002, 6,581 CR numbers were registered with CPD-IAD and only 806 were sustained. Of the 1,447 civil rights violations filed in 2002, only 6 were sustained, less than ½ of a percent.     In the same year, OPS retained 2,763 complaints, only 140 of which were ever sustained. Of the remaining 2,623 retained cases, 833 were deemed "unfounded," 82 were deemed "exonerated," and 1,834 were deemed "not sustained." (Chicago Police Department, 2002 Annual Report, pp. 42-43, exhibit 103).

**2003**

315.    In 2003, 5,941 allegations of misconduct were lodged with CPD-IAD, only 418 of which were sustained. 1,458 of the allegations lodged in 2003 were for civil right violations, only 7 of which were sustained. In 2003, OPS received 2,167 excessive force complaints, only 104 of which were sustained. (Chicago Police Department, 2003 Annual Report, pp. 42-43, exhibit 104).

## VI.    SCOPE

316.    At all relevant times, Joseph Miedzianowski was employed by the City of Chicago as a police officer. (City of Chicago's Local Rule 56.1 Statement of Undisputed Facts, No. 2, exhibit 9; Miedzianowski Deposition, p. 24, exhibit 19; City of Chicago's Answer to Plaintiff's Fourth Amended Complaint, para. 7, exhibit 3)

317.    Even while detailed to ATF, Miedzianowski carried his Chicago Police Department badge and reported daily to the Chicago Police Department. (Miedzianowski Deposition, pp. 25-28, exhibit 19)

318.    During the time that Miedzianowski was detailed to ATF, his performance was evaluated by his supervisors at CPD. (Miedzianowski Deposition, p. 28, exhibit 19; Miedzianowski performance evaluations, exhibit 61)

319.    Miedzianowski's CPD supervisor, Sgt. Korte, provided Miedzianowski with guidance on how Miedzianowski should conduct his activities while detailed to ATF. (Miedzianowski Deposition, p. 32, exhibit 19)

320.     Miedzianowski wrote memos regarding plaintiff Klipfel "as a Chicago Police Officer." (Miedzianowski Deposition, p. 297, exhibit 19; Miedzianowski's Cause for Concern memos to Risley dated February 9, 12 and 22, 1993, exhibits 24, 25 and 64; G.O. 93-03-02(B), p. 5, exhibit 105)

321.     Miedzianowski generally developed his gang contacts, including those with which he engaged in criminal activity, after arresting them pursuant to Miedzianowski's authority as a Chicago Police Officer. (Miedzianowski Deposition, p. 344, exhibit 19)

322.     In his capacity as a Chicago Police Officer, Miedzianowski used CPD letterhead and his star number when filing complaints against plaintiffs. (IAD File No. 197823, exhibit 38; ATF Internal Affairs Incident Reports, exhibits 28 through 35)

323.     Everything Miedzianowski did as a police officer was to further the cause of the Chicago Police Department. (*U.S. v. Miedzianowski* Trial Transcript, p. 5,656, exhibit 106, Miedzianowski Deposition, p. 463, exhibit 19)

324.     Miedzianowski asserts that he was acting pursuant to departmental procedure by making misconduct allegations against Ms. Klipfel. (Miedzianowski Deposition, pp. 515-516, exhibit 19)

325.    The Chicago Police Department used its official capacity to file complaints against plaintiffs with ATF IAD. (ATF IAD Investigative Referral Memo 940005, exhibit 107; Miedzianowski Deposition, p. 384, exhibit 19; ATF Internal Affairs Incident Reports, exhibits 28-35)

326.    CPD IAD also actively assisted Miedzianowski in filing numerous false complaints against plaintiffs by using official departmental correspondence to make referrals to ATF of false accusations of plaintiffs' alleged criminal conduct. (Hemsath Affidavit, exhibit 15)

327.    CPD IAD not only exonerated the Chicago Police officers involved in violating plaintiffs' civil rights, but used the same IAD investigation and the power of the City of Chicago to allege that Ms. Klipfel had engaged in criminal conduct.    (Nov. 20, 1996 Deposition of James Kalkman, p. 62, exhibit 36; CPD Internal Affairs Report Closing Memo for CR 197823, exhibit 38; June 9, 1993 Memorandum from Raymond Risley to CPD Superintendent Rodriguez, exhibit 23)

328.    When ADS Risley wanted to speak to Miedzianowski, he had his wife, Chicago Police Officer Linda Risley, page Miedzianowski on his CPD pager and then Miedzianowski would return the call to Linda Risley's Chicago Police Department phone. (Miedzianowski deposition, pp.431-433, exhibit 19)

