**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **DIANE L. KLIPFEL and**<br>**MICHAEL V. CASALI,** )<br>)<br>)<br>**Plaintiffs,** )<br>)<br>**ALBERTO GONZALES, THE** )<br>**CITY OF CHICAGO, and** )<br>**JOSEPH MIEDZIANOWSKI,** )<br>)<br>**Defendants.** )<br>_____) | **Case No. 94 C 6415** |

**MEMORANDUM AND ORDER**

The City of Chicago has filed a motion for summary judgment as to Count II of the

plaintiffs' Fourth Amended Complaint and its counterclaim. For the reasons stated below, the

motion is denied.

**I.      BACKGROUND**

The complaint at issue is the Fourth Amended Complaint. Count I against the Bureau of

Alcohol, Tobacco and Firearms (ATF) was settled. In Count II, which is the subject of the City's

motion for summary judgment, the plaintiffs allege that the City of Chicago and former Chicago

police officer Joseph Miedzianowski violated plaintiffs' constitutional rights under § 1983.

Specifically, the plaintiffs allege that the City's widespread custom and practice of failing to

properly supervise, investigate and discipline its officers allowed Miedzianowski to violate the

plaintiffs' First Amendment rights when he threatened the plaintiffs and made false statements

about them in retaliation for their disclosure of Miedzianowski's criminal activities. Finally,

Count III is a claim for defamation against Miedzianowski. Further, the City has filed a

counterclaim seeking a declaratory judgment that it is not required to pay any judgment that may

be entered against Miedzianowski.

## II.    FACTS[1]

Defendant Miedzianowski was, at all times relevant to the complaint, employed by the

City of Chicago as a police officer.  The plaintiffs have alleged a claim against the City under 42

U.S.C. § 1983, and the court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(3).

### A.    Plaintiffs' *Monell* Allegations

Prior to engaging in an in-depth discussion of the facts in this case (the plaintiffs'

statement of additional facts is over 340 paragraphs long), it makes sense to properly frame the

issue in an attempt to streamline the facts that need to be addressed.

The plaintiffs' § 1983 claim against the City alleges that it is liable to the plaintiffs for

allowing Miedzianowski to violate their First Amendment rights when he retaliated against them

for disclosing Miedzianowski's misconduct to supervisors.  Specifically, the plaintiffs allege that

the City and the Chicago Police Department ("CPD") were deliberately indifferent to the

violations of the plaintiffs' First Amendment rights because of their policy of failing to

investigate, discipline, and supervise their members despite the City and CPD's knowledge of

misconduct.  As further alleged by the plaintiffs, the City failed to conduct a legitimate

investigation into plaintiffs' allegations against Miedzianowski, and top officials from the CPD

approved the CPD Internal Affairs Division's ("IAD") sham investigative procedures which

---

[1]In their response to the City's Statement of Undisputed Facts, the plaintiffs often improperly include additional facts rather than simply admit or deny the pertinent fact. Accordingly, the court disregards all "additional facts" included by the plaintiffs in their response to the City's Statement of Fact.  Moreover, the plaintiffs' statement of additional fact is 340 paragraphs long.  Rather than incorporate each of these additional facts, the court will include them as necessary in its consideration of the legal issues.  Finally, the plaintiffs' motion to strike is denied unless otherwise noted herein.

interfered with the plaintiffs' First Amendment rights.

As part and parcel of this argument, the plaintiffs also refer throughout their response brief to the alleged "code of silence," or "blue wall of silence" which they allege exists within the CPD. According to the plaintiffs, this code requires that officers not report one another's misconduct to their supervisors, not stop such misconduct or criminal conduct, not testify against one another, and even assist a fellow officer to evade detection by the authorities. The plaintiffs contend that the City is fully aware of this code of silence and does nothing to prevent officers from abiding by it. As a result, the plaintiffs' argument goes, the City's acquiescence in the blue wall of silence allowed Miedzianowski to engage in his campaign of retaliation against the plaintiffs without fear of being reported or sanctioned.

Thus, the ultimate issue that the court is concerned with in the instant motion is if there is any genuine issue of material fact as to the City's alleged systemic failure to investigate, supervise and discipline its officers.

B.    <u>Facts Relating to the Plaintiffs' Claims</u>

1.    *Klipfel*

Klipfel was hired as a special agent, criminal investigator with the Bureau of Alcohol, Tobacco and Firearms ("ATF") in 1976. Klipfel was promoted to a group supervisor position in February 1990, and at all relevant times, she reported to Assistant Special Agent in Charge (ASAC) Jimmie Adamcik or ASAC Tom Lambert and Special Agent in Charge (SAC) Joe Vince.

In March 1990, Klipfel initiated the creation of a Latin gang task force, which enlisted the assistance of Chicago police officers. Miedzianowski was detailed to work with ATF as part of

the gang task force. On or about February 20, 1992, Klipfel, together with an ATF special agent, Miedzianowski, and other officers from the Chicago police department, executed a search warrant on the home of Darrin Pippin.

Pippin, a fugitive, informed Klipfel that Miedzianowski and another Chicago police officer stole 51 $100 bills, a gold cross necklace, a pinkie ring, two bracelets and a brown leather coat from the residence. Pippin also related to Klipfel that he had about $28,000 in cash and a gun in a safety deposit box at Albany Park bank, which Miedzianowski was planning to steal using a key he had found during the execution of the search warrant.

