# EXHIBIT A

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

**KLIPFEL & CASALI,**

    **Plaintiffs,**

**V.**                       **Case No. 94 C 6415**

**CITY OF CHICAGO, et al.,**

    **Defendants.**

_____/

### PRELIMINARY EXPERT REPORT OF LOU REITER

1.    My name is Lou Reiter. I have been actively involved in police practices and law enforcement since 1961. I was an active police officer for 20 years. Since my retirement, I have been involved police and law enforcement practices as a private police consultant.

2.    Since 1983 I have been providing law enforcement consultation in police training and management. I provide law enforcement training in the following areas:

- Investigation of critical incidents - officer involved shootings, use of force, and pursuits.
- Managing the Internal Affairs function.
- Police discipline.
- Use of force and deadly force issues.
- Police pursuit issues.
- Investigative procedures and supervision.
- Jail intake procedures.
- Personnel practices.
- Supervisory techniques.

1

- Liability management.
- Policy and procedure development.
- Management effectiveness.

I consult with police departments of 3 to 39,000 employees, performing internal audits for the police organization. My primary areas of focus during these audits are:

- Citizen complaint procedures.
- Discipline, internal affairs and early warning systems.
- Personnel practices including selection, hiring, EEOC/AA, promotion, assignment and retention.
- Specialized operations including traffic, investigations, narcotics, vice, intelligence, emergency response teams and unusual occurrence units.
- Organizational structure and command responsibilities.
- Police department governance.
- Policy and procedures development.
- Use of force policy and procedures.
- Investigation of critical incidents.

Since 1983, I have been retained in nearly 1000 police related cases. This involvement has been on a mix of approximately 2/3 plaintiff and 1/3 defense. Assistance provided includes case analysis and development and expert witness testimony. I have been qualified in state and Federal courts, including the District of Columbia and Puerto Rico, to provide trial testimony in many areas including:

- Field procedures including tactics, arrest techniques and pursuits.
- Standards of police misconduct investigations.
- Use of force and deadly force.
- Supervision.
- Investigative procedures.
- Jail intake procedures
- Police management and personnel practices.
- Investigation of citizen complaints and discipline.
- Police policy and procedures development.
- Police training.

4.     I am a former Deputy Chief of Police of the Los Angeles Police Department. I served as a police officer in the Los Angeles Police Department for over

2

twenty years until I retired in 1981. During that period of time I served as a patrol and traffic officer, supervisor, manager, command officer and executive staff officer. I was involved in police training, investigating allegations of police misconduct, Chairman of the Use of Force Review Board, member of the Unusual Occurrence Command Post Cadre, and researcher and author of the chapters on internal discipline, training and management/employee relations for the Police Task Force Report of the National Advisory Commission on Criminal Justice Standards and Goals. In 1993 I published the manual/guide Law Enforcement Administrative Investigations; the Second Edition in 1998; and other article related to law enforcement administrative investigations and police discipline.

5.      My experience, training and background is more fully described in the attached resume. A complete list of my testimony during the past four (4) years is attached.

6.      I have reviewed the following materials to date regarding this case:

- Complaint and Answers
- Plaintiff and Defendant City of Chicago Local Rule 56.1(a)(3) Statement of Undisputed Facts
- Depositions:
  - Raymond Risley, with exhibits
  - Matt L. Rodriguez
  - Philip Cline, with exhibits
  - Brian Netols, with exhibits
- Various newspaper articles 1995
- FBI 302 interview of Philip Cline
- Depositions in *Tolson v. City of Chicago, et al*:
- Depositions in *Wright v. City of Chicago, et al*:
- Depositions in *Wilson v. City of Chicago, et al*:
- Depositions in *Marsalis v. City of Chicago, et al*:

3

- Depositions in *Cannon v. City of Chicago, et al*:
- Deposition of Risley in *Czajkowski v. City of Chicago, et al*:
- Special/General Orders of CPD:
  - 97-10 Behavioral Intervention System
  - 83-3    Personnel Concerns
  - 83-1    Responsibilities of Sgts. in the Field
  - 92-6    Search Warrants
  - 90-1    Bureau of Investigative Services
  - 93-4    Written Directives
  - 93-3    Complaint Registers and Discipline
  - 97-11 Personnel Concerns
- Goldston/Sanders Reports, 1990
- Police Foundation Report, 1991
- Webb Commission Reports and meeting minutes
- Training materials on use of force and civil rights
- Jones v. City of Chicago opinion
- Reiter interrogatory answers in Salto v. Mercado and Hardaway
- Complaint in Santiago v. Marquez
- Chicago Reporter statistics on sustained cases of OPS and IAD

7.    These opinions are based upon the totality of my specialized knowledge in the field of police practices.  This experience is derived from my personal police experience, knowledge and training.   This expertise has been developed during my 45 years involvement in law enforcement at all various capacities as a practitioner and my continued experience as a trainer, auditor and litigation consultant.  This experience has provided me with extensive personal and specialized training, experience and knowledge of police operations and generally accepted police practices.  The body of knowledge that I have reviewed over the years coupled with my personal and professional experiences, my continued auditing of police agencies, my constant training of police supervisors, managers and executives, my continuous interaction with other police professionals, organizations and training personnel, all form the foundation

4

for the opinions I am rendering in this matter.

