# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| DIANE L. KLIPFEL and MICHAEL V. CASALI, | ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | 94 C 6415 |
| THE CITY OF CHICAGO and JOSEPH MIEDZIANOWSKI, | ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM AND ORDER

This cause is before the court on defendants' motion in limine [359-1] to exclude plaintiffs' use of an expert on loss of enjoyment of life. Plaintiffs have disclosed economist Stanley Smith, who would be called to provide expert testimony regarding hedonic, or loss of enjoyment of life, damages. Dr. Smith's testimony is based on a "willingness to pay" theory which "focuses on how much Americans are willing to pay for reductions in health and safety risks, and how much they are compensated for assuming extra risk." *Mercado v. Ahmed*, 974 F.2d 863 (7th Cir. 1992). Defendants direct the court's attention to cases from this district as well as the Seventh Circuit rejecting Smith's testimony. *See id.*; *Ayers v. Robinson*, 887 F. Supp. 1049 (N.D. Ill. 1995). Relying on *Ayers* and *Mercado*, defendants specifically object to Smith's testimony on the following bases: Smith's testimony regarding hedonic damages does not constitute scientific knowledge because it lacks reliability and validity and Smith's testimony will not assist the jury.

According to the plaintiffs, defendants' reliance on *Ayers* and *Mercado* is misplaced because those decisions are based on a misunderstanding of economics and economic evidence

and a misapplication of *Daubert*. Plaintiffs argue that Smith's testimony is reliable and assert that calculations of loss of enjoyment of life are now widely accepted and in support thereof attach affidavits of thirteen forensic economists. Plaintiffs further argue that Smith's testimony will assist the jury in determining the appropriate amount of damages to award the plaintiffs for their lost relationships and enjoyment of life.

Under Federal Rule of Evidence 702, expert testimony may be proffered if it will "assist the trier of fact to understand the evidence or determine a fact in issue." FED. R. EVID. 702. Specifically, the court must assess "whether the reasoning or methodology underlying the testimony is scientifically valid," and whether "that reasoning or methodology properly can be applied to the facts in issue." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592-93 (1993). In assessing the admissibility of expert scientific testimony, a court should consider the following factors: (1) can the theory be tested; (2) has it been subject to peer review; (3) what is the known or potential rate of error; and (4) what is the acceptance of the theory in the scientific community. *Id.* at 592-94.

The Seventh Circuit appears to have come out on both sides of the issue regarding the admissibility of Dr. Smith's testimony. The first time it addressed the issue, the Seventh Circuit affirmed the admission of Dr. Smith's testimony regarding the hedonic value of human life. *Sherrod v. Berry*, 827 F.2d 195 (7th Cir. 1987), *vacated*, 835 F.2d 1222 (7th Cir. 1988), *rev'd en banc on other grounds*, 856 F.2d 802 (7th Cir. 1988); *see also Ayers*, 887 F. Supp. at 1059, n.2 (stating that despite the concept that "a vacated opinion becomes no opinion at all," language in the en banc *Sherrod* opinion suggests its holding permitting Smith's hedonic damages testimony remained good law).

However, four years following *Sherrod*, in an opinion criticizing Smith's methodology, the Seventh Circuit held that it was not an abuse of discretion for the trial court to have excluded Smith's hedonic damages testimony. *Mercado,* 974 F.2d at 871. The district court in the *Mercado* case excluded the testimony on two grounds: "(1) no consensus among experts supported Smith's method of valuing life and (2) Smith's research was no more than a compilation of the opinions, expressed through spending decisions, of a large number of Americans as to the value of life." *Id*. at 870-71. The Seventh Circuit stated that the first premise was irrefutable. As to the second, it noted:

