Klipfel - cross by Ellis

```
 1   council, right?
 2   A.   Yes.
 3   Q.   And there is a committee for police and fire, right?
 4   A.   I don't know.
 5   Q.   You never went to the committee for police and fire to make
 6   a complaint about the Chicago Police Department, right?
 7   A.   I wasn't aware that there was one.
 8   Q.   You never went anywhere in the city council to make a
 9   complaint about either Joe Miedzianowski or the Chicago Police
10   Department, right?
11   A.   No.
12   Q.   That's right?  You never went, correct?
13   A.   Right.
14   Q.   Now, you testified a little bit about the damages that you
15   suffered as the result of the retaliation you testified that
16   you've received resulting from the complaints you made about
17   the police officers, right?
18   A.   Right.
19   Q.   And one of the things that you testified about was that
20   you've developed psoriasis?
21   A.   Yes.
22   Q.   Okay.  Now, you first developed psoriasis about four years
23   ago, right?
24   A.   Right.
25   Q.   And that would be 2003?
```



EXHIBIT A

2707T1

13 Q. Had you seen him since you left grade school?
14 A. Not that I recall.
15 Q. Now, when you were the lieutenant in gangs, did you have
16 any dealings at all with ATF?
17 A. Yes.
18 Q. And can you describe what the relationship was between the
19 Chicago Police Department and ATF at that time?
20    MS. SALTZBERG: Your Honor, I'm going to object.
21 This is beyond the scope.
22    THE COURT: Pat, read the question back.
23    (Record read.)
24    THE COURT: I'll consider that a preliminary
25 question. Overruled. You may answer it, sir.

1858

Cline - cross by Ellis

1 BY THE WITNESS:
2 A. We had a good working relationship. We worked a lot of
3 joint cases together.
4 BY MS. ELLIS:
5 Q. Now, there came a time when Mr. Miedzianowski was working
6 for you that he came to complain to you about being the victim
7 of false allegations, right?
8 A. Yes.
9 Q. What happened? First of all, do you remember when it was
10 that he came to you?
11 A. It would have been in the first several months there
12 because he was still working for me for the first several
13 months. He came up to me and said he felt that someone was
14 making some false allegations against him, and I told him that
15 there was a procedure where he could have IAD investigate that.

Page 42

2707T1

16 Q. And do you know whether he followed up on your advice?
17 A. I believe he did.
18 Q. Now, there came a time when you believe or when you had
19 suspicions that Mr. Miedzianowski had committed acts of
20 misconduct, correct?
21 A. Yes.
22 Q. The first one was in 1996?
23 A. I know it was in the mid '90s. I don't remember the exact
24 date. It was the incident that counsel talked to me about
25 where the GPR ended up in the hands of the defense attorney.

1859

Cline - cross by Ellis

1 Q. Okay. How did you come to learn about the GPR being in the
2 hands of a defense attorney?
3 A. Some of my detectives brought it to my attention.
4 Q. And those detectives, did they have a -- did they relate to
5 you a suspicion of who they believed turned the GPR over?
6 A. No.
7 Q. Once you got -- once you received knowledge of that GPR
8 being turned over, what did you do?
9 A. I got a CR number, which is a complaint register number,
10 and then Sergeant Patton was assigned to investigate it.
11 Q. And what steps were taken to investigate it?
12 A. Sergeant Patton attempted to interview the defense
13 attorney, and she refused to talk to him. We then brought it
14 to the attention of the state's attorney's office and asked
15 them for subpoenas for the defense attorney's cell phone and
16 office phone.
17 Q. And do you know if those subpoenas were granted?

