**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **DIANE L. KLIPFEL and MICHAEL V. CASALI,** | ) | |
|     **Plaintiffs,** | ) | |
| | ) | |
|     **v.** | ) | **94 C 6415** |
| | ) | |
| **THE CITY OF CHICAGO and JOSEPH MIEDZIANOWSKI,** | ) | |
|     **Defendants.** | ) | |

## ORDER

From January 22 to February 23, 2007, this court conducted a jury trial of Diane Klipfel's and Michael Casali's § 1983 claims and Klipfel's defamation claim against defendants City of Chicago and Joseph Miedzianowski. Miedzianowski and the City now move for remittitur of the $8.75 million dollars in damages ($7.75 million for constitutional violations and $1.0 million for defamation) awarded to Klipfel and the $1.0 million awarded to Casali on his § 1983 claim against Miedzianowski.[1] For the reasons stated below, the motions [449-1 and 454-1] are granted in part.

**I.      Analysis**

When considering whether a compensatory damage award should be subject to remittitur, the court engages in a three-prong inquiry: "whether the award is 'monstrously excessive'; whether there is no rational connection between the award and the evidence, indicating that it is merely a product of the jury's fevered imaginings or personal vendettas[;] and whether the award is roughly comparable to awards made in similar cases." *Farfaras v. Citizens Bank and Trust of*

---

[1]The defendants brought separate motions; however, because they both seek remittitur, the court will address the motions together.

*Chicago*, 433 F.3d 558 (7th Cir. 2006)(citations omitted).   Further, "[a] court gives substantial deference to a jury's calculation of damages, but must also 'ensure that the award is supported by competent evidence.'" *U.S. ex rel. Tyson v. Amerigroup Illinois, Inc.*, --- F.Supp.2d ----, 2007 WL 781729, at *16 (Mar. 13, 2007)(citation omitted).

A.      Diane Klipfel

          1.      *Is the award of $7.75 million on Diane Klipfel's § 1983 claim monstrously excessive and rationally related to the evidence?[2]*

The Seventh Circuit has stated that "the 'monstrously excessive' inquiry is a vague one that may simply be another way of asking whether there is a rational connection between the award and the evidence." *Harvey v. Office of Banks & Real Estate*, 377 F.3d 698, 713-14 (7th Cir. 2004).  Both Miedzianowski and the City contend that the $7.75 million award to Diane Klipfel in connection with her § 1983 claim is too high and should be remitted.  Prior to proceeding with an analysis of the defendants' arguments in this regard, it is important to ascertain, if possible, how the jury allocated its award between lost wages and economic loss.

The jury was instructed that it could consider as compensatory damages: reasonable value of past, present and future medical care and supplies; past wages, salary, profits, and earning capacity as well as the present value of the future loss of these; physical, mental emotional pain and suffering and disability suffered in the past and are reasonably expected to experience in the future; and loss of a normal life.

a.      Economic damages

---

[2]While noting the $1 million defamation award to Klipfel, the City does not expressly address it other than to say that the plaintiffs requested this amount "without connecting any particular injury to that claim."  Motion at 2.  Due to the lack of any support with respect to this argument, the court finds it forfeited.

The City claims that half of Klipfel's $7.75 million § 1983 award, or $3.875 million, is attributable to economic loss while half is attributable to emotional pain and suffering. In support, the City refers to plaintiffs' counsel's suggestion during closing argument that the jury take the economic losses suffered by Diane Klipfel and double the amount to account for her emotional damages. Klipfel, on the other hand, contends that their economic expert, Dr. Smith, testified that she had a total loss of wages and benefits of $5,328,000. Thus, she argues that the award should be allocated as follows: $5.32 million in lost benefits and salary, and $2.43 million in emotional pain and suffering.

The parties have not cited any law for how to allocate a jury award of damages when it is not apparent from the verdict form. However, whether or not we know how the jury allocated its damages, the court finds that there is a rational basis for at least $5.32 of Klipfel's $7.75 million constitutional injury award based on the testimony of her damages expert, Stan Smith. Indeed, even the City's economic expert, Dr. Donley, testified that earnings history is a "fair barometer" of how earnings would increase in the future and agreed that Klipfel's wages and salary loss would be approximately $4 million if calculated out to age 67, as the plaintiffs' expert did, and about $3.1 million if calculated out to only age 60. Tr. 2665. Moreover, it is important to note that Dr. Donley testified that he did not include pension or benefits in his analysis, which would increase the amount of the loss. Tr. 2650-51.[3]

Contrary to the City's statement, which is entirely unsupported by authority, that "one could and should assume that the jury used the plaintiffs' formula," the court finds the more

---

[3]Because the parties did not provide the court with copies of the expert reports, it is impossible for the court to compare the testimony with the actual calculations in the reports.

reasonable assumption to first credit the concrete number associated with lost wages, salary, and benefits with the balance to be made up of the more imprecise emotional distress and pain and suffering calculation. *Spina v. Forest Preserve District of Cook*, 207 F. Supp. 2d 764, 771 (N.D. Ill. 2002)("[P]ain and suffering, loss of reputation, and emotional distress are not goods traded on the open market, which result in an ascertainable market value. Valuing such compensatory damages requires juries and courts to place a dollar amount on experiences that are necessarily difficult to quantify monetarily.").