329.    Miedzianowski acted to violate plaintiffs' Constitutional rights not to protect himself, but to protect the reputation of the Chicago Police Department. (Miedzianowski

89

Deposition, p. 279, exhibit 19; Miedzianowski's February 22, 1993 memo to Risley, exhibit 25; T-III Wiretap Transcript of Joseph Miedzianowski and John Galligan on 9/15/98, p.5, exhibit 79; Raymond Risley deposition, pp. 81, 83, exhibit 22; Eugene Karczewski deposition, pp. 97–98, exhibit 66)

330.    On June 16, 2005, the 7th Circuit affirmed Joseph Miedzianowski's conviction and life sentence stating: "Joseph Miedzianowski, a police officer who used his position to protect this drug ring (in which he took part as a principal)... (*U.S. v. Rivera, et al., 136 Fed. Appx. 925* (7th Cir. (Ill)), exhibit 108)

331.    Virtually all of the evidence at the criminal trial of Miedzianowski was that Miedzianowski's position as a police officer either aided or actually made possible the crimes that he committed. (Netols deposition, pp. 43, 82, exhibit 5)

332.    The evidence at the Miedzianowski criminal trial was that Miedzianowski's position as a police officer actually made possible his ability to commit crimes and remain undetected and unprosecuted even after he was detected. (Netols deposition, p. 43, exhibit 5)

333.    Some of the criminal charges Miedzianowski was charged with are charges where his status as a police officer, his relationship with the Chicago Police Department is effectively an element of the events. For other charges, his status as a police officer enabled him to commit the offense. (Netols deposition, p. 80, exhibit 5)

334. Miedzianowski expressly denies that he filed complaints against Ms. Klipfel to deflect her allegations against him. (Miedzianowski Deposition, p. 216, exhibit 19)

335. Miedzianowski filed complaints against Ms. Klipfel to prompt the Chicago Police Department to handle the investigation properly. (Miedzianowski Deposition, p. 217, exhibit 19)

336. Everything. Miedzianowski did regarding the Pippin warrant and the subsequent events arose out of his duties as a Chicago Police Officer. (Miedzianowski Deposition, p. 218, exhibit 19)

337. The warrants on Pippin and the execution of the Pippin warrant were related to Mr. Miedzianowski's duties as a Chicago Police Officer. (Miedzianowski Deposition, p. 218, exhibit 19)

338. On April 23, 2001, defendant Miedzianowski was convicted of engaging in racketeering and narcotics conspiracy, dating back continuously at least 14 years and including the three years that he was assigned to ATF. (Miedzianowski's Answer to Fourth Amended Complaint, para. 92, exhibit 8)

339. Defendant Miedzianowski used police department vehicles to perpetuate his criminal activities. (Santiago Proffer, exhibit 109; Padilla FBI 302, exhibit 45)

91

340. Throughout Miedzianowski's 14 year crime spree, the City of Chicago failed to take any action to curb Miedzianowski's illegal activities, many of which Miedzianowski accomplished with the aid of other City of Chicago police officers, including high ranking officials, and which occurred during Miedzianowski's official work-shifts and involved the use of City of Chicago police property. (Computerized List of CR's, exhibit 47; Netols deposition, pp. 43, 82, exhibit 5)

Date: November 4, 2005

Respectfully submitted,
MICHAEL CASALI
DIANE KLIPFEL

By: _____
      One of their Attorneys

Sally H. Saltzberg
P. Michael Loftus
Attorneys for Defendant
Loftus & Saltzberg, P.C.
53 West Jackson, Suite 1515
Chicago, Illinois 60604
(312) 913-2000

Michael Kreloff, of counsel

92

STATE OF ILLINOIS )
                     ) SS.
COUNTY OF COOK )

## CERTIFICATE OF SERVICE

The undersigned, an attorney, hereby certifies that she caused a copy of the foregoing **Plaintiffs' Local Rule 56.1(b)(3) Response to Defendant City of Chicago's Statement of Undisputed Facts, Plaintiffs' Local Rule 56.1(b)(2) Statement of Additional Undisputed Facts, Plaintiff's Memorandum of Law in Opposition to City's Motion for Summary Judgment and Ten (10) Exhibit Binders,** to be served on all counsel of record via hand delivery on this 4th day of November 2005.

_Sally Saltzberg_
Sally H. Saltzberg

Andrea M. Buford
Buford Law Office, LLC
6 East Monroe, Suite 1301
Chicago, IL 60603

Arnold Park
City of Chicago Corporation Counsel
30 North LaSalle Street, Suite 900
Chicago, IL 60602