That night, Klipfel confronted Miedzianowski with these allegations. According to Klipfel, Miedzianowski kicked her car and screamed:

> "Bitch, you're stupid. There are four of us here who will say you stole the money and stole off every search warrant you've ever been on. Four against one. Your husband and you both work in the City. Remember that, always remember that. And you better watch your darling kids. Your house could get lit up. That bastard (pointing to Pippin) will never back you up after he gets his ass poked in jail, and 'she' (SA Jolley) will back us on everything. She'll be our witness. Nothing happened, but the only thing that will happen is you'll get fired. Gamboa's going to hear about this. Adamcik will back us all the way and your ass will be out in the street. We own fucking Adamcik."

Klipfel immediately asked her supervisor Adamcik to send Miedzianowski and Galligan (another CPD officer who had been detailed to ATF) back to their unit in the CPD. Klipfel then began reporting acts of police corruption (by Miedzianowksi and others) to her supervisors and to ATF personnel. For example, she reported to Vince and Adamcik that Miedzianowski had threatened to kill Klipfel, Casali and their children. Later in 1992, Klipfel reported to ATF personnel the alleged sexual harassment of another employee by that employee's supervisor, John Gamboa, who was a close friend of Miedzianowski. Soon thereafter, Klipfel reported to ATF personnel that

Vince and Adamcik were accepting gifts and favors from the CPD officers assigned to ATF who were alleged to be involved in illegal dealings with Chicago street gangs.

Then, in or about September 1993, Klipfel reported to a representative of the U.S. Attorneys' Office information she had received that Miedzianowski had coerced an ATF confidential informant into making false allegations to ATF IA and CPD IAD about Agent Klipfel in order to deflect a CPD IAD investigation of the Chicago police officers. According to the confidential informant, Miedzianowski fabricated false allegations against Klipfel that the informant then reported to CPD IAD and ATF IA.

Miedzianowski told the informant that Klipfel was "messing everything up" and that if Klipfel was not silenced, Miedzianowski's criminal conduct would become public. The informant believed that Miedzianowski would kill the informant if he refused to file a false report against Klipfel. The plaintiffs later learned that Miedzianowski drove the informant to CPD IAD, and sat next to the informant during his IAD interview. The informant gave the same false statement regarding Klipfel to ATF IA.

2.    *Casali*

On or about May 24, 1976, Casali was hired as a special agent, criminal investigator, by the ATF. He became a group supervisor in 1991, and in 1997 he became ATF Firearms Instructor Coordinator for the Chicago Field Division and has held that position ever since. At all relevant times, Casali reported to Adamcik and Vince.

In April 1992, Casali learned from an informant that "Joe from ATF" (presumably Joseph Miedzianowski) was involved in supplying a gang with firearms and narcotics stolen from search warrants. In or about early June 1992, Casali reported this information to Vince. Vince

told Casali not to contact anyone else with the information.[2]  On or about June 22, 1992, Casali

repeated the information to Vince and Adamcik, who asked Casali to identify any others who

knew of these allegations and ordered Casali not to contact ATF IA or the FBI, the authorities

that had primary jurisdiction to investigate his allegations of police corruption.

On or about June 26, 1992, Casali reported to the U.S. Attorneys' office in Chicago,

Illinois, the information regarding Miedzianowski.  On or about July 6, 1992, Casali provided

Vince, Adamcik and a representative of the U. S. Attorney's Office with a taped, undercover

telephone conversation with a suspect who identified a CPD officer as a source of supply for

guns and silencers.  An assistant U.S. Attorney believed the tape and other information provided

by Casali created a sufficient predicate on which to request that Adamcik transfer Miedzianowski

and Galligan off of the ATF task force.

Miedzianowski's assignment with the ATF was terminated on or about January 8, 1993.

Soon after, Casali reported to ATF IA his knowledge of the corruption of ATF managers and

what he believed was "malfeasance" by Vince and Adamcik for failing to have Miedzianowski

removed from the ATF detail.  In November 1993, Casali also reported his knowledge of

Miedzianowksi's misconduct and the corruption of ATF managers to an agent from the

Department of Treasury's Office of Inspector General ("OIG").  On February 28, 1997, the Merit

Systems Protection Board concluded that Casali's whistleblowing disclosures were a contributing

factor in the ATF's threatened removal action.

C.    Miedzianowski's Alleged Retaliation

---

[2]The City denies this statement of fact but only on the ground that it does not contain
material facts.  This is an insufficient basis on which to deny a statement of fact; thus, it is
deemed admitted.

On January 26, 1993, Klipfel was interviewed by ATF IA agents concerning allegations made by Miedzianowski against her. According to the plaintiffs, Miedzianowski engaged in a wide ranging effort to discredit Klipfel. For instance, Miedzianowski told an ATF supervisor that it was Klipfel who stole the property from Pippin while executing the search warrant, and that she had stolen before while executing search warrants. On February 5, 1993, the plaintiffs learned that Miedzianowski repeatedly told other CPD gang crimes officers not to work with ATF, and especially not to work with Klipfel because she was a rat and may be wearing a wire. Miedzianowski admits that when he was discussing Klipfel with others, "lunatic" was one of the nicer words he used. Further, from September 1993 to June 1995, Miedzianowski solicited informants to give false statements against Klipfel.

On March 2, 1993, Klipfel was notified that she was the subject of an ATF IA investigation based on Miedzianowski and Galligan's allegations that Klipfel had made racial remarks and held a racist meeting over one and a half years earlier. Moreover, Miedzianowski obtained copies of the statements given to the CPD IAD even though generally, the accused in an CPD IAD investigation is not permitted to have any of the documents pertaining to the investigation. Miedzianowski also looked into Klipfel's financial records, conducted surveillance on her home, and spread rumors.