There is a large body of knowledge and literature about the practices and standards which modern, reasonably managed and administered police agencies across the U.S. should follow and apply to its operations. These generally accepted practices have developed over time to encourage and assist police agencies to deliver police services to communities serviced which are professional, reasonable, effective and legal. Many of these generally accepted practices have been developed from law enforcement critical analysis of field incidents and examinations of incidents reported to cause police liability, deficiencies and employee misconduct. These generally accepted practices have been a response to reported cases of police misconduct and liability and a desire by law enforcement to create a system to ensure that police conduct remains within acceptable legal and constitutional bounds. I am familiar with this body of knowledge and through my continuous training and audits assist law enforcement with this requirement for reasonable and legal police response to field incidents and for constant improvement.

My examination of the factors involved in this police practices incident embodies the basic fundamentals which I employ in my professional examination of police agencies during my audits and when working as a consultant with the U.S. Department of Justice. My opinions are provided with a reasonable degree of certainty within the fields of law enforcement, police activity and police administration and supervision.

The terminology I use in my Expert Report is not meant to invade the purview of the court or the final jury determination. I use these terms in my training of police

5

supervisors, managers and command officers when instructing on administrative investigations and civil liability. These are products of my continuous review of case law which should guide a reasonable police agency in supervising its employees. These terms have become common terms within law enforcement supervision, management and risk management; just as the terms of probable cause, reasonable suspicion and the prima facie elements of crimes have become common terminology for police field personnel and detectives.

8.     Law enforcement administrative investigations are a principal and essential element to ensure that a police agency and individual employees operate in a manner to guarantee that professional, legal and Constitutional policing are maintained. Police officers operate in the field essentially autonomously. Their daily performance is monitored and controlled by training, policies and procedures and supervisory techniques and systems, including administrative investigations. These three (3) elements establish the parameters within which field police officers perform. These systems and practices inform officers what they should or should not do particularly when dealing with citizens during enforcement encounters. The supervisory practices, techniques, systems and administrative investigations are the most critical aspect of controlling, monitoring and guiding field officer performance.

Administrative investigations, commonly referred to as Internal Affairs or Professional Standards, are vital to maintaining reasonable parameters of field performance by officers. These investigations can originate from a myriad of sources. A common police practice is to investigate allegations of police misconduct which come

6

to the attention of the police agency from any source if the allegation, if later proven true, would amount to misconduct. This type of system protects the concerns and rights of the four (4) essential elements to such a system - the aggrieved person, the accused officer, the involved police agency, and the community served by the police agency. These systems of administrative investigations establish the environment within the involved agency for field officers to know that they will be held accountable for their actions in the field.

These practices are not new in the police field. They have been delineated in frequent national studies on police practices including the 1931 Wickershim Commission, 1967 President Johnson's Commission, 1968 Kerner Commission Report, 1974 Police Task Force Report of the National Advisory Commission on Criminal Standards and Goals, and other similar studies since that time. These practices are embodied in model policies of nationally recognized police professional groups such as the International Association of Chiefs of Police and the Police Executive Research Forum. They have been continuously referenced in authoritative texts such as the O.W. Wilson Police Administration, a former Chicago Police Superintendent, and its many successors and the International City Management Association's texts on municipal police practices. It is extensively covered in specific training for administrative investigations by national training entities including the Institute for Police Technology and Management (FL), International Association of Chiefs of Police (VA), Americans for Effective Law Enforcement (IL), Northwestern University Police Traffic Institute (IL), Southern Police Institute (KY), and Public Agency Training Council (IN).

I regularly train on this subject to police practitioners and use my publication, <u>Law Enforcement Administrative Investigations</u>, as a training tool. I frequently conduct internal audits of police agencies in the practice of administrative investigations. I have personally been an investigator of police misconduct allegations and have adjudicated other cases of police misconduct for 11 years as a police command officer. I am familiar with the effect these practices have within police agencies.

9.   I have been involved in several cases involving the Chicago Police Department since the mid 1980's. During that time I have reviewed several hundred administrative investigations conducted by the Chicago Police Department either by the Office of Professional Standards, Internal Affairs Division or District supervisors. This preliminary expert report also relies on the knowledge I developed during my involvement with these other civil litigation matters.

10.   I have been asked to review the materials directly related to this case, coupled with my prior reviews of materials in other Chicago Police Department litigation matters, and determine whether there has existed a custom and practice within the agency of the Code of Silence. I have been further asked to evaluate whether the existence of the Code of Silence contributed to the allegations of the Plaintiffs in this current civil matter.