> However, even accepting Smith's premise that his method of determining the value of life is different in an important way from submitting the question to a jury because it focuses on observable behavior and not opinion, we have serious doubts about his assertion that the studies he relies upon actually measure how much Americans value life. For example, spending on items like air bags and smoke detectors is probably influenced as much by advertising and marketing decisions made by profit-seeking manufacturers and by government-mandated safety requirements as it is by any consideration by consumers of how much life is worth. Also, many people may be interested in a whole range of safety devices and believe they are worthwhile, but are unable to afford them. More fundamentally, spending on safety items reflects a consumer's willingness to pay to reduce risk, perhaps more a measure of how cautious a person is than how much he or she values life. Few of us, when confronted with the threat, "Your money or your life!" would, like Jack Benny, pause and respond, "I'm thinking, I'm thinking." Most of us would empty our wallets. Why that decision reflects less the value we place on life than whether we buy an airbag is not immediately obvious.
>
> The two other kinds of studies Smith relies upon are open to valid and logical criticism as well. To say that the salary paid to those who hold risky jobs tells us something significant about how much we value life ignores the fact that humans are moved by more than monetary incentives. For example, someone who believes police officers working in an extremely dangerous city are grossly undercompensated for the risks they assume might nevertheless take up the badge out of a sense of civic duty to their hometown. Finally, government calculations about how much to spend (or force others to spend) on health and safety

> regulations are motivated by a host of considerations other than the value of life: is it an election year? how large is the budget deficit? on which constituents will the burden of the regulations fall? what influence and pressure have lobbyists brought to bear? what is the view of interested constituents? And so on.

*Id*. at 871.

The Seventh Circuit's discussion of the technical shortcomings of Smith's methodology then questioned whether Smith offered any expertise to the jury. *Id*. at 870. As the *Mercado* court stated:

> Smith has taken up a daunting task: to develop a methodology capable of producing specialized knowledge to assist jurors in determining the monetary value of being alive. The district court ruled that, despite Smith's training, extensive research and countless calculations, his testimony would not aid the jury in evaluating the evidence and arriving at its verdict (the true test of expert testimony under Fed.R.Evid. 702) because Smith was no more expert in valuing life than the average person. This conclusion may be less a reflection of the flaws in Smith's methodology than on the impossibility of any person achieving unique knowledge of the value of life.

*Id.*

Thus, the Seventh Circuit affirmed the decision to exclude the testimony in part because Smith's research was no more than a compilation of opinions of non-experts and, accordingly, "Smith was no more expert in valuing life than the average person." *Mercado*, 974 F.2d at 871; *see also Ayers*, 887 F. Supp. at 868-71 (excluding Smith's testimony based on the "value of life" application); *Crespo v. City of Chicago*, No. 96 C 2787, 1997 WL 537343 (N.D. Ill. Aug. 22, 1997)(excluding the hedonic damages theory on the ground, among others, that it was "unconvinced" that the theory would be helpful to the jury).

The plaintiffs cite to their Exhibit A which they contend is a list of cases "in which [Dr. Smith] has recently testified." However, this court reviewed the docket sheets for several of the

recent Northern District of Illinois cases cited in Exhibit A and it is not clear that Dr. Smith provided any testimony in those cases. Moreover, while the plaintiffs cite to a number of cases (outside of this district) in which they assert that Dr. Smith's hedonic damages testimony has been admitted, they fail to provide copies of any of the relevant orders or specific citation information from those cases. Accordingly, the court has been unable to consider the bases of those orders.

Nevertheless, the court has concerns not only about the methodology employed by Dr. Smith but also as to its assistance to the jury. As to his methodology, from what the court can tell (neither side discusses or offers any deposition testimony of Dr. Smith), Dr. Smith contends, for example, that Mr. Casali's loss of enjoyment of life is in the range of $2,003,530 on the low end and $3,719,905 on the high end. According to Dr. Smith's report, the lower end of the range is based on his estimate of Mr. Casali's impairment as a 90% "reduction in the ability to lead a normal life through 1998, 85 percent in 1999, 80 percent in 2000, 75 percent in 2001, 70 percent in 2002, 60 percent in 2003, 50 percent in 2004, 40 percent in 2005, and 33 percent from 2006 and thereafter. . . ." The percentages are based on: (1) Mr. Casali's self-assessment that since February 20, 1992, he has had almost no enjoyment of life and continues to have almost no enjoyment of life, and (2) Dr. Frank Leavitt's report dated July 16, 2006, which estimates Mr. Casali's DSM IV, Axis V Global Assessment of Functioning at 67.[1] Dr. Smith's upper range is based on a 90% reduction in the value of life over all years. Dr. Smith then attaches tables in