Page 43

22007

1 rule applies in all those cases as we described in our
2 instruction.
3      THE COURT:  Have you had sufficient time to read
4 this?
5      MS. ELLIS:  Judge, well, we just got handed it to us.
6      THE COURT:  I just got it handed to me, too, and I'm
7 finished reading.
8      MS. ELLIS:  Well, I'll leave it to Mr. Baker.  He was
9 reading that one.
10      MR. BAKER:  Judge, I don't think we have a contention
11 that 1983 actions can't be brought on First Amendment rights
12 against general public employers when it's under the color of
13 law.  I think our contention here is that there is a standard
14 of objective behavior that's applied specifically in employment
15 suits, and I don't know that that standard is directly
16 addressed in at least the Seventh Circuit case, Power.
17      Beyond that point, Judge, I think our arguments
18 against the supplementation to the jury instructions at this
19 time stand as they stood before.
20      THE COURT:  All right.  Any other objections?
21      MR. ZANSITIS:  We'd just stand on our previous
22 objections.
23      THE COURT:  All right.  I will allow the instruction.
24 Are we ready to proceed?
25      MR. KRELOFF:  We need to insert that one page into

2951

Jury Instructions

1 the ten jurors' packs and Your Honor's pack, and then we're
2 ready.
3      THE COURT:  Okay.  How long will that take?

22007

3  one preliminary issue to bring to Your Honor, and this concerns
4  an additional instruction that we believe is called for in this
5  case.
6          THE COURT:  All right.
7          MS. SALTZBERG:  If I could, we'd like to tender the
8  proposed instruction and the case law for it.
9          (Discussion off the record.)
10         THE COURT:  All right.  I've read it.
11         MR. KRELOFF:  Your Honor, our position on this is
12 this.  As Your Honor well recalls, just prior to trial there
13 was a motion for judgment on the pleadings alleging that our
14 clients had not spoken out.  We made our response, and Your
15 Honor denied that motion.
16         The case went through, and there was certainly
17 evidence of them speaking out.  There's a new issue that was
18 raised at the final moments during closing argument that
19 alleged, and we believe improperly alleged because it's not
20 based on the law, that the two plaintiffs were not chilled in
21 their First Amendment rights because they spoke out to so many
22 people.
23         We don't believe that's a proper statement of federal
24 law, Illinois law, Seventh Circuit law, and we believe it has a
25 great risk for confusion to the jury because certainly they did

2939

1  speak out.  Certainly these plaintiffs did talk to many, many
2  different groups and agencies.
3          The law as we think is presented in this instruction
4  is that it's not a test of whether they were actually shut

Page 3

22007

5 down. Your Honor, this issue was raised in a motion for
6 verdict by the city and by Mr. Miedzianowski and responded to
7 in a response that I guess is still pending before Your Honor,
8 and there were no citations by the city. We did bring these --
9 all of the cases we've cited were in that memorandum.
10      Our point is that the test in the law is not were
11 they silenced, but were they punished for their speaking out.
12 We believe that this instruction will hopefully ameliorate an
13 improper argument that was made.
14      MS. ELLIS: Judge, this is too little, too late, way
15 too little, too late. To present an additional jury
16 instruction --
17      THE COURT: This is after the closing arguments,
18 right?
19      MS. ELLIS: -- within minutes of the jurors coming
20 out, Judge, they knew about what our defense would be. They
21 knew from when we were asking questions of Ms. Klipfel on
22 cross. We went through with her who she spoke to, how many
23 times she spoke to people, and we did it with Mr. Casali.
24      THE COURT: Let me interrupt you. How do you respond
25 to what they're saying the law is?

2940

1      MS. ELLIS: Judge, the law, first of all, having just
2 gotten the case two minutes ago --
3      MR. KRELOFF: Though they were cited to them in our
4 memorandum.
5      MS. ELLIS: -- it appears, you know, what they put in
6 here is what it is. Judge, it's a question of waiver. You
7 know, we were supposed to present our jury instructions at the

Page 4

22007

8   pretrial conference way back in January. We had a jury
9   instructions conference with you that lasted all day. This was
10  never brought up.
11          To bring it up now doesn't make any -- first of all,
12  it's not fair, and they've waived it. They've known about
13  certainly our defense. As the trial progressed and we were
14  asking questions of Ms. Klipfel and Mr. Casali, they knew that
15  we would be discussing this. They also knew about it when we
16  filed our motion for directed verdict, which they never
17  presented the -- and we gave them copies of that before the
18  jury instructions conference, and they never presented this
19  instruction at that point. They are only presenting it now?
20          In terms of the arguments that were made at closing,
21  we can say that objectively, you know, even though it's an
22  objective standard, look at what they did. What they did in
23  terms of speaking out would show objectively that their rights
24  were not chilled. So I don't believe that this instruction,
25  one, is necessary and, two, it's certainly not timely, and,