In an attempt to undermine the jury verdict for Klipfel's economic losses, the City argues that Klipfel presented no credible evidence that she would have been promoted to a higher supervisory level, like a Special Agent in Charge or an Assistant Special Agent in Charge. But Smith testified that, based on his interview with Klipfel, he had built into his wage projections "routine and expected" promotions with pay increases which were consistent with the increases she had received in her first twenty years with ATF. Tr. 2534. He also testified that had he ignored her wage promotions and extrapolated the numbers based solely on how much she had earned for the first twenty years, her anticipated wages would not substantially different. The jury had a right to credit this testimony in the absence of compelling evidence to the contrary, to which the City does not point.

The City also asserts that Klipfel would not have suffered economic losses if she had retired in 1996, "like she had stated her plans were to the adoption agency." The City's citation to the transcript only references Miedzianowski's counsel's cross-examination of Stan Smith, the plaintiffs' economics expert, in which counsel asks Smith whether Klipfel ever told him about an intended 1996 retire date. Smith responded that "no," Klipfel had not told him that. Tr. 2562.

Notwithstanding the fact that the City fails to cite to the record where evidence about a 1996 retire date was properly presented to the jury (rather than through the questioning of counsel during trial), the court still finds its unpersuasive. As noted by Miedzianowski's counsel just a few questions later in cross-examining Smith: "It's up to the trier of fact, I take it, though, to cut . . . off [the tables calculating lost wages and annuities] at whatever year they feel appropriate based on the testimony. You're not contesting that, are you?" Tr. 2563. Thus, assuming that Klipfel did make this representation to the adoption agency and this evidence was properly admitted at trial, it was up to the jury to decide what testimony it found credible and how that testimony affected her lost wages, assuming their conclusion has a basis in the evidence.

Miedzianowski, for his part, asserts that the court should not charge Miedzianowski with any lost wages for two reasons. First, Miedzianowski notes that Klipfel had available to her and "made use of [] a grievance procedure against her employer which adjudicated to her the wage loss she had suffered as a result of her employer's treatment of her." Unfortunately, Miedzianowski again fails to cite to the trial transcript in support, thus, the court cannot properly address this assertion. In any event, Miedzianowksi wholly fails to support this contention with any citation to authority. Second, he contends that there was no evidence that he could control or dictate the actions of Klipfel's colleagues. According to Miedzianowski, even though he may have made derogatory comments which may have caused Klipfel's colleagues to have a poor opinion of her, upon which opinion they acted, then her colleagues "had become wrong-doers in their own right." Miedzianowski asserts that there was no evidence adduced that he was acting as an agent of Klipel's colleagues. It is not clear whether this argument goes to the § 1983 and defamation claims or both but, in any event, it is misplaced. This argument ignores the jury

instruction which detailed the types of damages the jury could award to Klipfel if it found Miedzianowski liable for the § 1983 and defamation claims–an instruction that Miedzianowski did not challenge in a post-trial motion. Accordingly, the court rejects this ground for Miedzianowski's motion for remittitur.

The court finds a sufficient basis on which to conclude that at least $5.32 million of Klipfel's award has a rational connection to the evidence presented. This leaves approximately $2.43 million attributable to the "non-economic" pain and suffering/loss of a normal life portion of the award.

b. <u>Non-economic damages</u>

The plaintiffs point to a significant amount of testimony in support of the jury award as to Klipfel's non-economic damages. Klipfel testified that the day after Miedzianowski initially made threats against her, she called her supervisor and told him that Miedzianowski had threatened her, she felt that he would kill her that night and that she was in fear for her family.

According to Klipfel, she takes a number of drugs for depression and to assist in sleeping and has been seeing a psychiatrist regularly since 1994. There are weeks that she cannot get out of bed because of the medication she takes, her weight keeps going up and she is too tired to exercise, her mental state has deteriorated and every year it gets worse, and she avoids people because she felt that others look down on her. She stated that her neighbors at one point had heard she was a drug dealer. She also testified that she did not want to run into people so she just stayed in the house. The jury heard her testify that she and her family lived in state of constant fear and she was fearful that she would be arrested. She believed they had no future, no money and no job. Klipfel testified that she and her husband do not go out to dinner, that the false

allegations and threats affected her marriage and that she has not been able to work.

Klipfel's psychiatrist, Inna Dubinsky, testified that Klipfel's symptoms were similar to the symptoms of someone with post-traumatic stress disorder. Dr. Dubinsky testified that Klipfel had reported trouble sleeping, panic attacks, her concern for her own life and the lives of her children, her professional problems, her loss of friends and her subsequent desire to stay inside her house. Dr. Dubinsky's current diagnosis was of major recurrent chronic depression. She testified that Klipfel takes a "pretty big dose of antidepressants" and therefore she "could never try to stop it." Dr. Dubinsky further stated that Klipfel never had "full remission" from her depression because "she has never been free of all [her] problems." Dr. Dubinsky also testified that Klipfel is unable to hold a nine-to-five job.