In a June 9, 1993 memorandum from Raymond Risley to Chicago Police Superintendent Rodriguez, Risley attached a document entitled "Criminal Conduct" which contained numerous accusations of criminal conduct by the plaintiffs. On August 2, 1994, the plaintiffs received Notices of Proposed Removal from the ATF, which were based on information primarily fabricated by the CPD and forwarded to the ATF. After issuing the Notices, for the next 25

months, the ATF stripped the plaintiffs of their supervisory positions and did not allow them to engage in law enforcement activity. The ATF confined the plaintiffs to work in a storage closet for more than two years where they were forced to idle with little substantive work.

       D.     City's Investigation of Miedzianowski

An investigation (CR 197823) was initiated on January 8, 1993. Ray Risley, Assistant Deputy Superintendent (ADS) of CPD IAD , testified that he initiated a complaint register (CR) investigation as to Miedzianowski and other CPD officers after being instructed by then-Chicago Police Superintendent Rodriguez to do so. The parties dispute the source of the allegations in the CR, but a June 9, 1993, memorandum from Risley to Rodriguez indicates that the investigation focused on allegations as described by the local media. These allegations, as stated in the June 9, 1993, memorandum, were that "Chicago Police Officers assigned to ATF had sold confiscated weapons to gang members, that they had stolen money from an informant at gunpoint and that they had arranged for organized crime figures to build a deck on the home of James Adamcik, the Assistant Special Agent in Charge at ATF." The investigation against Miedzianowski was not sustained because of a stated "lack of evidence."

Risley testified that the CPD IAD investigation of Miedzianowski did not conform to CPD IAD policies because of ATF's failure to cooperate with the investigation, among other things. The lack of conformance includes the failure to include an interview of the complainants, the termination of the investigation without interviewing the accused officers, and the fact that the CPD IAD permitted witnesses to be interviewed in the presence of Miedzianowski.

       E.     Facts Relating to the City's Express Policies

           1.     *Express Policies*

According to the City, it has express policies and directives in place that are intended to ensure that the CPD's duties are carried out properly and pursuant to law, that any irregularities are to be reported, and that all investigations are conducted in an impartial manner. Specifically, the City has an express policy that its police officers are to obey all laws, and that its supervisory officers are responsible for ensuring that the members of the Department comply with these obligations. These policies are contained in City ordinance and in the rules and regulations promulgated by the Chicago Police Board pursuant to authority delegated to the board by ordinance. Moreover, they are further elaborated and made specific by department directives issued by the Superintendent of Police as chief executive officer of the department. It is the City's express policy, as evidenced by the Chicago Municipal Code, that every complaint of misconduct by a member of the Police Department be investigated and discipline imposed where warranted.

The superintendent has provided a procedure by which every member of the police force is required to report any complaint of misconduct or observed misconduct immediately and whereby all such complaints are to be investigated. Further, the City contends that every effort is to be made to ensure that the investigation is conducted in an impartial manner.

The Office of Professional Standards investigates allegations of use of excessive force while other complaints are referred to the Internal Affairs Division for investigation. Upon completion of the investigation of the complaint, it is classified as one of the following: a) "unfounded," when the allegation is false or not factual; b) "exonerated," when the incident occurred but the actions of the accused were lawful and proper; c) "not sustained," when there is insufficient evidence either to prove or disprove the allegation; or d) "sustained," when the

allegation is supported by substantial evidence to justify disciplinary action. As with the above statements of fact, the plaintiffs admit that the procedures exist, but deny that the procedures have been implemented, enforced or that the CPD has consistently taken affirmative steps to enforce such procedures.

Investigations are reviewed by supervisors to ascertain the adequacy and timeliness of the investigation. The plaintiffs admit that investigations are supposed to be reviewed by supervisors, but deny that supervisors consistently ascertain whether investigations are adequate and timely.

   2.  *Statistics on Investigations*

The City sets forth the following statistics regarding the number of complaints investigated and discipline imposed. In 1993, 8,299 investigations were initiated by the Office of Professional Standards and the Internal Affairs Division. The Office of Professional Standards initiated 2,681 investigations and completed 2,718 investigations (including those initiated in a prior year). 1,723 investigations (including those initiated in a prior year), by both the Office of Professional Standards and the Internal Affairs Division, were classified as "sustained". Including disciplinary action taken for those investigations initiated in a prior year, 41 members were separated and 1,594 members received some lesser discipline.

In 1994, 8,699 investigations were initiated by the Office of Professional Standards and the Internal Affairs Division. The Office of Professional Standards initiated 2,820 investigations and completed 2,714 investigations (including those initiated in a prior year). 1,624 investigations (including those initiated in a prior year), by both the Office of Professional Standards and the Internal Affairs Division, were classified as "sustained." Including disciplinary

action taken for those investigations initiated in a prior year, 56 members were separated and 1,709 members received some lesser discipline.  The plaintiffs admit that these numbers reflect statistics published by the CPD, but deny that the Chicago Police Department consistently and properly imposes discipline on officers who have been shown to have committed misconduct.

### 3.  *Miedzianowksi's Training with the CPD*

Miedzianowski participated in various police training classes throughout his tenure with the CPD.  All members of the Chicago Police Department are required to be aware of and to follow the rules and regulations and the directives applicable to their positions.  Copies of the directives are to be maintained in all units and accessible to all members on a 24-hour basis.  The plaintiffs admit that the CPD has the aforementioned general orders and rules, but deny that it has taken affirmative steps to consistently enforce such orders or rules.  They further note that Miedzianowski testified that he did not receive copies of all general orders.