## Code of Silence

**11.   The Code of Silence exists to varying degrees in all police agencies in the United States. The failure of the Chicago Police Department to**

8

acknowledge its potential and take affirmative steps to eliminate or minimize the influence of the Code of Silence, in my opinion, is a conscious choice various Chicago Police managers and executive officers have taken and, in my opinion, represents a position of deliberate indifference by the Chicago Police Department to this disruptive issue within the agency. Any reasonable officer in the Chicago Police Department would be aware of the systemic deficiencies in the administrative investigative process and the discipline deliberative system coupled with the entrenched affect of the Code of Silence. Those officers who engage in misconduct and violate citizens' Constitutional rights would do so with the perception that their misconduct would go undiscovered or investigated in such a deficient manner or subjected to prolonged delay in adjudication that they would not be held accountable or sanctioned.

12.     The Code of Silence (Blue Veil or Blue Wall) is a reluctance for persons to come forward with negative information about another person. This concept exists to varying degrees within all walks of life and employee settings. It is more sinister in law enforcement for several reasons. Police officers have powers over citizens which no one else in America has - to restrict liberty and to use force against a member of the public. Police officers are most often the only witnesses to police abuse of citizens' rights. The paramilitary nature of most police agencies creates a closer relationship amongst police officers. Various forms of retaliation are frequent to police employees who break the Code of Silence.

9

The Code of Silence has been memorialized and documented in law enforcement historically. It can be traced back to the 1866 Civil Rights Act passed to combat "Black Codes" and the 1871 KuKluxKlan Act passed to address "customs" and unwritten codes and failures to prosecute following the American civil war and specifically directed to the law enforcement officers in the South who would not enforce and prosecute persons who violated the rights of blacks. The 1931 Wickershim Commission study under President Hoover spoke to its existence in law enforcement. In 1936, leading police administration expert August Vollmer wrote: "It's unwritten law in police departments that police officers must never testify against their brother officers." The writings of Professor Neiderhoffer in the late 1950's and 1960's further documented this issue in law enforcement. It has been an integral part of all national study commissions on police practices and local commissions, such as the 1991 Christopher Commission in Los Angeles, 1992 St. Clair Commission in Boston, and 1992 Koltz Commission of the Los County Sheriff's Office. The Christopher Commission's study of the Los Angeles Police Department in 1991 found that the Code of Silence was "…perhaps the greatest single barrier to the effective investigation and adjudication of complaints." It has been documented in the continuous commissions involving the New York Police Department since the days of Serpico and, most recently in 1994, the Mollen Commission. This concept and its negative effects has been documented in most leading and authoritative texts on police practices.

13.     The Code of Silence has been the underlying issue in countless civil litigation matters involving police employees. These generally have been in cases

involving employee retaliation when they either voluntarily or reluctantly come forth with information that results in other employees being sanctioned. Most of these cases result in the employees not being able to continue to work within the agency. Some examples I use during my training of police practitioners are:

- _Blair v. City of Pomono_, 223 F.3d 1074 (9th Circ. 2000)
- _Brandon v. Allen_, 516 F. Supp. 1355 (W.D. Tenn. 1981) Affirmed 469 U.S. 464 (1985)
- _Katt v. New York_, 151 F. Supp. 2d 313 (S.D.N.Y. 2001)
- _Simon v. Naperville_, 88 F. Supp. 2d 872 (N.D. Ill. 2000)
- A recent case developing in 2000 in Oakland, CA., involved the misconduct of officers referred to as The Riders; the probationary officer bringing the misconduct to the attention of authorities had to be moved to another police agency by Chief Word for fear of retaliation.

14.    I have written about the Code of Silence and have made it an integral part of the regular training I conduct within law enforcement. I initially documented the tremendous negative impact of the Code of Silence in the chapter I authored on "Internal Discipline" for the Police Task Force Report of the National Advisory Commission on Criminal Justice Standards and Goals, 1973, for the U.S. Department of Justice. I have testified on the Code of Silence in civil litigation trials at both the local and Federal levels.

15.    In my law enforcement training seminar I conduct and in testimony given regarding the Code of Silence, I enumerate a methodology useful in determining whether the Code of Silence may be present in an agency and be having an adverse affect on the performance of the agency and the identification of officers engaging in misconduct:

11

- Repeated acts without reporting and/or taking any remedial action
- Will officers engage in misconduct in the presence of other officers
- Have any complaints been initiated by supervisors?
- Retaliation against officers who break ranks.
- Is what other officers say they were doing at the critical moment contrary to reasonable practices?
- Is it an occurrence which should have alerted a reasonable officer and focused his/her attention to the incident?
- Was the incident so obvious officers would have had to shut their eyes and ears not to have been aware of it?
- Were officers in a position to have seen or heard what occurred but denied any knowledge?
- Are they avoiding, rather than denying?
- Development of cliques and small specialized units
- Requests not to work with specific officers or units.