---

[1] The DSM IV is shorthand for the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition. This manual is published by the American Psychiatric Association and helps mental health professionals categorize psychiatric diagnoses.

which he calculates the estimated reduction in the value of life for each year from 1992 through 2031 when Mr. Casali turns 80. Dr. Smith engages in similar calculations and estimates as to Ms. Klipfel, though he estimates her life expectancy to be 82.7 years.

Without even going into whether Dr. Smith's willingness-to-pay theory has been peer-reviewed and is generally accepted, the court has concerns with the methodology Dr. Smith has employed for his estimates. For example, it does not appear that Dr. Smith's value of a life, which the court reads as being $3.8 million and which Dr. Smith multiplies by the estimated reduction in the value of a life percentage to come up with the annual reduction in the value of life, is based on any reliable methodology. *See, e.g., Ayers,* 887 F. Supp. at 1060-61 ("But to locate its $3.5 million benchmark [for the value of a life] within the broad range of values contained in the willingness-to-pay literature, *Hedonic Damages* employs a simple eyeballing technique. Eyeballing may have the advantage of ease, but it surely lacks scientific reliability in the sense of producing consistent results.")(citation omitted). Indeed, the fact that Mr. Smith has apparently assigned a value of life of $3.8 million to both Mr. Casali and Ms. Klipfel despite their differences is troubling and indicates, if nothing else, a lack of reliable methodology in arriving at these values.

Moreover, it is entirely unclear on what reliable methodology Dr. Smith has based his estimate that Mr. Casali's estimated reduction in the value of life is 90% (or less). He appears to have simply pulled it out of a hat based only on his interpretation of Mr. Casali's (and Ms. Klipfel's) self-assessments and the plaintiff's position on the DSM-IV multiaxial system, as assessed by (presumably) his psychologist.

Even setting aside its concerns with Dr. Smith's methodology, the court is ultimately concerned with the same thing that other courts in this district have grappled with – that is whether Dr. Smith's testimony will assist the jury in determining the issue for which it is being offered. Or, in other words, as noted by the Seventh Circuit, does Dr. Smith have any better idea as to what a life is worth than anyone else?

This case is currently at the end of its third week and it is anticipated that it will continue through most of next (the fourth) week. The jury has heard detailed testimony from the plaintiffs regarding the deleterious effect that the alleged retaliatory conduct had on them, their family, and their personal life. Moreover, the jury has heard and will hear additional testimony as to the medical and psychological repercussions on the plaintiffs' mental and physical health over the past fifteen years. The jury is in as good a position as anyone to determine the existence and extent of any reduction in the value of the plaintiffs' lives as a result of the defendants' alleged actions (or inaction, as the case may be). This is so particularly true in light of the fact that Dr. Smith's estimates for the plaintiffs' reduction in the value of life seem to be based wholly on his own unspecified determination.

There is no indication that Smith's methodology has fundamentally changed in the years since *Mercado*. Even if it had, however, after careful consideration of the substance of Dr. Smith's testimony, and based on the court's intimate knowledge of this 13-year-old case, including viewing all of the evidence that has thus far been presented to the jury, the court finds that Dr. Smith's testimony would not be helpful to the jury. Because Smith's testimony on hedonic damages would not assist the jury in reaching its decision, his testimony must be excluded. The defendants' motion in limine to exclude [359-1] is granted.


DATE:  February 9, 2007

                                                     *[signature]*
**Blanche M. Manning**
**United States District Judge**