2941

1   three, they've waived it.
2           MR. ZANSITIS: I don't think it's the law either,
3   Your Honor. It's nice to take little sound bites from cases at
4   this point, but I think the jury instructions are clear enough
5   the way we've worked them out. They come in after closing and
6   say: Oh, wait. Let's add one more.
7           I think it's prejudicial to our parties, both the
8   city and us, to try and do it at this late time. I don't -- I
9   think you can always find cases where you can take sound bites

Page 5

22007

10  and say that this would apply. That's why it has to be done
11  before all this. That's how come it works out when it's done
12  this way. Otherwise, a case would never end because we could
13  go back to our office and find two or three others where we
14  want to take sound bites from case law.
15        MS. SALTZBERG: Your Honor, if I may respond just
16  briefly, then I'll give it back to Ms. Kreloff. You know, with
17  all due respect to Ms. Ellis, she said we knew their defense.
18  First of all, until we heard their closing argument, they are
19  not entitled to misstate the law. That does not make a
20  defense.
21        What they told the jury was that Ms. Klipfel spoke
22  out and so they didn't find any liability. That is a
23  misstatement of the law in the Seventh Circuit. It is a
24  misstatement of the federal law. It is a misstatement of
25  Illinois law. The reason for this jury instruction was not

2942

1  apparent to anybody, at least to us, until after both
2  defendants stood up there and made the statement.
3        Now, in regard to their directed finding motion, they
4  made that argument without case citation. We frankly thought
5  who would then make it in a closing. There's no basis for it.
6  Suddenly they stand up in closing and act as if this is the law
7  of the state of Illinois, and it's not. This is the law
8  (indicating). We looked for adverse. They're wrong. There's
9  nothing. This is the law. So it is nothing other than
10  clarifying what they did, which was a misstatement of the law
11  during their closing argument. It was objectionable, and it
12  should not be allowed to cause the confusion to the jurors it

22007

13  might cause.
14          MS. ELLIS: Judge, they didn't object during my
15  closing.
16          MS. SALTZBERG: I did object to other things in her
17  closing.
18          MS. ELLIS: They did not object when I made this
19  argument during my closing, and the argument that I made during
20  closing was that it's not objectively reasonable. You need to
21  look at what they did, and what they did was they spoke out.
22  My argument in closing does not contradict this jury
23  instruction.
24          Moreover, they say that they cited all these cases in
25  their motion for directed verdict. Well, they brought their

2943

1  motion for directed verdict when we were doing the jury
2  instructions conference, and so they were aware of it then.
3  They never presented this instruction at that point in time.
4  It's waived.
5          MR. KRELOFF: May I briefly respond, Judge? The
6  opening statement which is what gave us the guide to the case
7  is that our clients, the plaintiffs, were silent. They didn't
8  speak out. That had been their position up until the closing
9  arguments -- well, up until they filed their motion for
10 verdict, and they cite that in a page and a half of wonderful
11 prose but without a single case citation, without any
12 authority, because there is no authority for their position.
13 Then they expose the jury to it at the last moment.
14          If anyone is late on this, it is. We are the victims

21307t2

19  MS. ELLIS: No, Judge. But what I'm saying is that
20  they knew what Agent Hemsath was going to testify to.
21  THE COURT: Did you -- did you depose Agent Hemsath?
22  MS. ELLIS: No, he was not deposed, Judge.
23  THE COURT: You could have, though?
24  MS. ELLIS: Presumably, yes, we could have deposed
25  him.