The plaintiffs also offered the testimony of Dr. Frank Leavitt as their psychiatric expert. He stated that he tested Klipfel for feigning and found her to be reliable and credible. He further stated that she tested at an extreme level of depression and that less than one person in a thousand would score in the same range. The jury heard Dr. Leavitt testify that Klipfel suffers from major depression, a mood disorder that can negatively affect one's energy level and appetite, as well as one's concentration, memory and self-esteem. Dr. Leavitt also diagnosed Klipfel with post-traumatic stress disorder and that she would require medication in order to function. Neither the City nor Miedzianowski presented rebuttal testimony from their own psychiatric experts, despite the fact that the court denied the plaintiffs' motion in limine to exclude the City's expert, Dr. Jaffe. Dr. Jaffe had examined both Klipfel and Casali and produced extensive reports on each, but these were not presented to the jury.

In her professional life, Klipfel further testified that she and her husband, Michael Casali,

while still at ATF, were assigned to work from a storage closet, were called names by their colleagues and were generally ostracized. Coworkers threw garbage in her and Casali's mailbox and would pass gas at their door. If Klipfel received a phone call, she would be told "C--t, the call is for you." Klipfel testified that she developed a series of panic attacks that caused her to seek medical help and she "just felt like the ceiling was coming in."

Klipfel also testified about the financial strain caused by having to maintain two households and hire lawyers to defend themselves of the charges brought by the Chicago Police Department.

As to her children, they were ridiculed in school and Klipfel had to move them out of state away from their father, Michael Casali, several times, at one point for a period of two years. Their daughter was very fearful and developed bleeding ulcers. Klipfel stated that the City's conduct robbed her family of time together, as well as time to enjoy her children and that she feels guilty for that.

Importantly, the defendants offered no rebuttal expert testimony to that of Drs. Dubinsky and Leavitt. Based on all of the above, the court finds that the non-economic damage award to Diane Klipfel has a rational basis in the evidence as described above.[4]

The court finds Miedzianowski's arguments to the contrary unpersuasive. Miedzianowski emphasizes what he perceives to be weaknesses in Klipfel's evidence of emotional distress. For example, he states that Klipfel testified that her children were struggling

---

[4]The court notes that in its reply brief, the City appears to abandon any reliance an its argument that the verdict had no rational basis in the evidence or that it was monstrously excessive. Instead, the City's reply brief addresses only the comparability issue, and then revisits the mitigation of damages issue and the "double recovery" issues which the court rejects below.

in school and were harmed socially and physically by the measures Klipfel had to take to protect them. However, he points to Klipfel's testimony that a 1995 adoption report found her and her husband, Casali, to have energetic personalities and that their children were happy, social, and charming.

He also notes that Dr. Dubinsky testified that Klipfel consistently denied suicidal thoughts and that Dr. Dubinsky could not recall whether Klipfel ever told her that Chicago police officers were watching her house and had threatened to kill her family. He further states that Dr. Dubinsky testified that she did not prescribe therapy for Klipfel after 1994, only medication. As to the suicide, this court is not willing to conclude that simply because Klipfel may not have wanted to kill herself, her emotional distress was insignificant. This is especially true in the absence of any expert testimony on the issue. Indeed, Dr. Dubinsky testified that patients do not always admit that they are having suicidal thoughts, but she did not think that Klipfel was suicidal. Tr. 2338, 2340. In any event, Klipfel did testify that "I got to the point that I felt like driving into – well, I drive to work in the morning, and I would think about crossing the center line and hitting something and thinking, you know, well, it would be over." Tr. 274. Regarding the therapy, Dr. Dubinsky, while acknowledging that she had no recollection of prescribing or recommending therapy for Klipfel, also stated: "I prescribed medications. I did mostly medication management. We had therapists who did therapy." Tr. 2313. She further elaborated as follows: "I didn't have to prescribe therapy. I told you, you know, she [Klipfel] started seeing the therapist before she started seeing me." Tr. 2314.

Moreover, the jury was able to determine the weight to attribute to both Klipfel and Dr. Dubinsky's testimony based on their demeanor as well the substance of their testimony,

including weaknesses raised during cross-examination. The court declines to second-guess this jury determination.

Miedzianowski further argues that plaintiffs' interpretation of Dr. Dubinsky's testimony is off-point. Specifically, Dr. Dubinsky stated that she did not know whether Klipfel would ever be able to stop taking psychotropic medications and had no idea if Klipfel would ever recover completely. The plaintiffs assert that this testimony by Dr. Dubinsky demonstrates the weakness of the defendants' position that Klipfel's injury was not as serious or ongoing as the jury award indicates. Miedzianowski contends that contrary to this interpretation, Dr. Dubinsky's statement that she had "no idea" if Klipfel would ever recover should be read as a lack of evidence on the plaintiffs part to satisfy their burden that Klipfel had a "permanent injury." As an initial matter, Klipfel did not have a burden to prove permanent injury. She was required to put forth evidence supporting their contention that she suffered emotional distress, which according to her was severe and lasting. It was from that evidence that the jury was to assign its award. Second, the court finds that it was up to the jurors to interpret the testimony. It is certainly not implausible to argue, as have the plaintiffs, that the jury could have construed that testimony to indicate that Klipfel's emotional injury was significant and enduring.