### 4.  *Consent Decree*

In the years 1992-1995 (and continuing until 2001; *see Alliance to End Repression v. City of Chicago*, 237 F.3d 799 (7th Cir. 2001)), the City of Chicago was subject to a consent decree regarding the First Amendment.  This decree, adopted by the Superintendent in General Order 88-17, II, provided that police officers were required to make every effort to avoid impacting First Amendment conduct, even in the course of legitimate investigations.

### F.  Facts Relating to Scope of Employment

Miedzianowski threatened to kill Plaintiff Diane Klipfel and her family in an attempt to make her keep silent regarding his criminal activities.  During the period of 1992-1993, Miedzianowski made false statements that Klipfel was engaged in an improper relationship with

Darren Pippin and his family.  During this same period, Miedzianowski made false statements that Klipfel had stolen money and jewelry while executing search warrants.  Miedzianowski also made false allegations that Klipfel was reporting misconduct and that CPD Gang Crimes officers should not work with Klipfel.  Further, Miedzianowski made false allegations that Klipfel was racist and had organized a meeting to persuade white ATF agents to unite against black agents. He also made false statements that Klipfel was crazy.

The parties agree that Miedzianowski and former Chicago Police Officer Galligan "misused their official position as police officers to further their narcotics and RICO conspiracies," and "many of their crimes, as was their efforts to conceal them, were committed during official duty hours."

## G.    SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuinely disputed issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Schuster v. Lucent Techs., Inc*., 327 F.3d 569, 573 (7th Cir. 2003).  When reviewing a motion for summary judgment, the court must view the facts in the light most favorable to the nonmoving party and draw all reasonable inferences in its favor.  *See, e.g., Krchnavy v. Limagrain Genetics Corp*., 294 F.3d 871, 875 (7th Cir. 2002).  A triable fact issue exists "only if there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Schuster*, 327 F.3d at 573 *(quoting Wade v. Lerner New York, Inc*., 243 F.3d 319, 321 (7th Cir. 2001) (quotation omitted)).

The movant bears the initial burden of establishing that there is no genuinely disputed

issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "Because the purpose of summary judgment is to isolate and dispose of factually unsupported claims," the non-movant must then present specific facts showing that there is an issue for trial. *Michael v. St. Joseph County, et al.*, 259 F.3d 842, 845 (7th Cir. 2001) (*quoting* Fed.R.Civ.P. 56(e)). To successfully oppose the motion, the non-movant cannot rest on the pleadings alone, but must designate specific facts in affidavits, depositions, answers to interrogatories, or admissions that establish that there is a genuine triable issue. *Celotex*, 477 U.S. at 324. A scintilla of evidence in support of the non-movant's position is insufficient to defeat a summary judgment motion; "there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## IV. ANALYSIS

### A. *Monell* Liability

According to the plaintiffs, "[t]his is a textbook case of failure to discipline, failure to supervise, and assistance in misconduct even by supervisory department personnel." Plaintiff's Resp. at 2. The plaintiffs further assert that "[t]here is pervasive evidence that the City had knowledge of the Chicago Police Department's custom of covering up misconduct and retaliating against good cops who 'ratted' on other cops." *Id.*[3] The plaintiffs apparently believe that if the City had properly supervised, investigated and disciplined Miedzianowski, he would not have been able to engage in his campaign of retaliation against the plaintiffs for revealing his

---

[3]The court notes that the plaintiffs sometimes assert that this is a failure to train case. *See* Resp. at 13. However, the court has found no basis in the plaintiffs' response to treat this as a failure to train case. Indeed, the plaintiffs' allegations appear to be that the City is responsible for the CPD's failure to properly supervise, investigate and discipline its officers and that such failures were based in part on the City's acquiescence in the alleged "blue wall of silence."

wrongdoing and criminal conduct. As such, the plaintiffs seek to hold the City liable for

Miedzianowski's conduct toward them.

A municipality is liable under § 1983 when a deprivation of constitutional rights is caused

by a municipal policy or custom. *Franklin v. City of Evanston*, 384 F.3d 838, 843 (7th Cir. 2004).

In order to succeed on a § 1983 claim against the City, the plaintiffs face significant hurdles. As

the Seventh Circuit recently noted,

> Under *Monell v. Department of Social Services*, 436 U.S. 658, 690, 98 S.Ct. 2018,
> 56 L.Ed.2d 611 (1978), municipalities and other local government units are
> "among those persons to whom § 1983 applies." *Monell*, however, places a
> substantial limitation on this liability. A municipality "cannot be held liable solely
> because it employs a tortfeasor--or, in other words, a municipality cannot be held
> liable under § 1983 on a respondeat superior theory." *Id*. at 691. Rather, municipal
> governments may be sued only when their officers inflict an injury in the
> execution of the government's policy or custom, "whether made by its lawmakers
> or by those whose edicts or acts may fairly be said to represent official policy." *Id*.
> at 694.

*Sornberger v. City of Knoxville, IL*, 434 F.3d 1006, 1029 (7th Cir. 2006).

The Seventh Circuit has stated that *Monell* liability may be established in three different

ways: "(1) through an express policy that, when enforced, causes a constitutional deprivation; (2)

through a 'wide-spread practice' that although not authorized by written law and express policy,

is so permanent and well-settled as to constitute a 'custom or usage' with the force of law; or (3)

through an allegation that the constitutional injury was caused by a person with 'final decision

policymaking authority.'" *Calhoun v. Ramsey*, 408 F.3d 375, 379 (7th Cir. 2005) (citation

omitted).