16.    During my audits of agencies, involvement with various litigation matters and my seminars, I have come to realize that another aspect of the Code of Silence exists in law enforcement somewhat different from the traditional view of this adverse philosophy.  I have come to identify this newer view as the Blue Shield - acts or omissions by an agency which insulate and protect its employees from accountability and criticism.  Examples that I regularly use during my training programs are:

- Inadequate administrative investigations
- Unreasonable delays in adjudicating administrative investigations and imposition of discipline
- Failure to discipline
- No misconduct for false and misleading statements
- Accept criminal decision in lieu of administrative decision
- No confrontation with penalized misconduct
- Hiding the discipline.
- Confidentiality of records
- "in lieu of" and "personal reasons"
- Allow/encourage inaccurate testimony in civil cases.

12

17.    During the police seminar training I conduct on law enforcement administrative investigations and police discipline, I frequently use court case citations. These are used to illustrate the importance of following generally accepted practices when conducting these types of supervisory investigations. Some of those I have and continue to use are *Beck v. City of Pittsburgh, et al.*, 89 F.3d 966 (3rd Circ. 1996)Cert. denied, and *Clark v. City of Muskegon,* 2000 U.S. Dist. LEXIS 6660 (WD MI. 2000). From *Beck*, I emphasize the following points:

> Policy made in 2 ways. (1) "official proclamation, policy or edict." (2) "A course of conduct is considered to be a 'custom' when, though not authorized by law, such practices of state officials are so permanent and well-settled as to virtually constitute law. Custom may also be established by evidence of knowledge and acquiescence."

> "The investigative process must be real. It must have some teeth. It must answer to the citizen by providing at least a rudimentary chance of redress when injustice is done. The mere fact of investigation for the sake of investigation does not fulfill a city's obligation to its citizens."

From *Clark*, I point out the court's observations of the importance of the complaint acceptance and investigation systems and the result they can have on individual officer performance and behavior and agency liability:

> "...a direct link between the municipalities acts and those of the police officer can exist where there is evidence that the ineffectiveness of...citizen complaint system was widespread, because it can be inferred that every police officer was aware that excessive force could be used with near impunity."

> "A police department's primary function is to investigate reports of malfeasance. When is fails to perform that function effectively, an obvious consequence is an increase in malfeasance since perpetrators will feel that their actions will go unpunished. This is no less true when...police officer. In fact, because police departments are vested with increased power and authority over ordinary citizens, police departments must be especially vigilant when complaints of excessive force are lodged...Citizen complaint processes are designed to reduce

13

police misconduct.  When citizen complaints are discouraged, ignored and discarded, it is an obvious and predictable consequence that in an department with 77 officers, some officers will realize they can commit misconduct with impunity."

"The existence of a policy is not enough…we cannot look to the mere existence of superficial grievance procedures as a guarantee that citizen's constitutional liberties are secured."  "Muskegon's deliberate indifference to the risks that flow from an inadequate citizen complaint process is sufficient to establish causation where an officer who knows that an ineffective process exists uses excessive force."

18.    The Code of Silence, in my opinion, exists within the Chicago Police Department.  The Department has failed to take any affirmative positions on this topic and has allowed it to continue to exist within the agency.

19.    The depositions in this and the other cases involving the Chicago Police Department have demonstrated that the agency has failed to inculcate the severity of this problem with its personnel.  It's as if the training has guided agency personnel to respond in a similar manner to the question whether they know of the Code of Silence. The common answer by members of the Chicago Police Department, including command personnel, is that the Code of Silence is a Chuck Norris movie or a product of Hollywood.  It is ironic that Chuck Norris played a Chicago police officer in this movie.

- Commander Christian, Commander of Education and Training Division, on page 66 (in *Tolson*) answered that the Code of Silence was a movie.
- Michael Hoke, Assistant Deputy Superintendent and head of IAD in 1995, on page 145 (in *Wilson*), said that the Code of Silence is in the legal profession and with judges.  Doesn't believe the Code exists in the Police Department, page 159.
- Officer Osborne (in *Tolson*) testified that the Code of Silence was simply a television concept.
- Sgt. O'Brien (in *Tolson*), Training Division, answered that he heard of it in police shows.
- Andrea Hyfantis, law instructor at the Academy, acknowledged that the

14

Code of Silence is included in the State lesson plan for the subject matter she is responsible for teaching, but she doesn't include it in her instruction. "Because I think the whole concept is vague." page 150 (in *Tolson*).

- Former Superintendent Rodriguez acknowledged that he was familiar with the "Blue Wall of Silence" (101) and he agreed that some engaged in it within the Chicago Police Department, but that it wasn't consistent. He believed that anyone who adhered to the Code of Silence "will end up being in trouble." (102) He further testified that "a good many of the anonymous calls" to IA he believed were from other officers (an indication that retaliation could have been a concern).

20. Brian Netols, Assist U.S. Attorney, was the lead prosecutor in the Miedzianowski criminal trial. He testified during his deposition that he believes that the Code of Silence was involved in all eighteen (18) criminal trials of Chicago police officers that he has prosecuted (31). His definition of the Code of Silence was "...a belief by members of law enforcement that there's a code that defines certain things you do and don't do is report the criminal activities of other officers. And the way I understand it to work in practice, and the way I've addressed it in court, is that code also includes not just not, not reporting the criminal activities, but actually not interrupting or stopping the criminal activities if you come about them." (29-30) He has heard that citizens involved with these types of cases have feared retaliation from the police (32).