2606

1  THE COURT: And you were at the deposition of --
2  MS. ELLIS: Well, actually, I was not at the
3  deposition.
4  THE COURT: Well, I mean the City was.
5  MS. ELLIS: The City was at the deposition of
6  Mr. Karczewski, yes. But the thing is, Judge, that, you know,
7  we certainly didn't know that the handwriting exemplars would
8  be an issue.
9  MS. SALTZBERG: But you -- I'm sorry. You would have
10 if you'd taken anybody's deposition; and you were there and
11 could have asked Mr. Karczewski questions, and you didn't. I
12 mean, we had no way of knowing what it is Mr. Karczewski had
13 that was of importance to you. It's as if they're creating a
14 defense on the fourth week of trial to a case that's 12 years
15 old.
16 THE COURT: Yeah, I think that's patently unfair. In
17 light of the age of this case, the opportunities that the City
18 had to take depositions, and now to come up at the last minute
19 with a witness that you contend is a rebuttal witness, but in
20 essence, is your case in chief, and you've not divulged the

Page 33

21307t2

21 substance of what the testimony would be until we got started
22 with the trial, I think it's -- I think it would be extremely
23 prejudicial, and I'm going to adhere to my ruling. All right?
24          MR. BAKER: Thank you, Judge.
25          MS. SALTZBERG: Thank you.

2607

1          We can start -- Judge, does she need to be resworn?
2          MS. ELLIS: Judge, before we bring the jury back
3 out --
4          MS. SALTZBERG: Judge, will you want Ms. Klipfel
5 resworn?
6          THE COURT: No, she's still under oath. But let me
7 just bring something to your attention. I understand in
8 certain parts of the county, the weather's quite bad.
9          MS. SALTZBERG: Oh, I hadn't heard a thing.
10         THE COURT: It's not as bad downtown, but in other
11 areas, it is. And what I'm thinking is just in the event that
12 the weather gets terribly inclement tomorrow and we have to for
13 whatever reason postpone it or come in later or something,
14 Robbie needs your respective cell phone numbers so she can
15 notify you.
16         MS. ELLIS: And, Judge, what I was just asking
17 Mr. Baker about was we only have the one witness, who's our
18 economist, who would come tomorrow. So, we were thinking as
19 opposed to bringing the jury down for just a couple of hours to
20 do his testimony, that maybe we could just move him to Thursday
21 morning, do him, and go right in to closings.
22         MS. SALTZBERG: That would be fine. If we can -- we
23 can squeeze the instructions conference in between then and

Page 34

ISAAC FOUNDATION FOR 82

1306

9 BY MR. BAKER:

10 Q. Good afternoon, lieutenant.

11 A. Good afternoon.

12 Q. Lieutenant, when you were on the stand -- I believe you

13 still have the binder in front of you. Actually, you've

14 reviewed that binder in the last couple of days, haven't you?

15 A. Yes, sir.

16 Q. And what is that binder?

17 A. The binder is a -- what I believe to be my investigation

18 regarding the allegations.

19 Q. Is there anything about that binder that's inconsistent

20 with the way you compiled the investigation when you concluded

21 it?

22 A. I believe the order of some of the documents is out of

23 order.

24 Q. How so?

25 A. Well, initially, when I would submit it, it would have my

1307

Isaac - cross

1 findings and my work -- my summary digest would all be in the
2 front.
3 Q.   Outside of that, is that a complete version of your -- or
4 excuse me. Is that the final report that you submitted in
5 response to CR 197823?
6 A.   The exact one? It's a copy of stuff that I submitted.
7 I'm -- I'm not sure if it's everything I submitted, but I
8 believe it is. Partially or wholly, I'm not quite sure.
9 Q.   It is a copy -- of the reviewed binder that you saw the
10 other day, is it a copy of the report that you submitted?
11 A.   This is the one that I looked at?
12 Q.   Yes, ma'am.
13 A.   Then it is.
14 Q.   And you did an investigation as a part of that. You
15 investigated the allegations concerning the safety deposit box,
16 didn't you, ma'am?
17 A.   Yes, I did.
18 Q.   And what did you find in your investigation?
19 A.   I found that -- that the paper -- that the affidavit for

20 the warrant had been completed. It had gotten properly signed

21 by the State's Attorney's office. It had been executed at the

22 bank. The box was opened in the presence of a bank employee

23 who stayed there while the money and the items were inventoried

24 and counted, and that he was tendered a photograph of the

25 contents of that box, as well as a photograph was kept for the

1308

Isaac - cross

1 officers.