Miedzianowski argues that the award in favor of Klipfel was monstrously excessive because she only had one encounter in which Miedzianowski made threats against her and any physical contact was limited to Miedzianowski poking his finger in her chest on one occasion. However, "[a]n award for nonpecuniary loss can be supported, in certain circumstances, solely by a plaintiff's testimony about his or her emotional distress." *Tullis v. Townley Engineering & Manufacturing Co., Inc.*, 243 F.3d 1058, 1068 (7th Cir. 2001). Clearly, the evidence described

above demonstrates that Klipfel experienced a great deal of anxiety and stress, particularly where the safety of her own life and that of her children was concerned.  Moreover, while the actual physical contact was not extensive, the *threat* of such contact was extreme and not outside of the realm of possibility.  Indeed, the jury heard testimony from Jose Rivera that Miedzianowski solicited him to kill Klipfel and that Rivera did not follow through based solely on his own personal reasons.

Miedzianowski also asserts that Klipfel's emotional distress and pain and suffering were all job-related, and Miedzianowski did not have the ability to take any job-related actions against the plaintiffs.  Thus, apparently (though Miedzianowski fails to so state), none of the damages could be attributed to him (and presumably all fall at the door of the ATF).  But again, this argument goes to Miedzianowski's liability with respect to the claims at issue and is not properly raised on a motion for remittitur.

Miedzianowski also asserts that the evidence showed that the ATF had many reasons (other than Miedzianowski's accusations apparently) to "punish" and ostracize the plaintiffs.  Specifically, Miedzianowski contends that the "Plaintiffs had engaged in a series of whistle blowing against their bosses starting in 1992, leading to firings, job transfers, and a large amount of negative publicity against the ATF."  Miedzianowski also notes that the director of the bureau was quoted as saying that the plaintiffs were bad employees who deserved to be fired.  Again, Miedzianowski totally fails to connect this argument to any relevant factor this court must consider on a motion for remittitur and fails to cite to the trial transcript in his opening motion, apparently asking the court to rely on its memory of the testimony.  In any event, it is more than reasonable to assume that the jury considered these "outside stressors" in awarding damages,

particularly in light of the fact that the award was less than that requested by the plaintiffs.

2.    *Is Klipfel's award comparable to awards made in similar cases?*

Both the City and Miedzianowski assert that Klipfel's award is not comparable to other awards in "similar retaliation" cases.  As an initial matter, the court notes its confusion relating to the amount of damages as asserted by the City.  As noted above, in its opening brief, the City contends that as to Klipfel's First Amendment award of $7.75 million, the court should assume that the jury followed plaintiffs' counsel's advice and doubled the economic loss for emotional damages.  Under this scenario, with an award of $7.75 million, Klipfel received $3,875,000 for economic losses and $3,875,000 for non-economic losses.   However, in its reply brief, the City contends that Klipfel received a non-economic award of $5,115,000 out of $7.75 million total based on a purported "1/3 to 2/3 split."  The court will not attempt to reconcile the different approaches, but notes the difference for the record and has addressed only the half and half allocation initially asserted by the City as the City may not raise new arguments in its reply.

The court further notes that "awards in other cases provide a reference point that assists the court in assessing reasonableness, they do not establish a range beyond which awards are necessarily excessive."  *Deloughery v. City of Chicago*, 422 F.3d 611, 621 (7th Cir. 2005)(citation omitted).  As recently summarized by another judge in this district:

> The Seventh Circuit has emphasized that 'monstrously excessive' is not a talisman, the mere invocation of which automatically resolves questions of excessiveness. . . .The court has also cautioned against excessive and uncritical reliance on and comparisons with the amount of awards in other cases.  Although comparisons may provide a reference point that assists in the assessment of reasonableness, they do not inevitably establish a range beyond which awards are necessarily excessive.

*O'Sullivan v. City of Chicago*, 474 F.Supp. 2d 971 (N.D. Ill. 2007).  This court agrees with this

summary of Seventh Circuit guidance on the issue and, therefore, rejects out of hand the City's argument in its opening brief that based on the awards in two cases, *Spina v. Forest Preserve Dist. of Cook County*, 207 F.Supp.2d 764, 776 (N.D. Ill. 2002) and *Fleming v. County of Kane,* 898 F.2d 553, 560 (7th Cir. 1990), the court should reduce Klipfel's emotional damages award to an amount between $40,000 and $300,000.

In its reply, the City expands the number of cases in support of its argument that the award here is not comparable. *See Farfaras v. Citizen's Bank & Trust of Chicago,* 433 F.3d 558 (7th Cir. 2006); *Deloughery v. City of Chicago*, 422 F.3d 611, 616 (7th Cir. 2005); *Harvey v. Office of Banks & Real Estate*, 377 F.3d 698, 707 (7th Cir. 2004); *Tullis v. Townley Engineering & Manufacturing Co., Inc.*, 243 F.3d 1058, 1067-68 (7th Cir. 2001); *Fleming v. County of Kane,* 898 F.2d 553, 560 (7th Cir. 1990); *Spina v. Forest Preserve Dist. of Cook County*, 207 F.Supp.2d 764, 776 (N.D. Ill. 2002). Miedzianowski points to *Avitia v. Metropolitan Club of Chicago, Inc.*, 49 F.3d 1219, 1230 (7th Cir. 1995), *Cygnar v. City of Chicago*, 865 F.2d 827 (7th Cir. 1989), and *Bennett v. Smith*, No. 96 C 2422, 2000 WL 1849029 (N.D. Ill. 2000) as relevant similar cases.