Here, the plaintiffs rely on the second method – the existence of a widespread policy by

the City of acquiescing in the CPD's failure to properly investigate, supervise and discipline its

officers, which failure was due in part to the alleged "blue wall of silence." *Cf. Bradich v. City of Chicago*, 413 F.3d 688 690 (7th Cir. 2005) ("The Estate does not argue that the City *systematically* fails to enforce its written policies and instead maintains informal policies that violate the Constitution.") (emphasis in original). "To trigger municipal liability, plaintiffs must establish that the city adopted or condoned the widespread practice." *Scott v. City of Chicago*, 03 C 2703, 2004 WL 2700486, at *7 (N.D. Ill. Feb. 5, 2004) (*citing Wilson v. City of Chicago*, 6 F.3d 1233, 1240-41 (7th Cir.1993)). "A widespread policy is adopted or condoned if the municipality was deliberately indifferent to complaints against its officers and concerns about [its investigation and discipline of officers]." *Id.* (citations omitted). *See also Garcia v. City of Chicago*, No. 01 C 8945, 2003 WL 1845397, at *3 (N.D. Ill. April 8, 2003) (in denying motion for reconsideration, stating that "[t]he inadequacy of police training, supervision, or control, may serve as a basis for § 1983 liability only where the failure 'amounts to deliberate indifference to the rights of persons with whom the police come into contact,' such that its policies can be said to be 'the moving force behind the constitutional violation.'") (citation omitted).

> 1.    Admissibility of Evidence

As expressly noted by the plaintiffs, they rely to a great degree on the deposition of Assistant U.S. Attorney Brian P. Netols as a basis for denying the City's Motion for Summary Judgment. Plaintiff's Resp. at 2 n.1 ("Indeed, a review of a single exhibit, the deposition of Brian Patrick Netols, the Assistant United States' Attorney who prosecuted Miedzianowski, discloses more than adequate factual bases upon which to deny the City's motion."). Netols was the lead federal prosecutor on numerous police corruption cases, including that of defendant Miedzianowski.

The plaintiffs seek to rely on Netols' testimony regarding the purported existence of a "blue wall of silence," which the plaintiffs assert exists as a matter of policy within the City and its police department. According to the plaintiffs, this wall of silence is a code by which CPD officers do not report crimes committed by other officers and do not intervene in criminal activity by other officers. Moreover, the plaintiffs assert that the "wall of silence" dictates that officers not testify against one another and assist fellow officers who "get in trouble." The plaintiffs point to Netols' testimony to show that a "blue wall of silence" is endemic to the CPD's operations, weakened investigation efforts, and allowed Miedzianowski to evade prosecution for his criminal activity, which in turn created the environment in which he could retaliate against the plaintiffs.

Evidence submitted at summary judgment must be admissible at trial under the Federal Rules of Evidence. *Woods v. City of Chicago*, 234 F.3d 979, 988 (7th Cir. 2000). The City's first contention is that the plaintiffs seek to use Netols as an expert witness, yet he was never identified as an expert under Fed. R Civ. P. 26(a) and never produced an expert report.

Fed. R. Evid. 702 governs the use of expert testimony. It provides that:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Alternatively, Fed. R. Evid. 701 provides:

> If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness, (b) helpful to a clear

understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

Lay opinion testimony is "not to provide specialized explanations or interpretations that an untrained layman could not make if perceiving the same acts or events." *U.S. v. Conn*, 297 F.3d 548, 554 (7th Cir. 2002).

The court has read Netols' deposition transcript and concludes that, to the extent it will be used in consideration of the instant motion, the testimony he is offering is not expert testimony, but rather is lay opinion testimony.[4] Netols testified as to his experiences in acting as the federal prosecutor in cases against corrupt police officers. The Advisory Committee Notes to Rule 701 regarding the 2000 amendments state that courts have generally allowed, for example, the owner or officer of a business to testify to the value or projected profits of the business. "Such opinion testimony is admitted not because of experience, training or specialized knowledge within the realm of an expert, *but because of the particularized knowledge that the witness has by virtue of his or her position in the business*." Advisory Committee Notes to Rule 701, 2000 amendments

---

[4] The court believes that certain of Netols testimony may indeed go beyond the realm of lay opinion testimony; however, because it will not be considered with respect to this motion, the court need not dwell on that issue. The court notes, however, that it sought additional briefing from the parties as to the testimony of Netols. In its order of February 16, 2006, directing the additional briefing, the court expressly told the City to "clarify whether the City's position is that Mr. Netols' testimony as a whole be deemed expert testimony or whether it can reasonably be separated into expert and non-expert portions." If the City's position was the latter, it was directed to identify which portions it believes constitute expert testimony. The City failed to make any express statement as to this part of the court's order, so the court has construed the silence as an indication that the City believes the entirety of Netols' testimony is expert testimony. Moreover, the court notes that the City did not address in its supplemental briefing the various other bases upon which it originally objected to Netols' testimony (i.e., hearsay, lacks foundation, consists only of his recollections, and was not open to cross-examination) even though instructed by the court to do so. Accordingly, the court deems the bases for these objections to have been forfeited.

(emphasis added).

The court finds that, like the business owner's knowledge, Netols' testimony regarding public information as to the number of police officer corruption investigations he was involved in, and what evidence the government presented at those trials, including the "blue wall of silence," is based on his particularized knowledge of these topics which he obtained during his time as a federal prosecutor. Indeed, during Netols' deposition, Netols' lawyer objected several times stating that the questioning was beyond the scope of what the parties had agreed to:

> Mr. Haile: Once again, you're going into – What he's authorized to testify about is public record information, and so you can talk to him about what information that is. But conclusions or opinions which he would draw from that are not within the scope of the authorized testimony.