21. Philip Cline, who is now the Superintendent of the Police Department, was an immediate supervisor of Officer Miedzianowski during the period of the early 1990s when he was a part of the gang unit. During his deposition on this matter he testified to several issues regarding Miedzianowski that should have been acknowledged as being precursors to misconduct and elements of the Code of Silence.

15

Superintendent Cline testified that Miedzianowski "had problems getting along with some of the other gang specialists...he had an attitude." (23)   He believed that Miedzianowski and his partner, Galligan, resented his supervision (24) and he didn't think Miedzianowski was a "team player...Him and Galligan were like loners." (50) Superintendent Cline, in May 1996, had concerns regarding Miedzianowski and didn't trust him (62) and "I barred him from Area 5" (64) and ordered the other investigators not to work with him.

## Administrative investigation deficiencies

**22.     Deficiencies in administrative investigations appear to be systemic within the Chicago Police Department's investigation of complaints alleging employee misconduct.  Since I have reviewed investigations spanning the tenure of three heads of OPS and several Police Superintendents, it has given weight to my belief that these are well entrenched within the agency and would be the operational practice which any reasonable officer would be aware of.  These types of deficiencies are significant influences in supporting the Code of Silence and insulating officers who engage in misconduct to feel protected.**

23.     It has been continuously documented in prior reviews I've done and articles I've read regarding the Chicago Police Department that the imposition of discipline is a complicated and delayed process.  The final imposition of discipline can be delayed up to three (3) years until the matter gets to and is adjudicated by the Police Board.  By that time the recommended discipline is often reduced through plea

16

bargaining.

24.     The Chicago Police Department's written policies and procedures have continuously been very detailed and would, in my opinion, be consistent with generally accepted practices in law enforcement.  The problem is the implementation of these in practice.

25.     Former Superintendent Rodriguez during the years 1992-1997 testified that when he was appointed to the position there was a "great deal of backlog with respect to disciplinary cases that needed to be reviewed by the superintendent..." and it took "pretty much over three years to get anywhere near a handle on it as I should have." (18)   He did not know what had caused the backlog (19).  He believed it was not authorized for an employee to maintain personal copies of IA/CR investigations (65).  It would not be proper for the accused employee to sit in on interviews with other persons during a CR investigation, as has been alleged by other persons interviewed (85).

26.     Brian Netols, the Federal prosecutor of Miedzianowski, testified that he believed the Chicago Police Department was in the RICO conspiracy with Miedzianowski (15) and in the wiretaps of the case which he played in court officers stated that they "were not concerned about investigations by the Internal Affairs Division." (19)   When the search warrant was served on Miedzianowski's home there were "thousands of documents were taken from his home..." which appeared to be from Internal Affairs investigations (27).  He said one officer told him that he reported allegations regarding Miedzianowski to his supervisor, didn't hear whether any investigation had been done, but and didn't follow-up on it (72).

17

27.     Superintendent Cline testified that he had initiated two (2) CR complaints on Miedzianowski during the time he was his supervisor and he never received any follow-up on these or results of the investigations (59, 61, 65 and 74).  He was aware of the CR regarding allegations from Miedzianowski's tenure with the ATF, but he never saw the investigation (44) and was unaware of the actual allegations (48).

28.     Raymond Risley was over IA under Superintendents Martin and Rodriguez (22).  He was unaware of and surprised that Miedzianowski had witness statements from the CR investigation within 30 minutes of their being taken and it would be improper (146), but he acknowledged that he, Risley, had a copy of the CR investigation in his personal control even after retirement.  There were several areas of this deposition that indicated a bias, in my opinion, to his role as head of IA: He didn't think Ms. Klipfel was "very stable," yet he was making a credibility statement without any personal contact with her or even requiring her to be interviewed during the CR investigation (60).  Commander Risley acknowledged that Miedzianowski called him to thank him after the confidential CR investigation was completed (49), that he had lunch with Miedzianowski allegedly to get information regarding police corruption (50), that he was picked up on the Federal investigation wire on Miedzianowski (51) and that he communicated with Miedzianowski after he went to prison and as late as 2003 when he was already retired (51.53).

29.     The deposition of OPS Investigator Kuykendoll (in *Tolson*), who has been in that position for 12 years, indicated that there have been no changes in policy or procedure or practice during the transition from Director Shines to Baird.  She indicated

that she has conducted her investigations the same through the tenures of those directors and Director Fogel. It was interesting to note that this seasoned OPS investigator in her deposition on pages 54-56 could not answer what burden of proof she used in these investigations.