The City's citation to *Spina v. Forest Preserve Dist. of Cook County*, 207 F.Supp.2d 764, 776 (N.D. Ill. 2002), in support of their motion for remittitur is, in this court's view, inapposite. In *Spina*, the court reduced the emotional damages from $3 million to $300,000. The facts are somewhat similar to the case at hand in that the plaintiff, a female police officer, was retaliated against by her coworkers for complaining of sexual harassment at work, including being berated and belittled, having her tires slashed while at work, having other officers refuse to back her up or cooperate with her, having inappropriate rumors spread about her, being held to a higher standard in terms of sick days and vacation requests, and being denied prestigious job

assignments.  *Id*. at 767.

Interestingly, the *Spina* jury awarded the plaintiff $3 million--an amount very close to the $2.43 million  awarded to Klipfel.  In this court's view, the fact that two different juries awarded similar amounts for what the City contends is roughly comparable conduct by the offenders dictates in favor of upholding the award, not reducing it.  The court acknowledges that the judge in *Spina* noted that emotional damages awards in the Seventh Circuit "typically fall within the range of $500 to $50,000 or more."  *Spina*, 207 F.Supp.2d at 773.  The trial court reduced the $3 million award to $300,000 because the harassment to which that plaintiff was exposed "was not, in and of itself, so extreme or outrageous as to shock the conscience," the plaintiff did not seek medical treatment or professional mental health counseling, and the harassment never interfered with her ability to do her job as a police officer.  *Id*. at 774.  The court also was seeking to fit the award into a spectrum of what it concluded was a range for such damages in the Seventh Circuit as one of the factors that a motion for remittitur requires.

But, as alluded to by the Seventh Circuit in cases noted above, the comparison to "roughly comparable" cases is by its very nature imprecise.  While the orders on post-trial motions in these other cases provide some background of the evidence presented and a general outline of the emotional distress suffered by the plaintiffs, they fail to offer any true insight into exactly what the jury found compelling or persuasive in any particular case.  *Tullis,* 243 F.3d at 1069 (a court must "take [] into account the jury's right to make awards based on its view of a witness's demeanor and credibility.").  *See also Lampley v. Onyx Acceptance Corp*., 340 F.3d 478, 485 (7th Cir. 2003)("A court should not substitute a jury's damages verdict with its own figure merely because a case with similar facts has not yet arisen, or because a plaintiff in a

similar case was perhaps not able to plead his facts to the jury well.").  As noted in *O'Sullivan*, it

is historically the jury's province to make credibility determinations.  *O'Sullivan*, 474 F.Supp.2d

at 987-88.  If the jury is bound by a range, then perhaps it should be made aware of it.

*Jutzi-Johnson v. U.S.*, 263 F.3d 753, 759 (7th Cir. 2001)("To minimize the arbitrary variance in

awards bound to result from such a throw-up-the-hands approach, the trier of fact should, as is

done routinely in England, J. Munkman, *Damages for Personal Injury and Death* 162-63 (7th

ed.1985); Law Commission, supra, at 19-22, be informed of the amounts of pain and suffering

damages awarded in similar cases.")(citations omitted).  Ultimately, this court agrees with a

fellow court's assessment of reviewing jury verdicts:

> [N]umerical tabulations and exercises of judicial discretion are vastly different
> endeavors, and thus, simply noting the results of cases is not enough under any
> calculus.  If courts are to do more than pay lip service to the Constitutional
> prerogatives of juries, there must be some allowances for the inevitable variances
> in jury assessments of evidence and ultimate damage awards.  Unless the award is
> monstrously excessive and so beyond the pale as to make a mockery of the
> concept of discretionary judgments, it ought to be sustained.

*O'Sullivan*, 474 F.Supp.2d at 990.

The court is especially hesitant to invade on the province of the jury when the defendants

did little to nothing to place limits on the amount of emotional damages the jury might have

awarded.  Admittedly, the defendants cross-examined the plaintiffs in order to point out

weaknesses in their testimony, but one can assume that the jurors took any weaknesses into

account in coming up with its emotional damage award.  Indeed, the jury awarded significantly

less than the amounts requested by the plaintiffs.  Moreover, the City failed to call its psychiatric

expert, Dr. Jaffe, to rebut the testimony of the plaintiffs' treating and expert mental health

professionals despite the court ruling that the testimony was admissible.  Nor did Miedzianowski

indicate at any time that he had any rebuttal testimony on the issue.  The lack of any contrary evidence left the jury with only the amounts suggested by the plaintiffs, viewed against a background composed of evidence of extraordinarily severe conduct.  As stated by the Seventh Circuit,

> When a defendant goes for broke, staking its all on convincing the jury to award zero damages-fearing otherwise a compromise verdict-it risks being hit with a verdict much larger than if it had offered the jury an alternative estimate of damages to the plaintiffs. It should not expect the appellate court to relieve it from the consequences of its gamble.

*Avitia v. Metropolitan Club of Chicago, Inc.*, 49 F.3d 1219, 1230 (7th Cir. 1995).