Netols did not apply his knowledge to the facts of the instant case, he merely recited facts about which he was personally aware due to his experience as a federal prosecutor. Because Netols' testimony is (a) rationally based on his perception, (b) helpful to a clear understanding of his testimony or a determination of a fact at issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702, it is admissible under Rule 701.[5]

Thus, to the extent that Netols' testimony is based on his personal knowledge, which is the only type of testimony being relied upon for purposes of this motion, it is appropriate. *Fairley v. Andrews*, 03 C 5207, 2006 WL 1215405, at *13 (N.D. Ill. May 4, 2006) ("While the individuals' comments to Holman during the course of his investigations may not be admissible

---

[5]The City contends that even as a lay witness, Netols' testimony is problematic because "it consisted entirely of his recollections – when he could testify without divulging confidential prosecutorial information – of his prosecutions against 21 Chicago Police officers." Reply at 5. The City fails to provide any citation to authority for this argument, and failed to expand upon it in its supplemental briefing, so the court will not address it.

for the truth of the matter, Holman's investigative activity and lay person opinions based on such activity would be admissible."). *See also United States v. Joy*, 192 F.3d 761, 767 (7th Cir. 1999) ("Because most knowledge is inferential, personal knowledge includes opinions and inferences grounded in observations or other first-hand experiences.").

                2.      Existence of Widespread Custom of Failure to Supervise, Investigate and Discipline Resulting from Acquiescence in or Promotion of "Blue Wall of Silence"

The City contends that the plaintiffs have failed to meet their burden of rebutting with sufficient evidence the City's claim that it is entitled to summary judgment. According to the City, it has express policies in place that require that every complaint of misconduct be investigated and that discipline is imposed when the allegations are found to be sustained. The plaintiffs admit that the City has such express policies in place but asserts that the record evidence shows that a genuine issue of material fact exists as to whether the City acquiesced in a widespread practice known as the code of silence such that it is responsible for Miedzianowski's misconduct and retaliation against the plaintiffs.[6]

_____

[6]The court cannot overstate the degree to which the plaintiffs' poor briefing has added needlessly to the time and effort required by this court to consider the City's motion for summary judgment. In the argument section of their brief, the plaintiffs make general conclusory assertions, which are only occasionally augmented with actual citations to the record. Sometimes these citations include a range of 50 or more paragraphs from the plaintiffs 340-paragraph statement of additional facts. Moreover, the plaintiffs fail to provide the court with any basic outline of the pertinent facts necessary to resolve the City's motion. Instead, the plaintiffs haphazardly refer to random facts and names with absolutely no context or background – this is a 16-year-old case – and expect the court to just figure it out. Most frustrating, however, is the plaintiffs' utter failure to tie record evidence to their arguments. Instead of focusing on the relevant legal concepts and deciding which *specific* pieces of evidence create a genuine issue of material fact as to each legal issue, and then guiding the court through that evidence in an organized and methodical fashion, the plaintiffs have simply regurgitated fact after fact in the hopes that something sticks. This is an exceedingly dangerous and often ineffective strategy. Thus, to the extent possible, the court has attempted to sort through the plaintiffs' various

"The usual way in which an unconstitutional policy is inferred . . . is by showing a series of bad acts and inviting the court to infer from them that the policymaking level of government was bound to have noticed what was going on and by failing to do anything must have encouraged or at least condoned, thus in either event adopting, the misconduct of the subordinate officers." *Jackson v. Marion County*, 66 F.3d 151, 152 (7th Cir. 1995).

The plaintiffs' central piece of evidence is the testimony of Netols, discussed above. In his deposition, Netols testified that he was personally involved in the investigation of at least 18 CPD officers (including Miedzianowski) for various public corruption crimes such as racketeering, conspiracy, narcotics distribution, extortion, mail fraud, and firearms violations, among others. Netols stated that he had heard the term "code of silence" or "blue wall of silence" and defined it as follows:

> I understand it to mean a belief by members of law enforcement that there's a code that defines certain things you do and don't do, and one of the things you don't do is report the criminal activities of other police officers. And the way I understand it to work in practice, and the way I've addressed it in court, is that code also includes not just not, not reporting the criminal activities, but actually not interrupting or stopping the criminal activities if you come about them.

Netols Dep. at 29-30 (Pls. Exh. 5). When asked the number of times that the code of silence was an issue in connection with his prosecutions of Chicago police officers, he testified that it came up in all 18 prosecutions. Netols also stated that he believed that for every investigation of a Chicago police officer in which he was involved, "every officer that we investigated had been investigated by the [CPD] Internal Affairs Division for similar conduct that we were

---

citations to facts in order to properly consider this motion. But it declines to scour the record on the plaintiffs' behalf or accept contentions that are not supported by specific cited portions of the record.

investigating, without a sustained finding by the, . . . , Internal Affairs Division."