"Q     What's the standard that OPS investigators are supposed to follow?
A     The standard?
Q     The burden of proof or the standard.
A     There's no—are you talking about policy or something in the office that determines?
Q     Policy or practice.
A     No.
Q     What about yourself? Do you use a standard, like, if it's—do you require proof beyond a reasonable doubt before you'll sustain or do you look for proof by a preponderance of the evidence?
A     Both. I have done it both ways.
Q     Okay. Is there any reason you would use one standard over the other in a particular case?
A     No. I don't think so.
Q     Do you think that one standard is harder than the other?
A     I don't know."

**Notice of these deficiencies by the Chicago Police Department**

30.     These deficiencies in the administrative investigations of complaints, employee discipline and the adverse impact of the Code of Silence, has been noted by, documented for and relied upon managers and administrators within the Chicago Police Department. The failure to modify this systemic deficiency in the process by successive Police Superintendents, in my opinion, is indicative of a conscious choice by the Police Department to continue this practice of indifference to allegations of misconduct and police abuse including

19

**Constitutional violations.**

31.     In 1990, the Department undertook an internal investigation of its OPS practices which has become known as the "Goldston Report." This involved the re-investigation of allegations of torture and police abuse occurring at the 2nd District during the 1980's. Inspector Goldston's ultimate conclusion was that this abuse was systemic over a ten year period and that the command officers of the District were either involved in it or were aware of it. Inspector Sanders undertook a re-investigation of the original CR investigation of the alleged abuse which concluded that it was not sustained. Her review involved the criminal trial transcripts of the subsequent proceedings. She sustained the charges of abuse against three (3) police officials. It is interesting to note that even in this investigation there were no recommendations on issues of false and misleading statements or any analysis of agency issues including training, policy/procedures or supervisory practices.

32.     In June, 1997, the Mayor created an Anti-Corruption Task Force. That group conducted a series of meetings in its attempt to determine the scope of the problem and to create working unit for this review. In the minutes of that Task Force, members of the Police Department testified about the deficiencies of the administrative investigation and discipline process within the Department. Some of those comments were:

> •   Chief Risley, March 18, 1997, "...Risley stated that 'numbers' pressures can be overwhelming. He stated that shortcuts are tantamount to violations of civil rights, although officers are not called upon to answer for them. There is nothing in the organization to hold officers in check for constitutional violations...seems he is the only one who cares about

20

constitutional violations. He offered one example of a clear violation of constitutional rights involving an illegal search, which, before it reached Risley's desk, had resulted in a "non-finding" by the deputy chief, by the district lieutenant, and by the officers' sergeant."

- Director Shines, April 9, 1997, "...Shines desired to disabuse the Task Force of notion that a truly effective cop will have many complaints lodged against him regarding excessive force and corruption."

- Letter to the Task Force from the Latin American Police Association, August 14, 1997, "...Additionally, for Tactical and Gang Units, there is the established emphasis on measuring activity via arrest statistics. This forces officers to devise methods in order to perpetuate a steady flow of arrests for each shift - and creates a situation for the unscrupulous officer to pervert the criminal justice system."

- Leroy O'Shield, former commander of the Austin District and then Superintendent of CHA, September 16, 1997, "...He highlighted a number of areas that lead to corruption: (1) turnover arrests; (2) "confidential informant" situations, in which young aggressive officers are looking for big busts; (3) questionable search warrant practices."

- Chief Risley, March 18, 1998, "...Risley stated that there is a significant lack of investigative expertise and technique at OPS, and this problem always existed at OPS."

- UIC update (study group for the Task Force), April 23, 1998, "...They have generally found a lack of investigatory experience at OPS, and the quality of OPS' work and investigation techniques are lacking."

- UIC update, April 27, 1998, "...the staff has some concerns with the supervision and oversight of investigators at OPS, as well as their technique and expertise. They have seen a general dissatisfaction with OPS. However, to blame only Gayle Shines is a fit unfair. The police department simply does not cooperate with OPS investigations. In addition, OPS does not have good equipment, including computer automation. They also generally have a poor relationship with IAD. However, OPS investigators just are not making cases."

33.  In the deposition of Chief Risley in _Tolson_ stated on page 10 regarding a 1987 audit of OPS, "not operating any more efficiently than they had been in the past."

He reflected that they did not sustain the number of cases he believed they should have and the performance was the same under Director Shines.

34.     The actions of the Police Department in the <u>Guillen</u> and <u>2nd District Burge</u> matters are reflective of this orientation.  In both cases the Superintendent's Office either by the Superintendent himself or his counsel, modified or declassified the investigations or discipline recommended by the disciplinary process.  These were significant and noteworthy cases in the Chicago Police Department.  Reasonable officers in the Department would have been aware of these decisions and their impact on the status quo of the deficient disciplinary system.

35.     These types of administrative deficiencies and disciplinary problems appear to be embodied in the recently produced special report on the Burge incidents.  This secrecy is one of the elements of what I refer to as the Blue Shield.