Nevertheless, despite its reluctance to impose on what is generally a jury function, the court is obligated under the law as stated by the Seventh Circuit to look at "similar cases" in order to determine whether remittitur is required.  The court has reviewed the cases cited by the defendants and finds none contain facts on all fours with the instant case.  Moreover, to the extent that the cases cited by the defendants are Title VII cases, the damage awards are subject to a statutory damage cap.  *See* 42 U.S.C. § 1981a(b)(3).  Thus, their applicability is limited in that respect.

The plaintiff in *Spina*, whose $3 million award was remitted to $300,000, suffered anguish but remained at her job, did not seek mental health treatment and her expert witness opined that she does not need such treatment.  In *Deloughery*, the Seventh Circuit affirmed a remitted award of $175,000 for emotional damages for Title VII discrimination and First Amendment retaliation claims.  *Deloughery*, 422 F.3d at 611 620-21.  As with *Spina*, the plaintiff in *Deloughery* had not sought mental health treatment though she testified that she was "devastated" by not being promoted to captain.   In *Farfaras*, 433 F.3d at 563-64, the plaintiff

was awarded $200,000 for emotional distress damages where she "lost self-esteem, gained weight, had problems sleeping, changed demeanor, and became nervous . . . [but] never consulted a medical professional about her unhappiness." In *Harvey*, the Seventh Circuit affirmed jury verdicts between $50,000 and $150,000 for two plaintiffs who were successful on their discrimination and employment retaliation claims. *Harvey*, 377 F.3d at 714. The plaintiffs testified to "stomach problems" and other physical problems associated with the discriminatory and retaliatory conduct, depression for which at least one sought counseling, frustration, stress, high blood pressure, and humiliation. *Id.*

In *Tullis*, the Seventh Circuit affirmed the denial of a motion for remittitur where the plaintiff, who sued for retaliatory discharge, was awarded approximately $80,000 for non-pecuniary loss. The plaintiff testified that he felt "low", "degraded" and "back-stabbed", that he suffered financial difficulties as a result of having been out of work which affected his personal life, and his new job forced him to be away from his family. In *Fleming v. County of Kane*, 898 F.2d 553, 561-62 (7th Cir.1990), the court affirmed a reduction of emotional distress damages from $80,000 to $40,000 where plaintiff was discharged for whistle-blowing and consequently suffered embarrassment, humiliation, depression, serious headaches, and sleeplessness. In *Avitia*, the Seventh Circuit remitted a $21,000 emotional distress award to $10,500 for a waiter/banquet captain who was fired after thirteen years' employment in retaliation for asserting his right to overtime and who testified that he cried when he was fired, felt like the Sears Tower was falling on him, and felt "thrown like a piece of paper, piece of garbage. . . ." *Avitia*, 49 F.3d at 1227-29. In *Cygnar*, the Seventh Circuit agreed that a jury award of $55,000 to each of thirteen police officers who was transferred (not fired) was excessive and affirmed a remittitur to

$15,000. *Cygnar*, 865 F.2d at 847-48. And in *Bennett*, the court remitted a $240,000 emotional distress award to a plaintiff, successful on her race discrimination claim, who testified that the harmful conduct "affected her self-esteem and caused her stress" and that "she suffered from headaches, vomiting, and abdominal pain" to $45,000. *Bennett*, 96 C 2422, 2000 WL 1849029, at * 8.

Finally, in *O'Sullivan*, the magistrate judge denied a motion to remit a $250,000 jury award for a police officer who brought discrimination and retaliation claims as to which:

> The evidence demonstrated an insensate pattern of retaliation that was intended to humiliate and degrade Lipman on a daily basis in the most fundamental aspects of her job and to destroy her career by making any advancement virtually impossible. The distress that she suffered--and that the jury could find the City intended she suffer--was unremitting to the day of the trial and beyond. This was not the kind of ordinary distress that is inherent to some degree in every retaliatory employment action. There is a profound difference in the emotional anguish suffered over the loss of a job for which there is a ready replacement--and that suffered from having one's career as a sworn police officer stultified.

*O'Sullivan*, 474 F.Supp.2d at 985. The relevant plaintiff in *O'Sullivan*, Lipman, suffered "severe and unremitting anxiety . . . . headaches, nausea, and bruxism," she lost weight, her face broke out, she had difficulty eating and sleeping, she withdrew from her family and social life, and she would cry before and after work. *Id*. at 985-86. The trial judge stated that "[t]he record [in this case] can be read as the story of a highly motivated female police officer . . .being frustrated in her quest for greater responsibility simply because she had asserted her right to be free from discrimination." *Id*. at 988 (citation and internal quotation marks omitted)(alteration in *O'Sullivan*).

The court finds the emotional distress suffered by most of the plaintiffs described above to be less extreme than that suffered by Klipfel. Indeed, several of the plaintiffs in the cases cited

by the City did not seek mental health treatment while Klipfel has been seeing a psychiatrist for 14 years.[5]   Of all of the above cases, the emotional distress suffered by Lipman appears to be most similar to that suffered by Klipfel, except for one important difference–Lipman did not experience the additional stress and worry accompanying threats to one's physical safety and that of one's family.  Klipfel's life and that of her family had been threatened and Jose Rivera testified that he had been hired to murder Klipfel.  In response to these threats, Klipfel was required to move her children away from their home and their father for months (and at one point, for two years) on end in order to ensure the family's safety.  The Seventh Circuit has acknowledged that threats of physical injury can support a higher award than otherwise might be deemed reasonable.  *Neal v. Honeywell*, 191 F.3d 827 (7th Cir. 1999)(affirming remitted emotional distress award of $200,000 where whistleblower plaintiff suffered not only "ostracism, a year-long depression, and upheaval in her life," but also received "out of the ordinary" threats of physical injury which the defendant-company implicitly acknowledged could be based in reality).