The court finds the above testimony, when viewed in a light most favorable to the plaintiffs, creates a genuine issue of material fact as to whether a code of silence existed within the CPD, and whether that code of silence impacted the validity and effectiveness of the CPD IAD investigations.[7]

In addition, however, to showing that the code of silence existed and had the force of law, the plaintiffs also must show that the City's widespread practice of allowing the code of silence to continue was the "moving force" behind the constitutional violation alleged by the plaintiffs – i.e., retaliation for disclosing Miedzianowski's misconduct. *Garcia*, 01 C 8945, 2003 WL 1715621, at *6 ("To establish municipal liability under the 'widespread practice' theory, Garcia must show that the City's widespread practice is the 'moving force' behind the constitutional

---

[7]The court notes that other courts have concluded that a code of silence exists within the CPD. For example, in *United States v. Ambrose*, 740 F.2d 505, 521 (7th Cir. 1984), *abrogated on other grounds, U.S. v. Pino-Perez*, 870 F.2d 1230 (7th Cir. 1989), Judge Harlington Wood, dissenting, quoted the district court's comments at sentencing, which included the following:

> They [the defendant-officers] had two things going for them, two propositions. The first proposition is that these policemen never turn each other in, the code of silence. And, in fact, it is not simply a code of silence; it is a code of mutual cooperation. Not only will policemen not testify against each other, but they come to the assistance of a fellow officer who gets in trouble.
>
> I don't mean to say that there isn't such a thing as a policeman, or some policemen who will testify against others, but it is a fact, and it was even admitted here from the witness stand, that there is a code of silence, and that most policemen observe it. Those policemen who testify against others are usually in the intelligence units, and that's their very job, to attain evidence of illegal activity by other policemen, and I get the general impression that the policemen who are members of such units are not the most popular members of the force.

*See also Simon v. City of Naperville*, 88 F. Supp. 2d 872, 877 (N.D. Ill. 2000) (denying city's motion for summary judgment on Title VII claim because "[t]he 'blue wall of silence' is a well-established phenomenon that may shield police from investigations and disciplining of misconduct in a variety of circumstances.") (citations omitted).

violation in that the City's failure to train, supervise, and control its officers amounted to 'deliberate indifference' to the rights of the City's inhabitants."). *See also Estate of Novack ex rel v. County of Wood*, 226 F.3d 525, 531 (7th Cir. 2000) ("Moving force" is "when execution of a government's policy or custom . . . inflicts the injury that the government as an entity is responsible under § 1983.") (*quoting Monell*, 436 U.S. at 694 ). Such specific evidence exists in this case.

For example, the parties agree that the CPD investigation of Miedzianowski based on the allegations brought forth by the plaintiffs was flawed and did not follow proper procedures. The lack of conformance in the investigation included the failure to include an interview of the complainants, the termination of the investigation without interviewing the accused officers, and the fact that the CPD IAD permitted witnesses to be interviewed in the presence of Miedzianowski.

Indeed, there is evidence in the record that the CPD investigation into Miedzianowski turned into an attempt to discredit Klipfel. For example, prior to and during the period that the investigation of Miedzianowski was ongoing, he made false allegations of misconduct against Klipfel. Further, in a June 9, 1993, memorandum from Assistant Deputy Superintendent Ray Risley of the CPD IAD to CPD Superintendent Rodriguez regarding the CR initiated against Miedzianowski based on the plaintiffs' allegations, Risley informed Rodriguez that no wrongdoing was found on behalf of Miedzianowski (and the others named in the CR), and instead implicated Klipfel in criminal conduct.

Moreover, ATF supervisory special agent Richard Marianos, testified by affidavit that he was questioned by CPD IAD officer Wendy Marrello regarding officers Miedzianowksi and

Galligan.  Pls. Exh. 73.  Marianos attests that after being questioned generally about

Miedzianowski and Galligan, Marrello questioned him "extensively" about his immediate

supervisor, Klipfel.  Marianos stated that "[i]t soon became apparent to me that the Chicago

Police Department was conducting an investigation of Diane Klipfel rather than an investigation

of the accused Chicago Police Officers," and that Officer Marello was only pursuing

"derogatory" information about Klipfel.  In addition, Marianos stated that after the interview with

Marello, he returned to his office and almost immediately received a telephone call from

Miedzianowski.  In his affidavit, Marianos described Miedzianowski as "irate" and stated that

Miedzianowski was reading statements directly from Marianos' interview with Marrello, which

had occurred just about one hour before the phone call.  Thus, Marianos attested, it was clear that

someone had provided Miedzianowski with a copy of Marianos' statements immediately after the

interview.

     Viewing the facts and making all reasonable inferences in favor of the plaintiffs, the court

finds that the evidence discussed above creates a genuine issue of material fact as to whether

Miedzianowski believed that he could retaliate against the plaintiffs because other police officers

would not turn him in for the retaliatory conduct and that any efforts by the City to investigate the

plaintiffs' claims against him would be bogus – in other words, whether the City's policy of

tolerating the code of silence and resulting failure to properly supervise, investigate, and

discipline its officers requires that the City be held liable for Miedzianowski's alleged retaliation

against the plaintiffs.

     B.     Scope of Employment

     In Count III of their Fourth Amended Complaint, the plaintiffs allege a claim of

defamation against Miedzianowski.  As a result, the City filed a counterclaim seeking a

declaratory judgment that it is not liable for any judgment entered against Miedzianowksi.  The

City has moved for summary judgment on the counterclaim.  The relevant portion of the Illinois

indemnification statute at issue provides:

> A local public entity is empowered and directed to pay any tort judgment or
> settlement for compensatory damages (and may pay any associated attorney's fees
> and costs) for which it or an employee *while acting within the scope of his
> employment* is liable in the manner provided in this Article.

745 ILCS 10/9-102 (emphasis added).  The City argues that because Miedzianowksi's conduct as

alleged in the defamation claim was outside the scope of his employment, it cannot be held liable

for his actions.