**Early Warning System**

**36.     The Chicago Police Department has made a conscious choice to not implement a reasonable system to identify and remediate officers who exhibit negative performance, behavior and/or attitudinal problems.**

37.     An Early Warning System or Early Identification and Intervention System is a supervisory tool to identify officers who may need closer supervision and/or forms of training.  This type of system identified criteria to use to identify these officers, the threshold number to alert supervisors, a time frame for this accumulation and what form of supervisory intervention might be warranted.  These are not new within law enforcement.  They are not, however, prevalent.  In 2002 the provision of an EIIS was

22

required by the Commission on Accreditation for Law Enforcement Agencies. Law enforcement, in general, has been deliberately avoiding implementing these types of systems. Some of that reluctance has been fear of being forced to deal with these types of officers, lack of understanding of the process or resistance by employee groups.

38.     An effective EIIS process is designed to identify an officer such as Miedzianowski who was alleged to have been involved in criminal and misconduct activities ever since he was hired (Netols deposition 81).

39.     Superintendent Cline testified that it was his belief that the Chicago Police Department was unable to stop Miedzianowski since "There was not enough evidence to arrest and charge him." (111)   This philosophy totally avoids the value of and importance of administrative investigations that have a foundation of a lower burden of proof that criminal prosecutions and different evidence standards.

40.     The Chicago Police Department has had a form of this type of system for many years under the title "Behavior Alert and Personnel Concerns." Some of this system dates back into the early 1980's. Its use, however, is somewhat unpredictable and its has little common knowledge within the field forces. The written procedure for this system is adequate, however.

41.     In 1995 the Police Department began looking into an improved early intervention system commonly referred to as the "Brainmaker." That was coined after the computer software system which was to be used. It was created within IAD by Lt. Geinowsky. He indicated in his deposition (in *Tolson*) that the system was virtually

23

killed by the pressures of the union. The main issue was the attempt to include CR investigations which resulted in a finding of non-sustained; which is the vast majority well over the 90 percentile range. He also indicated in his deposition that those persons identified by the system were not addressed as Personnel Division did not have sufficient counselors on board. His replacement, Lt. Buslik (in *Tolson*), confirmed that opinion. Buslik further stated that Deputy Superintendent Hoke told him to put it on hold and all data was deleted in 1996. This was after a press conference in which the benefits of such a system were expressed by the Police Superintendent.

42.    In 1998 a replacement program was instituted called "Behavior Intervention." The field staff from their depositions in *Tolson* have virtually no understanding of this program.

43.    During my review of Chicago Police Department CR investigations involving officers in the *Tolson v. City of Chicago, et al.*, Lt. George Jones, Tactical Team Leader in the 7th District, stated in his deposition on this matter that he did not receive information about CR investigations involving his personnel. On page 58 he acknowledged that he had been Officer Osborne's commanding officer for 2 years and was aware of no CR investigations involving him. Lt. Ford of the 7th District on page 67 assumes that someone was keeping track of officers' CR numbers. He was unaware of non-sustained CR investigations. Lt. Joria, 7th District, on page 89 of his deposition indicated that he had no knowledge of CR violations, statistics in complaints or specific types of allegations for personnel in the District or in the Tactical Team. Commander Jose Velez, 14th District, on page 20 noted that he was never told by OPS of the

24

number of complaints on his officers. Andrea Hyfantis, law instructor at the Academy, in her deposition on page 88 had no knowledge of the terms "repeater" or "repeater lists."

44.     This is apparently not an isolated example of the failure of the Chicago Police Department from taking affirmative action to address the needs of officers who accumulate volumes of negative incidents. In the case I recently reviewed in the litigation of Kurylo/Lear v. Rex Hayes, et al., I discovered and recorded the following:

> **Officer Hayes' personnel record and agency notice**
> **of his propensity for misconduct including unreasonable uses of force**
>
> **17.     The Chicago Police Department, in my opinion, was deliberately indifferent in its supervision of Officer Rex Hayes and encouraged and allowed him to abuse his authority and use unreasonable force without threat of sanction or censure.**
>
> 18.     It was only based upon the filing of the civil lawsuits in these cases apparently that the Chicago Police Department suddenly realized that Officer Hayes' complaint and disciplinary record should result in direct supervisory intervention. The memorandum of Officer Hayes' commanding officer, Noreen Walker, of the 4[th] District dated January 22, 1999, stated:
>
>> The undersigned recommends that the below listed officer be placed in the Departments Personnel Concerns Program. On 20 January 1999 the R/Cmdr. was made aware of serious allegations of physical abuse of citizens by P.O. Rex A. HAYES #17561. These incidents were brought to my attention via a civil suit filed in the Federal Court. After learning of the suit a review of Officer HAYES' discipline record was conducted. That review revealed two (2) outstanding allegations of physical abuse on 3 April 1998 and 5 September 1998 in addition to a seven day suspension which was given in June of 1998 for a sustained CR#230394 for physical abuse which occurred in September of 1996. Officer HAYES is also the accused in a recent allegation of physical abuse which occurred on 17 January 1999.

25

Additional review reveals an extensive list of allegations of physical abuse against HAYES, throughout his employment with the Chicago Police Department. The recommendation for placement in the Personnel Concerns Program is based on the aforementioned information.