The defendants' conduct in the instant case clearly wrought years of untold stress, anxiety, social and family alienation, fear, and humiliation on Klipfel.  She has been housebound, is unable to work, and will likely be on psychotropic medication for the rest of her life due to the defendants' behavior.  Based on its careful consideration of the evidence presented as to Klipfel's emotional distress, and in particular the effect that the real threats on her and her family's lives

---

[5]The court acknowledges that seeking mental health treatment is not a prerequisite to receiving emotional distress damages.

had on her, the court concludes that an award of $1,000,000 is reasonable.[6]

The court recognizes that this amount exceeds any amount in cases set forth by the defendants in Seventh Circuit cases. However, the court views this case as an outlier. The facts of the misconduct in this case and the resulting distress are extreme. The very real threats to Klipfel and her family's physical safety take this case beyond the range in other cases cited by the defendant.

Moreover, the court is not bound exclusively by the decisions of this circuit. *Naeem v. McKesson Drug Co.*, 444 F.3d 593 (7th Cir. 2006)(the federal standard for reviewing compensatory damage awards includes comparing the award at issue "to other plaintiffs in other cases in the Seventh Circuit and other federal courts around the nation"). In *Passatino v. Johnson & Johnson Consumer Prod., Inc.*, 212 F.3d 493, 503, 513-14 (9th Cir. 2000), the court affirmed a $1 million emotional distress award for a sexual harassment plaintiff who "worried, cried, and felt trapped and upset," spent less time with her family, suffered stomach problems, rashes and headaches, and sought counseling with a pastor. Further, in *Wilmington v. J.I. Case Co.*, 793 F.2d 909, 922 (8th Cir. 1986), the court affirmed a $400,000 award to a plaintiff who showed "a deterioration in his health, mental anxiety, humiliation, and emotional distress resulting from the conditions under which he worked . . . and from his discharge." A $400,000 award in 1986 (over 20 years ago), has the same buying power in 2007 as $758,937.96, according to the CPI Inflation Calculator at http://www.bls.gov/cpi.

In addition, to the extent that any of the above cases are similar enough that they may be

---

[6]The court notes that while the defendants refer to other sources of stress in Klipfel's life that may have contributed to her emotional distress during this time, each fails to cite to the record in support. Thus, the court did not consider this argument.

deemed "roughly comparable" to Klipfel's situation, "[t]here is no rule that the highest reported verdict [or settlement] that can be found sets the cap for future awards." *Deloughery*, 02 C 2722, 2004 WL 1125897, at *7 (N.D. Ill. May 20, 2004), *aff'd* 422 F.3d 611 (7ᵗʰ Cir. 2005). Indeed, "it is problematic to determine reasonableness of an award based on comparisons to other cases because the reported cases are 'but a fraction, and maybe a small fraction, of the universe of jury awards; many cases are not appealed at all, and many others are settled post-verdict.'" *Paper Converting Machine Co., v. Handi-Foil Corp.*, No. 02 C 4054, 2005 WL 2007144, at *3 (N.D. Ill. Aug. 12, 2005)(*quoting Deloughery*, No. 02 C 1125897, 2004 WL 1125897 at *5).

And, as already noted, the other cases cited by the defendants are not entirely comparable in the degree and length of emotional distress suffered by Klipfel, thus they are of only limited relevance. *Deloughery v. City of Chicago*, 422 F.3d at 621 ("'[a]wards in other cases provide a reference point that assists the court in assessing reasonableness['] they do not establish a range beyond which awards are necessarily excessive'")(citation omitted).

B.    <u>Michael Casali</u>

As noted above, the jury awarded $1 million to Casali as to his § 1983 claim against Miedzianowski. According to the City, the award should be allocated 50% to economic damages and 50% to emotional distress damages, again based on the argument described above by plaintiffs' counsel in her closing argument.

As to the $500,000 it attributes to economic loss, the City argues that because Casali presented no credible evidence that he would have been promoted to a higher supervisory position, "it was mere speculation on the part of the jury that plaintiff Casali suffered any economic loss by virtue of the conduct of defendant Miedzianowski." Motion at 6. Therefore, it

asserts that the damages award on economic losses cannot be supported by the evidence and must be overturned. As to the non-economic damages, the City relies, as it did with Klipfel, on the argument that it is not in the "proper range" of $40,000 and $300,000. According to the City, his $500,000 non-economic award (as they see it) award should be remitted because: (1) Miedzianowski's conduct towards Casali was less severe than to Klipfel; (2) Casali remained employed and so did not suffer any emotional damages from being unemployed; and (3) his mental health treatment consisted solely of medication and no counseling.

The court notes that the City's reply brief contains no specific argument with respect to Casali's damages, either economic or non-economic. Nor has either side, from what the court can tell, provided the court with the actual expert reports issued by the economics experts, Drs. Smith (for Casali) or Dr. Donley (for the City). Thus, the court has only the transcript on which to address this issue.