The issue of whether Miedzianowski was acting within the scope of his employment

when he allegedly defamed the plaintiffs is an issue of state law.  As noted by the Illinois

Supreme Court:

> No precise definition has been accorded the term 'scope of employment' (*Sunseri
> v. Puccia* (1981), 97 Ill.App.3d 488, 493, 52 Ill.Dec. 716, 422 N.E.2d 925), but
> broad criteria have been enunciated:
> '(1) Conduct of a servant is within the scope of employment if, but only if:
> (a) it is of the kind he is employed to perform;
> (b) it occurs substantially within the authorized time and space limits;
> (c) it is actuated, at least in part, by a purpose to serve the master, * * *
> * * * * * *
> (2) Conduct of a servant is not within the scope of employment if it is different in
> kind from that authorized, far beyond the authorized time or space limits, or too
> little actuated by a purpose to serve the master.

*Pyne v. Witmer*, 543 N.E.2d 1304, 1308 (Ill. 1989) (quoting (Restatement (Second) of Agency §

228 (1958)).

In *Doe v. City of Chicago*, 350 F.3d 667 (7th Cir. 2004), the Seventh Circuit addressed a

situation similar to the case at hand.  Specifically, the plaintiff sued a city police officer who had begun harassing her and breaking into her home after assisting her at the scene of a car accident.  She alleged  federal civil rights violations and tortious misconduct under Illinois law against the officer, and in addition, sought indemnification from the city under 745 ILCS 10/9-102.  The Seventh Circuit vacated and remanded the district court's grant of the city's motion for summary judgment on the indemnification claim.

In so doing, the Seventh Circuit engaged in an examination of Illinois law as to the scope of employment and implied that the scope of employment could be interpreted more broadly when the employee in question is a police officer.  *Id*. at 671.  Although the parties urged the Seventh Circuit to certify the question to the Illinois Supreme Court of whether the officer in *Doe* was acting within the scope of his employment based upon the plaintiff's alleged facts, the Seventh Circuit concluded that:

> Whether the scope of a police officer's employment should be deemed broader than that of other employees is a difficult and important question that we should not ask the state supreme court to answer on make-believe facts.

*Id*. at 672.

Ultimately, then, and most relevant for the court's purposes at this time, the *Doe* court concluded that the court acted prematurely in granting the motion for summary judgment and noted that "[w]e have warned repeatedly against trying to resolve indemnity before liability."  *Id*. at 672.  The *Doe* court went on to state that:

> This case illustrates the inadvisability of the practice. The issue of the City's responsibility for the torts of its police officers is a difficult one that the district judge should not have attempted to resolve before the actual facts bearing on the issue were determined.

*Id.* at 673.[8]

This court heeds this sound advice in this factually and legally complex case. In order to ascertain whether Miedzianowski's allegedly defamatory conduct was within the scope of his employment, the exact parameters of that conduct must be ascertained. While the parties have agreed on certain facts related to Miedzianowski's retaliatory conduct against the plaintiffs, the court can at this time only assume what evidence the plaintiffs will put forth in support of their defamation claim.[9]

Given that neither of the parties has moved for summary judgment on the defamation claim, and a trial has obviously not occurred, the court has no definitive factual basis on which to resolve the scope of employment issue.[10] This court is not willing to determine at this time that resolution of the defamation issue is sufficiently cut and dried (i.e., that no genuine issue of material fact exists) such that consideration of indemnification is appropriate.[11]

---

[8]The City attempts to deflect reliance on the *Doe* case as a ground for deferring resolution of the indemnification issue until liability is established, and instead asserts that *Wilson v. City of Chicago*, 120 F.3d 681, 684-85 (7th Cir. 1997), allows the court to consider the issue now. However, the court elects to follow the more recent proclamation by the Seventh Circuit on this issue as stated in *Doe.*

[9]In addition, the court notes the numerous defenses that exist to a defamation claim under Illinois law, thus bolstering its decision to delay consideration of the indemnification claim unless, and until, liability has been established.

[10]Moreover, the plaintiffs cite to dozens of paragraphs in support of their defamation claim, and these are by no means uncontested by the city. Further, while the city cites to cases regarding criminal conduct, it is tortious (i.e., defamatory) and not necessarily criminal conduct which the City is being asked to indemnify.

[11]Indeed, the Seventh Circuit noted in *Doe*:
> Certification to the Illinois supreme court is in any event premature because the facts bearing on the scope of employment issue have not yet been determined. [Police officer] White denied Doe's charges at the hearing before the police

When and if a jury decides that Miedzianowski is liable for defaming the plaintiffs under Illinois law, the court will address the indemnification issue at that time, if necessary. *See Doe,* 360 F.3d at 673 (stating that the district court should have deferred ruling on the indemnification issue and entering judgment under Rule 54(b) given the "need to develop a factual basis for determining how broad the City's vicarious liability for the torts of its police officers should be. . . .").

## V.    CONCLUSION

For the reasons stated above, the City's motion for summary judgment [269-1] is denied. The City's motion to strike affidavits [257-1] is denied as moot.

**ENTER:**

DATE:   June 8, 2006

_____
**Blanche M. Manning**
**United States District Judge**

---

review board, and the board did not find him guilty of the most serious of her charges. The jury in White's trial in the district court may disbelieve Doe's evidence and reject her entire case, in which event the issue of the City's vicarious liability will be moot. Or the trial may cast the facts in a different light from the version that the procedural posture of this appeal requires us to accept without our knowing whether it is the correct version.
*Doe*, 360 F.3d at 672.