19.    The memorandum from Richard Stevens, Commander of Personnel Division, in response to Commander Walker's request, noted in January 29, 1999:

P.O. Hayes, on 29 January 1999 at 0500 hrs, was placed into the Personnel Concerns Program due to a sustained C.R. investigation (C.R. #230394) which determined that the officer had used excessive force by striking a citizen in the head with a flashlight. The officer subsequently served a seven (7) day suspension, 5-11 June 98.[1]

20.    It is interesting that this sustained complaint was known to the Department six months before Commander Walker's request and nothing had been done up to that date, yet did not cause concern or intervention. This is indicative of a systemic failure in the supervisory monitoring systems of the Chicago Police Department, in my opinion. The Behavior Alert and Personnel Concerns Programs have been in effect for many years in the Department. If someone with the complaint and disciplinary record of Officer Hayes can be overlooked, it is simply not being used effectively or in any manner consistent with this type of monitoring system.

21.    In fact, Officer Hayes' record is probably one of the worst complaint and disciplinary record I have reviewed in my professional experience.  The following chart reflects the dichotomy of the supervisory oversight of Officer Hayes. At the same time that he was receiving repeated complaints and civil lawsuits, he was being given high personnel evaluations by his immediate supervisors.

| Year | June eval. | Dec. eval. | CR or civil claim |
|---|---|---|---|
| 89 | 95.6 | 95 | 7 |

---

[1] The was a complaint filed by a Mr. Dixon in September 1996. It involved Officer Hayes' response to a domestic call with his partner, Dzurovcik. It involved uses of force and an arrest for drinking beer in his front yard. While the sergeant taking the complaint observed injuries, no Evidence Technician was available to take photographs. Both officers denied that Dixon was struck on the head with a flashlight despite the testimony of a disinterested witness. If the Department accepted the complainant and witness version of the events, then the officers gave OPS false statements. They were not charged with this.

26

| 90 | 95.6 | 95.8 | 3 |
| 91 | 96.2 | 96.6 | 3 |
| 92 | 96.2 | 95.2 | 5 |
| 93 | | 95 | 5 |
| 94 | 95 | 95 | 2 |
| 95 | 95 | 93 | 1 |
| 96 | 91 | 91 | 7 |
| 97 | 91 | 90 | 3 |
| 98 | 90 | | 3 |

22.     The concepts of the Personnel Concerns Program is similar to other types of police early intervention programs.  These are supervisory programs designed to correct behavior, attitude and/or performance problems in a police officer.  The written documents involved in Officer Hayes' placement in this program appear to represent such a program.  There are some significant problems with the process involved with Hayes, however:

- The direction of the Department was that Officer Hayes would be removed from field duty and put on the desk during his one year participation in this program.  This still places him in a position to interact with and abuse citizens.  Officer Hayes, in his deposition, however stated that this desk assignment was his choice, not a forced assignment.  Part of the process of these types of programs is an acceptance of the problem by the officer involved.

- Officer Hayes went to some sort of "Stress Reduction" program.  Again he stated that it was his choice.  There is no indication what this two day program consisted of which is an essential element of any remediation training program.  Did the operators of the remediation training program have any information regarding the problems of Officer Hayes?

- While the final Performance Plan identified that specific training be given to Hayes by his unit supervisors, there is no documentation that and such

27

> training was provided. There was no indication what the training should be oriented to or what performance, behavior or attitude problem would be addressed.
>
> • Officer Hayes was ordered to a medical examination for fitness for duty. Nothing in the complaint or disciplinary history indicated that Hayes had any physical problem which might have caused this history. There was no indication that anyone suggested that he undergo any sort of psychological evaluation or fitness for duty. This could have been very beneficial had the professional resource person been adequately informed of the specific problems being encountered with Officer Hayes.
>
> • The Performance Plan indicated that Hayes should voluntarily participate in Professional Counseling/Employee Assistance Program. Officer Hayes testified that the did not participate in any such program. Even had he participated in such a program, it would have been of little consequence to the Department. Voluntary participation normally creates a confidentiality of the process and the Department does not have the benefit of any evaluation conducted. Again, for any such program to be effective it would need to have the supportive documentation provided to the professional counseling source.

45. It is my understanding that additional materials may be in process of being produced or may be requested later. I would request that this report be considered a preliminary report. Should any subsequent information be produced and materially affect or alter any of these opinions, I will either submit a supplemental response or be prepared to discuss them during any scheduled deposition.

46. At this point in the development of this case I do not know whether I will be using any demonstrative aids during my testimony. Should I decide to use any such tool, I will assure that they are made available for review, if requested, prior to their use.

47. My fees for this professional service is a flat Case Development Fee of $7500 and a fee of $2000 for a deposition in Rhode Island or $2500 per day plus

28

expenses for services away from Rhode Island including depositions and trial appearances.

This report is signed under penalty of perjury on this 23rd day of July, 2006, in Greenville, RI.

Lou Reiter

29