In the interest of consistency and because it seems reasonable to this court to do so, it assumes that the jury awarded damages in the first instance based on some portion of the economic loss numbers as testified to by Dr. Smith, the plaintiffs' economic expert. He calculated Casali's "diminished" earnings (for wages and benefits) at approximately $1.8 million. Tr. 2552. Without seeing the actual report, it appears from the transcript that Dr. Smith took what he estimates Casali could have earned and subtracted what he actually did earn, which leads to the "diminished" earnings amount. Tr. 2548. The City argues that Casali presented no credible evidence that he would have been promoted to a higher supervisory position (if Miedzianowski had not engaged in the misconduct for which he was found liable), and therefore, he should be awarded no economic benefits. In other words, the City contends that because

Casali presented no evidence that he would have done any better than he did, he has no damages.

But Dr. Smith indicated that his calculations were based not only on his interviews with the plaintiffs about their anticipated career progression but also their "past track records," and information from a government website about how quickly a government employee moves up the pay scale. Tr. 2588. The jury was permitted to credit Dr. Smith's testimony and the City points to nothing undermining Casali's position (communicated to Dr. Smith) that he would have proceeded along a certain career path were it not for Miedzianowski. Moreover, given that the jury did not award the full amount of "diminished earnings" of $1.8 million as calculated by Dr. Smith, it is certainly reasonable to assume that the jury discounted Dr. Smith's estimate based on weaknesses in Casali's testimony, effective cross-examination of Dr. Smith by the defendants or statements made by the rebuttal expert, Dr. Donley. The court further notes that with respect to Dr. Donley, he testified about errors he had made in his initial calculations and thus, it is reasonable to assume that the jury did not credit his testimony.

Because the court concludes that there was sufficient evidence to support the award of $1 million, it need not address the defendants' arguments as to the purported non-economic portion of Casali's damages.

C.    Windfall Argument

The City, without citing to any authority, argues in this section of its brief that Klipfel should not be allowed to recover for both her § 1983 claim as well as her defamation claim. According to the City, Klipfel's injuries "were fully compensated by the damages award on the federal retaliation claim." City's Motion for Remittitur, dkt. #454, at 2. The court notes that even in its reply, the City fails to support this argument with: (1) any relevant citations to

authority; (2) any discussion of the elements of the causes of action; or (3) any discussion of the specific evidence that would support this argument. As such, this court deems the argument forfeited. *Davis v. Carter*, 452 F.3d 686 (7th Cir. 2006)(The Seventh Circuit has "'repeatedly recognized that perfunctory and undeveloped arguments, that are not supported by pertinent authority, are waived.'" )(citation omitted). This court is not in the business of making the parties' arguments for them including sifting through the record to find relevant citations.

D.    Failure to Mitigate

The City also argues for the first time that Klipfel failed to mitigate her damages. In *Farfaras v. Citizens Bank and Trust*, 433 F.3d 558, 568 (7th Cir. 2006), the defendant raised for the first time post-trial that the plaintiff had failed to mitigate her defenses. "When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings." *Id.* (quoting Fed. R. Civ. P. 15(b)).

As noted by the *Farfaras* court:

> The key factor in determining whether the pleadings have been amended is whether the issue has been tried with the express or implied consent of the parties. The test for such consent is "whether the opposing party had a fair opportunity to defend and whether he could have presented additional evidence had he known sooner the substance of the amendment." One sign of implied consent is that issues not raised by the pleadings are presented and argued without proper objection by opposing counsel.

*Id.* at 568 (citations omitted). The *Farfaras* court affirmed the district court's conclusion that the defendant had waived its mitigation of damages argument by not raising it at trial. *Id.* The Seventh Circuit agreed with the district court's rejection of the defendant's argument that the plaintiff implied consent to amend the answer with a failure to mitigate when her counsel failed to object to cross-examination questions to the plaintiff regarding the timing of her work.

Here, the City wholly fails to address the plaintiffs' citation to *Farfaras* and merely contends that Klipfel "cannot run from the fact that she had a duty to mitigate her damages." Reply at 5 (Dkt. # 495). Because the City fails to cite to any part of the trial transcript in which Klipfel expressly or impliedly consented to amending the City's answer to include a failure to mitigate affirmative defense, the City's argument with respect to the failure to mitigate is rejected.

## II.    Conclusion

The defendants' motions for remittitur are granted in part. Unless plaintiff Klipfel advises the court on or before August 27, 2007, that she accepts a reduction of the compensatory damage award on her § 1983 claim to $6,328,000, the court will grant the defendants' motion for a new trial – any new trial will be limited to the issue of compensatory damages. The court notes that if Klipfel accepts the remitted amount, she cannot challenge the remittitur on appeal. *See Republic Tobacco Co. v. North Atlantic Trading Co.*, 381 F.3d 717, 739 (7th Cir. 2004)("An order that offers a choice between a remitted award and a new trial is not a final decision, and if a plaintiff agrees to accept the reduced judgment in the trial court, that plaintiff may not later argue that the jury's verdict should be reisntated on appeal."). The remainder of the motions for remittitur are denied.

**DATE:**   August 14, 2007

_____
**Blanche M. Manning**
**United States District Judge**